JUDGE ABRAMS     14 CV 1056

Richard S. Busch (SB 5613)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone:  (615) 259-3456
Facsimile:  (615) 726-541

Kenneth E. Gordon (KG 5703)
GORDON, GORDON & SCHNAPP, P.C.
437 Madison Avenue, 39th Floor
New York, New York 10022
Telephone:  (212) 355-3200
Facsimile:  (212) 355-3292

Attorneys for Plaintiff



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **19 RECORDINGS LIMITED** | ) | |
| | ) | Case No._____ |
| **Plaintiff,** | ) | |
| **v.** | ) | **COMPLAINT FOR BREACH OF** |
| | ) | **CONTRACT; and, BREACH OF THE** |
| **SONY MUSIC ENTERTAINMENT,** | ) | **IMPLIED DUTY OF GOOD FAITH AND** |
| | ) | **FAIR DEALING** |
| | ) | |
| **Defendant.** | ) | **DEMAND FOR JURY TRIAL** |

Plaintiff 19 Recordings Limited ("19"), by and through its attorneys, for its Complaint against the Defendant named above alleges as follows:

### Parties

1.      Plaintiff 19 is a corporation organized under the law of England and Wales with its principal place of business in California.

2.     Defendant Sony Music Entertainment ("Sony") is successor-in-interest to the RCA Music Group, a unit of Sony BMG Entertainment (Sony and its predecessors are referred to as "Sony" herein).   Sony is a Delaware General Partnership, whose partners are citizens of Delaware and New York.  Sony's principal place of business is located at 550 Madison Avenue, New York, NY 10022.

### Jurisdiction and Venue

3.     The Court has jurisdiction over this case pursuant to 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00 exclusive of interests and costs.

4.     Jurisdiction over Defendant is proper in this Court on the following grounds: (a) Defendant transacts business in the State of New York; (b) Defendant's wrongful conduct, alleged herein, occurred in the State of New York; and (c) the parties agreed that any dispute over the contracts at issue herein would be filed in New York.

5.     Venue is proper in this District pursuant to 28 U.S.C. §1391(c).

### Factual Background

6.     19's affiliated company brought *American Idol*, the premier televised American talent competition, to the United States.  *American Idol* first aired in June 2002 and has completed twelve seasons. For eight consecutive years, it was the number one television show in the United States.  *American Idol* has served to make dozens of individual artists household names.   As part of the *American Idol* competition, 19 signed the contestants to exclusive recording agreements and, as described below, entered into licensing agreements with Defendant for the winners of the competition and certain other finalists, which permitted the Defendant to

exploit these artists' recorded work and reap millions of dollars in profits. Artists launching their careers from *American Idol* have collectively, to date, achieved over 400 Billboard "No. 1s."

7.      In 2002, Kelly Clarkson became the winner of the inaugural season of *American Idol*. Clarkson's debut single topped the Billboard Hot 100 Singles chart and she went on to become one of the best selling artists of the decade. She is a three time Grammy Award winner and has countless other accolades over her career. Clarkson has sold over 20 million albums in the United States alone and has achieved 54 Billboard "No. 1s." The title Track of her most recent studio album, *Stronger*, has sold over 5 million downloads. Clarkson's duet with Jason Aldean, "Don't You Wanna Stay," is the best selling country collaboration in history.

8.      Clay Aiken is a singer, songwriter, television personality, and author. Mr. Aiken placed second on the second season of *American Idol*. In 2003, Aiken's debut album sold more than 600,000 copies in its first week. This was the highest-selling debut for a solo artist in a decade.

9.      Carrie Underwood is an American country music singer, songwriter and actress. She is the winner of the fourth season of *American Idol*. She is a multi-platinum selling artist and winner of six Grammy Awards, Billboard Music Awards, American Music Awards, CMA Awards, CMT Music Awards, and Academy of Country Music Awards. Underwood is among the most popular artists in any genre. She is one of the few country artists to ever debut at "number one" on Billboard's Top 200 Albums chart and her unprecedented string of hits has landed her in the Guinness Book of World Records. Underwood has sold over 15 million albums in the United States and is the best selling album artist of the past ten years.

10.     Chris Daughtry was the fourth place contestant on the fifth season of *American Idol*. Chris Daughtry, along with Josh Steely, Brian Craddock, Elvio Fernandes, Josh Paul and

Robin Diaz, comprise the American rock band, Daughtry. Daughtry's post-*American Idol* career was a meteoric rise to the top of the music industry. Daughtry has sold more than 50 million digital downloads worldwide and draws large audiences wherever he plays. Daughtry's debut album was the fastest-selling debut rock album in Soundscan history. Both Daughtry's first and second albums were "No. 1s." Daughtry has sold 8 million albums in the United States with its first album staying in the United States Top 200 Albums chart for a total of 320 weeks.

11.     Kellie Pickler is a country music artist and television personality. Ms. Pickler was a contestant on *American Idol* and finished in sixth place during the fifth season. In addition to achieving a "gold" record album in the United States, Pickler was the winner of the 16th season of *Dancing with the Stars*. Her first album sold over 800,000 copies. She also scored a top 10 single dueting with her friend, Taylor Swift. Pickler has also performed at some of the world's largest events, including the 2012 World Series.

12.     Jordin Sparks is a singer, songwriter and actress. At age seventeen, she became the winner of the sixth season of *American Idol*. Ms. Sparks was nominated for a Grammy Award and has won numerous awards including a BET Award, American Music Award, Teen Choice Award and People's Choice Award. Sparks has returned to perform on *American Idol* seven times after her win on that program. Sparks has a broad appeal, appearing everywhere from Broadway to the Super Bowl. She co-starred in the film, *Sparkle*, alongside Whitney Houston, in Houston's final movie role.

13.     David Archuleta is a singer and songwriter. At age sixteen, he was one of the youngest contestants on *American Idol* and won the second place title on *American Idol*'s seventh season. Archuleta's first single debuted at number 2 on the Billboard Hot 100 Singles chart. Forbes named Archuleta as a Breakout Star of 2008.

14.     David Cook is a rock singer and songwriter and is the winner of the seventh season of *American Idol*. Cook's debut album has been certified as a "platinum seller." The week after Cook won *American Idol* he broke the previous record by having eleven songs debut in the Billboard Hot 100 Singles chart. During that single week, Cook had combined sales of more than one million downloads.

15.     Kelly Clarkson, Clay Aiken, Carrie Underwood, Chris Daughtry, Kellie Pickler, Jordin Sparks, David Archuleta and David Cook, collectively referred to herein as the "Artists," each entered into individual exclusive artist recording agreements with 19 as part of their respective participations in the *American Idol* competition.

16.     Beginning on September 25, 2002, 19 and Sony entered into a series of exclusive license agreements (individually and collectively referred to, as each may have been amended, the "Recording Agreement," and the "Recording Agreements," respectively), with the first such Recording Agreement having an effective date of September 4, 2002 for the recordings of Kelly Clarkson (the paragraph references in this Complaint refer to paragraph numbers in this first Recording Agreement; the subsequent Recording Agreements contain the same or substantially the same language discussed herein, but in some limited instances may have different paragraph numbering). Through the Recording Agreements, 19 granted to Sony the exclusive right to manufacture, advertise, promote, distribute, sell, and otherwise exploit, and to license such rights to others, the individual recordings of the Artists in all configurations throughout the world.

17.     Pursuant to and during the terms of the Recording Agreements, 19 caused each applicable Artist's master recordings of musical performances (collectively the "Masters") to be produced, recorded, and delivered to Sony.

18.     The Masters included some of the biggest hits of the 21st Century and each year one or more of the Artists were among the most prominent recording artists on Sony's roster. For instance, the Artists' Masters include: Kelly Clarkson's "Since U Been Gone," which achieved "double platinum" status and remained in the "top ten" of the Billboard Hot 100 Singles chart for twenty weeks in 2005, peaking at number two. The song appeared on Kelly Clarkson's hit album *Breakaway*, which solely consisted of Masters recorded pursuant to her Recording Agreement and sold over 15 million copies worldwide, including more than 6 million copies in the United States alone.   The Masters also include Carrie Underwood's incredible string of 18 "#1" hit "singles" from "Jesus, Take the Wheel" to her latest, "See You Again." Jordin Sparks also added significant notoriety to the Masters, including "No Air" which sold more than three million copies in the United States and led to Sparks being nominated for a Grammy.   Further, the video for "No Air" won a BET Award.   The Masters also include Daughtry's first single "It's Not Over," which reached number 4 on the Billboard Hot 100 Singles chart and sold more than 2,000,000 copies.  The success of "It's Not Over" as well as other Masters included on Daughtry's self-titled debut album, helped make *Daughtry* the first debut album in the history of Soundscan to stay in the Billboard Top 200 Albums chart for more than 135 weeks.

19.     In consideration of 19's performance under the Recording Agreements, Sony agreed to account to and pay 19 under a certain royalty structure set forth in detail therein.  In order to ensure Sony correctly accounted to and paid 19 under the Recording Agreements, Paragraph 17.4 of each Recording Agreement gave 19 the explicit right to inspect Sony's books and records through an audit procedure.  Specifically, Sony agreed to allow 19 to "inspect

examine and otherwise audit [Sony's] books and records for the purposes of determining the accuracy of [Sony's] statements to [19] hereunder."

20.     Pursuant to its audit rights under the Recording Agreements, 19, utilizing two accounting firms, performed audits of Sony's books and records regarding Sony's accountings and payment to 19 with respect to sales and other exploitations by Sony of the Artists' Masters during specified accounting periods for each Artist.

21.     Haber Corporation is a highly experienced music industry accounting and auditing firm and performed an audit with respect to Carrie Underwood.

22.     Audits were performed by Miller Kaplan Arase LLP, also a highly experienced accounting and auditing firm, with respect to the remaining Artists.

23.     The individual audits for the respective Artists concerned and for the respective accounting periods concerned are collectively referred to herein as "the Audits."

24.     The Audits revealed a wide array of underpayments by Sony, including systematically incorrect calculations, which resulted in significant underpayments. Each specific underpayment found in each of the Audits was quantified into a claim, where possible, and these claims and potential claims (when Sony provided insufficient materials from their books and records on which to base and/or quantify a claim) were then provided to Sony through a series of audit reports. These claims gave Sony notice of its specific breaches and they, together with the potential claims, are incorporated by reference herein.

25.     The claims revealed by the Audits were overarching, with many of the breaches giving rise to the underpayments being the same or similar for each of the Artists' respective accounts. Other breaches were unique to one or more given Artists.

26.    The claims and potential claims revealed by the Audits are ongoing and continue into the post-Audit periods.  Pursuant to paragraph 17.3 of the Recording Agreements, before challenging Sony's accountings, 19 must notify Sony in writing of its objections to any royalty statement.  On January 8, 2014, 19 sent Sony written correspondence specifically objecting to all "accountings rendered and all payments made" relating to Kelly Clarkson, Carrie Underwood, and Chris Daughtry up to and including the royalty period ending June 30, 2013.  As a result, this action also includes claims and damages through the royalty period June 30, 2013.

27.    Despite Sony's systemic underpayments to 19, 19 attempted on several occasions to settle its claims with Sony.

28.    During the course of the negotiations, on August 14, 2012, the parties entered into a tolling agreement (the "Tolling Agreement").  That Tolling Agreement, *inter alia*, stopped the running of the contractual and statutory limitations periods that would otherwise continue and conceded that certain claims, that might arguably be barred, were nevertheless timely.  Under the terms of the Tolling Agreement, one party could terminate the Tolling Agreement and cause the applicable limitations periods to resume running by providing 120 days prior notice to the other party.  That Tolling Agreement, by reason of 19's exercise of such right of termination and the expiration of such 120 day notice period (as extended by the parties), is set to expire February 21, 2014.

29.    The Audits have been ongoing since 2008 and the delay in resolving this matter has caused significant additional financial losses to 19.  Despite 19's best efforts, Sony has refused to correct its underpayments to 19 and has forced 19 to file the instant suit in order to recoup the amounts Sony has underpaid 19 as well as recover any additional damages such underpayments have caused 19. For example, 19 is entitled to prejudgment interest at a rate of

9% pursuant to CPLR § 5004.  The prejudgment interest 19 is entitled to alone is in excess of three million dollars.

30.    Part of the reason the parties have been unable to settle the Audits is due to Sony's refusal to allow 19's auditors access to all the necessary books and records of Sony needed to be reviewed in order for the auditors to calculate all the potential claims.  This refusal itself is a breach of the Recording Agreements, as the Recording Agreements give broad audit rights to 19.

31.    Despite Sony's failure to provide all this necessary and relevant documentation and information, 19 has nevertheless been able to determine a number of ways in which Sony has breached the Recording Agreements and underpaid royalties due, but many more breaches and underpayments would likely be found if 19 and its auditors were given full access to Sony's book and records as the Recording Agreements expressly provide.

### Underpayment of Streaming Royalties

32.    The Audits revealed that Sony failed to properly account to and pay 19 for Masters licensed to third party streaming services (i.e., third party services that license the Masters from Sony and broadcast or "stream" them over the Internet to end users) by wrongfully stating that the underlying licenses between Sony and their third-party streaming providers describe or characterize the streaming services' exploitation as "sales" or "distributions" rather than as "broadcasts" or "transmissions" (e.g., streams).  It was the intent of the parties that 19 would be entitled to 50% of Sony's net receipts for non permanent streaming, which is conducted by broadcasts or transmissions by streaming services to end users, but would receive a lower royalty rate for permanent downloads.

33.     Specifically, Paragraph 7.16 of the Recording Agreements provides for two different potential royalty rates for "Internet Radio Services or any other kind of streaming service not specifically provided for above."  The royalty rate is either 50% of Company's [Sony's] Receipts if the "license or other agreement pursuant to which moneys are received by [Sony] describes or characterizes the exploitation [by the streaming services] as [a] 'broadcast' or 'transmission'" or the lower Album rate times Company's [Sony's] Receipts if the exploitation is described or characterized as "distribution" or "sale." In clarification of the foregoing, the "exploitation" referenced above is the transaction between the streaming provider and the end user.

34.     Sony has entered into agreements with a variety of streaming services.  All streaming services exploit the Masters provided them by Sony by broadcasting or otherwise transmitting non-permanent copies of the Masters to end users so that those end users may listen to the Masters in accordance with the terms of the applicable agreements between the streaming services and the end users. Such exploitation can only be fairly described as "transmissions" or "broadcasts," and, upon information and belief, are so described in the licenses or other agreements between Sony and the streaming services. However, Sony has nevertheless accounted to 19 for all streaming income received at the lower Album rate as if the exploitation between the streaming service and the end user was described as a "distribution" or "sale" and, by so doing, Sony has breached the Recording Agreements.

35.     Sony has failed to provide 19 with the full versions of the requested underlying licenses or other agreements between Sony and the streaming services.  Instead, Sony attempted to mislead 19's auditors with highly redacted portions of the agreements to allegedly support their mischaracterization of the services' exploitations.

36.     Even if it were to turn out the underlying licenses or other agreements between Sony and the streaming services do not describe the exploitation as a "broadcast" or "transmission," that is true only because the agreements have been purposefully drafted or edited by Sony in a manner which mischaracterizes the services' exploitations.

37.     As a matter of law, the underlying agreements between Sony and the streaming services are licenses which allow the streaming services to "broadcast" or provide a "transmission" of the Masters over the Internet to end users; therefore, if the licenses do not describe the exploitation of the Masters by the streaming services as a "broadcast" or "transmission" to the end user, Sony breached its duty of good faith and fair dealing. The only reason the licenses between Sony and the streaming services would misconstrue the parties' relationship and the nature of the exploitation of the Masters by the streaming services is because Sony is attempting to avoid its obligations under Paragraph 7.16 of the Recording Agreements, or other similar agreements with other producers and artists, and instead pay the lower Album royalty which only applies if the exploitation in the underlying license or other agreement is described as a "distribution" or "sale", which, of course, is far less favorable to 19. This robs 19 of some of the fruits of the Recording Agreements by purposefully avoiding using the correct operative words when Sony knew a "broadcast" or "transmission" was precisely what was occurring between the streaming services and their end users.

38.     Sony's action in wrongfully claiming the services' exploitation is a "sale" or "distribution" under each subject "license or other agreement" between Sony and the various streaming services has resulted in an underpayment to 19 on streaming royalties in excess of $3,000,000, and is a breach of paragraph 7.16 of the Recording Agreements.

### Sony's Incorrect Deduction of Amounts Spent on Television Advertising

39.     The Recording Agreements permit Sony to recover the costs of certain specified TV/Radio Spend (defined below) and are clear that Sony is required to obtain 19's consent if TV/Radio Spends for advertising any of the Artists' Masters exceeded a certain "ceiling" amount in certain specified territories, calculated on a "per Album" basis.

40.     Sony is aware of this obligation and over the last ten years Sony on several occasions sought consent from 19 regarding certain TV/Radio Spends.  For instance, in July 2007, Sony requested a "royalty break" based on a proposed TV ad spend in New Zealand and the United Kingdom for the Kelly Clarkson Album *My December* asking 19 to confirm in writing its consent.  19 declined to consent.

41.     However, Sony generally failed to seek such consent, finding it more convenient to simply ignore these limitations and underpay 19 by utilizing 19's royalties to recoup money spent in excess of Sony's rights.

42.     Clause 7.5.1 states, generally, that "in respect of Records Sold by Company [Sony] or its licensees the marketing of which is supported by a major advertising campaign on radio and/or television," Sony may reduce 19's royalty on such Records in half, for a specified limited period of time, but in no event beyond the time when Sony, as a result of such reduction, has recovered an amount equal to 50% of the costs of the TV and/or radio campaign concerned.

43.     Clause 7.5.2, however, sets forth different and more restrictive rules governing Sony's right and manner to recoup (i.e., recover) such television and/or radio advertising costs ("TV/Radio Spends") if Sony releases Artists' Albums in conjunction with television and/or radio advertising campaigns in the United States or in any of 15 specifically enumerated foreign countries.  In each instance, if Sony spends <u>less</u> than the specified "Minimum" in the country concerned on the aggregate TV/Radio Spends for the Album concerned, Sony may <u>not</u> recoup

any of such costs.   Alternatively, if Sony exceeds the specified "Maximum" in the country concerned on aggregate TV/Radio Spends (as applicable) for the Album concerned, Sony may not recoup any of the excess unless Sony obtains 19's prior consent thereto, not to be unreasonably withheld or delayed.

44.   In other words, pursuant to the Recording Agreements, Sony was required to obtain 19's prior consent to withhold and retain certain royalty payments due 19 in the manner described in Clause 7.5.2 when the aggregate TV/Radio Spends for a particular Album exceeded the applicable "Maximum" amount stated in the chart in Clause 7.5.2(c) for the country concerned.   Sony failed to do so on multiple occasions and thus cannot deduct these unapproved excess amounts.

45.   Sony's position that the Maximum amount of the aggregate TV/Radio Spends for the country concerned applied to each individual undefined "advertising campaign," and not to the aggregate advertising campaigns for each Album undertaken by Sony in the country concerned is not supported by the Recording Agreements, logic, or industry custom and practice. Sony's interpretation would lead to the absurd result of potentially allowing it the ability to conduct an unlimited number of TV and/or radio advertising campaigns in a given country for a particular Album without ever seeking 19's prior approval so long as each *individual* campaign, however limited, was within the specified required range.

46.   The Recording Agreements are clear that Sony cannot spend an unlimited amount of money on TV and/or radio advertising for a particular Album and then recoup any portion of the spends over the unapproved contractually specified Maximum spend from 19's royalties. Yet, Sony has attempted to do just that in violation of the express terms of the Recording Agreements.

47.     This improper reduction has resulted in Sony underpaying 19 by more than $800,000 during the applicable Audit period alone and a substantial additional amount in the post–Audit period.

## Sony's Deduction of Excess Charges from 19's Royalties

48.     The Audits revealed that Sony incorrectly deducted a number of unsupported charges from the royalties due to 19.  These expenses include both actual expenses which are not deductible under the terms of the Recording Agreements and expenses for which Sony is unable to provide any backup to show that it actually incurred the expenses alleged.

49.     For instance, the Audits exposed the fact that Sony inappropriately charged 19 for costs in excess of approved budgets for the production of music videos, whereas, as described below, 19 was only to be responsible for "approved" budgets.

50.     Clause 10.2 of the Recording Agreements applies to audio visual budgets and states that "[t]he budget for the recording of such Audio Visual Material ("the Audio Visual Material Budget") shall be Mutually Agreed and shall be reasonable in the context of the applicable mutually agreed treatment, story-board producer and director…In the event the Audio Visual Budget is exceeded due to [19]'s and/or Artist's default without prior written consent of [Sony] the amount of such excess … shall be fully deductible from any and all sums becoming due to [Sony] hereunder."

51.     However, over budget amounts not caused by 19 or Artists are recoupable by Sony only if "Mutually Agreed."

52.     "Mutually Agreed" is defined in clause 1.22 of the Recording Agreements to mean: "agreed between [19] (or [19's] Authorised Representative) and [Sony], such agreement

not to be unreasonably withheld or delayed by either party and with both parties acting in good faith with a view to seeking such agreement." Clause 1.22 provides the following three exceptions where Sony can make the decision concerned alone: (i) the Term has expired, (ii) during the Term, after making reasonable efforts to locate 19, 19 is "not available", or (iii) the parties are unable to mutually agree (which, by implication, requires that they at least discussed the issue together but could not come to an agreement).

53.     None of the enumerated exceptions in clause 1.22 applies to the over-budgets in question as 19 was always available (in fact, Sony admits that 19 was always on the music video set), the Term has not expired and budget issues were never brought to 19's attention.

54.     Sony's recoupment of costs that exceeded the budgets in question which were not caused by 19 or an Artist were improper and not in accordance with the Recording Agreements.

55.     Furthermore, Sony cannot even provide budgets for numerous videos for which it took deductions from royalties, including the Kelly Clarkson videos "A Moment Like This," "Before Your Love," "Low," "Miss Independent," "Since U Been Gone," and "Trouble With Love Is."

56.     Sony has also recouped expenses for which it cannot provide any backup information. Recouping expenses Sony did not actually incur is a clear and obvious violation of the Recording Agreements.

57.     Sony has failed to provide any information related to video costs for a number of videos and this failure makes it impossible to determine the royalty amounts due for these Artists' videos. This problem is further compounded in the case of Pickler's videos as Sony combined all her video projects into one account and provided no analysis of a video by video breakdown.

58.     Based on the information provided, the costs in excess of the approved budgets (which, because each budget had a built-in 10% contingency, means above 110 % of the "contingency free" budget) improperly charged 19 has resulted in Sony underpaying 19 by at least $100,000.00.

### Incorrect Royalties Paid for Joint Venture Compilation Albums

59.     The Audits also revealed that Sony has improperly accounted for and paid 19 a lower royalty rate than what is prescribed under the Recording Agreements for Compilation Albums released by joint ventures of which Sony is a part.

60.     Clause 7.4.2(c) of the Recording Agreements states "Compilation Albums which are released by [Sony] or as part of its joint venture arrangements or by an affiliate of Company – three quarters (3/4) of the otherwise applicable rate."

61.     Clause 7.4.2(d) of the Recording Agreements states: "Compilation Albums which are released by third parties – two thirds (2/3) of the otherwise applicable rate."

62.     It is clear that joint venture Compilation Albums are entitled to higher royalty rates than third party Compilation Albums.  If the Compilation Albums were actually issued or sold by Sony or as part of a Sony joint venture, 19 is entitled to the higher royalty amount.

63.     Based on the applicable agreements that Sony has provided concerning the nature of the entity issuing the Compilation Albums concerned, it is clear that Sony has underreported and underpaid 19 in the amount of at least $258,648 on joint venture Compilation Albums.

64.     In fact, in responding to the Audit, Sony admits that it has incorrectly paid some royalties based on its failure to calculate royalties for the domestic "Now Series," a joint venture that includes Sony, under the "joint venture" provision (i.e., Clause 7.4.2(c)) of the Recording Agreements.

65.     There are many requested documents that have yet to be provided regarding joint venture Compilation Albums; therefore, 19 is not yet able to calculate the substantial amount due it with particularity.

### Improper Calculation of Escalations

66.     The Audits also disclosed the fact that Sony did not properly escalate royalty rates for sales of Albums as required by the Recording Agreements.

67.     Paragraph 7.1 of the Recording Agreements states that "in the event that the number of Records Sold during the Term of any Recording Commitment Album throughout the world exceeds one million (1,000,000), then the royalty rate in respect of Records Sold of such Album in excess of one million (1,000,000) shall increase by one per cent (1%) in every territory."

68.     Paragraph 1.1 of the Recording Agreements defines "Album" as "a Record containing not less than twelve (12) (or such lesser number as Company may require) nor more than twenty-five (25) different Tracks and totaling no fewer than forty-five (45) minutes of playing time (unless otherwise agreed by [Sony] in writing)."

69.     Sony concedes that it has not properly calculated all escalations, but its concession does not address the numerous ways in which Sony has failed to correctly determine the amounts due under the escalation clause of the Recording Agreements.  Sony's concessions are far short of the actual amounts due 19 as discovered during the Audits.

### Failure to Include Track Equivalent Albums in Calculating Escalations

70.     It is clear from the Recording Agreements that Albums can be sold electronically over the Internet, either by Sony or licensed for sale through DSPs such as Apple's iTunes (which is the way the vast majority of Albums are electronically sold).

71.     Through these services, consumers are permitted to electronically purchase either an entire Album or choose and download one or more individual Tracks comprising segments of an Album.

72.     Under the terms of paragraph 1.1 of the Recording Agreements, when 12 Tracks (or segments of an Album) are sold totaling no fewer than forty-five (45) minutes of playing time, Sony is obligated to count such sales, whether by itself or its licensees, as the sale of an Album. By failing to do so Sony has breached the Recording Agreements.

73.     Furthermore, to the extent the Recording Agreements are ambiguous, the intent of the parties is evidenced by Sony's practice and the standard industry custom and practice, under which every time 10 to 12 individual Tracks are sold from an Album, these Tracks (or segments of an Album) are aggregated into Track Equivalent Albums ("TEAs"). These TEAs should then be counted in determining the number of Records Sold for purposes of calculating Album royalty escalations.

74.     In fact, virtually all record labels such as Sony, as well as others in the record industry, routinely rely on TEAs in determining sales amounts. For example, the Recording Industry Association of America (RIAA), the primary record label trade group of which Sony is a member, includes TEAs in its certification of "gold" and "platinum" Albums.

75.     Not only is counting TEAs required by the Recording Agreements, Sony's general practice, and the custom and practice in the industry, but it makes economic sense from the record labels' perspective, too. Historically, Albums were much more profitable for record

companies than "singles."  While the cost of manufacturing and delivering an Album to a retail "brick and mortar" store was not significantly greater, proportionately, than the cost of manufacturing and delivering a "single," the Albums sold for substantially more than "singles" and resulted in a much higher profit margin to the record company. Further, "singles" required extensive marketing and promotion costs, further eroding their margins.  Because Albums were so much more profitable, record companies almost universally paid artists a higher royalty rate than they paid artists on sales of "singles."

76.    Since the emergence of electronically available music over the Internet, however, this economic reality has flipped.  An iTunes individual Track download generally costs $.99 or $1.29.  The price for an entire Album is generally $9.99.  So if a label has a 12 Track Album, this means the sale of 12 individual Tracks from that Album is more profitable to the label than the sale of the 12-Track Album itself. So, on this basis alone, to not treat the sale of 10 individual Tracks (let alone 12 individual Tracks) as a TEA is patently unfair and not in accordance with current record industry norms.

77.    Further, when a buyer purchases individual Tracks from an Album, he or she is generally just purchasing segments of an Album and not "singles" under the normal industry understanding of the term "single" which, as noted above, was historically a separately manufactured, marketed, and promoted item.  Because record labels typically do not have the extra manufacturing, marketing or promotional expense in exploiting these individual Tracks, but instead are simply reaping the benefit of technological advances permitting consumers to purchase individual Tracks or segments from an Album, they should be treated as just portions of an Album and aggregated into an Album or TEA when 12 individual Tracks have been sold.

78.     Even Sony's correspondence with 19 confirms 19's interpretation of the Recording Agreements is correct and that individual Tracks from Albums are to effectively be treated as segments of Albums and not as traditional "singles." Sony's correspondence to 19, as described throughout this complaint, states that the royalty rate for individual Tracks is the "standard download royalty ([A]lbum rate x net receipts)." In other words, like all other major labels Sony treats individual Track downloads as a subsent of Album downloads. Accordingly, there is no justification anymore for not fully including TEAs in the calculation of Album royalty escalations.

79.     Sony's failure to escalate royalty rates based on TEAs has resulted in Sony underpaying 19 at least $960,610.

### Failure to Properly Account for Foreign Sales in Calculating Escalations

80.     In addition, the Audits revealed that Sony has underreported foreign royalties because it failed to count Album sales in certain foreign territories in determining the escalation of royalty rates.

81.     Paragraph 7.1 of the Recording Agreements states that "in the event that the number of Records Sold during the Term of any Recording Commitment Album throughout the world exceeds one million (1,000,000), then the royalty rate in respect of Records Sold of such Album in excess of one million (1,000,000) shall increase by one per cent (1%) in every territory."

82.     Despite its obligation to count all top line Records Sold worldwide in determining when to pay escalated royalties, Sony failed to include certain territories in its escalation calculation. Sony has admitted it breached the Recording Agreement through this failure, but its

admission is only to a part of its liability raised in the Audits and does not offer complete relief to 19.

### Sony's Failure to Count all Albums Sold through Normal Retail Channels in Calculating Escalations

83.    As discussed above, Paragraph 7.1 of the Recording Agreements provides for escalation of the royalty rate for Records Sold of an Album in excess of one million (1,000,000). Paragraph 7.1 also states that, for the purposes of escalation calculations, Records Sold must be at "full price through normal retail outlets only."

84.    Sony sold Albums at full price by means of television advertised sales, which, in the custom and practice of the music industry, constitutes a sale at a "normal retail outlet".  In fact, in responding to the Audits, Sony has conceded that Albums sold through television advertising should be included in the calculation of Album escalations.

85.    Sony has failed to escalate the sales for these Albums sold by means of television advertised sale and has underpaid 19 by at least $55,000 as a result.

### Sony's Failure to Pay 19 for Amounts Received as Part of Settlements

86.    Further, Sony under-reported or failed to report net receipts from settlements with certain DSPs.  Specifically, Sony has received monetary awards and settlements from numerous lawsuits and disputes regarding the piracy of recordings, including the Artists' Masters, but has not paid 19 the full share of these awards and settlements as required by the Recording Agreements.

87.    Paragraph 20.1 of the Recording Agreements requires Sony to credit 19's royalty balance based on "one half of any excess recovery" from sums received as a result of a legal proceeding.

88.     Sony's failure to report some of these settlements as well as their underreporting of net receipts from settlements with DSPs has resulted in an underpayment of at least $1,000,000.

**Sony's Failure to Correctly Account for Income from Record Clubs**

89.     The Audits exposed the fact that Sony has underreported Record Club royalties in numerous ways, including as a result of both using a base price other than the sales price reported by the record club and an underreporting of units sold.

90.     Paragraph 7.4.1 of the Recording Agreements requires Sony to calculate the royalties due for such exploitations at the "price upon which royalties to [Sony] are calculated." However, Sony accounted to 19 on a penny rate instead of using the correct contractually required rate pursuant to paragraph 7.4.1.

91.     Further, paragraph 1.32(c) excludes "free goods" from the calculation of "Records Sold." Thus, Sony did not pay 19 for "free goods" distributed by Record Clubs. However, Sony was eventually paid for so-called excessive "free goods." These payments can be directly linked to sales of 19's Masters and 19 should have been accounted to for these its share of these excessive "free goods" payments, but was not.

92.     Sony underpaid 19 as a result of the underreporting of Record Club royalties. The full amount of underpayment will be determined during discovery.

93.     In fact, Sony admits that, in some instances, units reported to Sony from the Record Clubs did not match the units reported to 19 and this reporting failure resulted in an underpayment of royalties.

94.     Additionally, upon information and belief, Sony is receiving "trademark royalties" from record clubs that are, in reality, disguised Master use payments.

95.     That is, Sony is allowing Record Clubs to use the Masters at an amount less than their fair market value, but is separately taking and "making up" the amount of this underpayment from the Record Clubs through trademark payments.   Sony's purpose in structuring its agreements in this manner is to prevent 19, Artists, and others from receiving royalties from this trademark income.

96.     Sony has failed to provide the applicable agreements in breach of its obligations and in order to disguise the full amount due 19.   Further, Sony failed to provide documents related to advances, lump sum payments, audit reports and additional settlement documentation relating to Record Clubs.

97.     Sony's attempts to disguise income in which 19 should participate by misclassifying it as trade mark income to escape its obligation to pay royalties is a breach of its duty of good faith and fair dealing.

### Sony's Improper Charging of Taxes to 19

98.     The Audits revealed that Sony has incorrectly deducted foreign income taxes from royalties owed to 19.

99.     Paragraph 7.2 of the Recording Agreement provides that Sony "shall use its reasonable endeavours [sic] to complete and submit appropriate double taxation exemption claim forms in respect of payments to [Sony] in the USA."

100.     Royalties reported to Sony by its foreign affiliates were reduced by foreign taxes. In turn, Sony again deducted such taxes from royalties otherwise earned by and payable to 19. However, under the United States Internal Revenue Code, foreign remittance taxes may be taken as a credit against United States income taxes due by those upon whom the tax is levied. Since

the foreign remittance taxes were imposed on Sony, Sony was entitled to and, upon information and belief, did utilize a foreign tax credit against its U.S. income taxes.

101.   Upon information and belief, 19 was charged by Sony for more than Sony's actual "net" tax liability because 19 is entitled to a portion of any tax credit received by Sony. Instead of offering this benefit to 19, Sony did not account for its foreign tax credit when it deducted taxes from royalties owed to 19.

102.   Sony's failure has resulted in Sony underpaying 19 by at least $274,150.

**Under and Non-Reporting of Synchronization and Other Royalties to 19**

103.   The Audits also exposed the fact that Sony did not report certain synchronization master uses for which Sony requested and received approval from 19.

104.   Based on the approval of 19, Sony licensed the right to "synchronize" certain Masters in films and/or television shows and received income as a result.   All of the synchronization income was not reported by Sony in its accountings to 19.

105.   The full amount of unreported synchronization income will be determined during discovery. However, Sony's failure to report synchronization income has resulted in an underpayment to 19 of at least $173,935.

106.   Further, Sony simply failed to pay royalties to 19 for a number of products that were actually sold, but never reported.

107.   This failure is demonstrated by the fact that Sony is holding some royalties in a "suspense account" even though those royalties are for products which embody the Masters.   The auditors have been unable to determine the amounts held in "suspense accounts" because Sony has failed to produce documents related to payments on certain items held in these "suspense accounts."

**Improper Royalty Deductions for Compilation Albums Sold Through TV Advertising**

108.     The Audits revealed that Sony improperly reduced the royalty rate owed to 19 for television advertised sales for Compilation Albums.

109.     Clause 7.5.1 of the Recording Agreements provides the royalty rate for Records Sold through marketing, utilizing a major television or radio advertising campaign, may be reduced by not more than 50% of the otherwise applicable rate, for a specified period of time, so that Sony may recoup an amount not in excess of 50% of the amount of the cost of the radio or television advertising campaign concerned.

110.     Clause 7.5.1 does not apply to Compilation Albums because that clause is only applicable to "Records Sold." Compilation Albums, pursuant to the definitions set forth in the Recording Agreements, are not Records Sold.

111.     Clause 1.32 of the Recording Agreements defines Records Sold as "Records shipped or otherwise distributed for sale in respect of which Company is paid in the USA . . . ." Clause 1.27 states, "The noun "Record" shall mean a reproduction of Audio Material." Clause 1.4 states, "Audio Material" shall mean any audio only Recording(s) of Artist's Performance(s) made pursuant to this Agreement." In effect this means, Clause 7.5.1. only applies to an Album consisting solely of Masters performed by a single Artist and not to Albums comprised of individual Tracks from multiple artists, which is what Compilation Albums are.

112.     In addition, Sony failed to provide documentation, as required by the Recording Agreements, that demonstrates Sony did in fact incur the alleged costs of the major television advertising campaign related to Compilation Albums.

113.     Sony's improper royalty rate reduction for television advertised sales for Compilation Albums resulted in an underpayment to 19 of at least $194,121.

### Sony's Wrongful Attempt to Recoup Payments from 19

114.    After 19 submitted its numerous claims set forth in the Audits, Sony falsely manufactured counterclaims in an attempt to force 19 to settle for an amount less than what is due.

### Sony Attempts to State Compilation Albums Are Not Albums

115.    First, Sony incorrectly and disingenuously contends that it has overpaid 19 for Compilation Albums on the basis that all recorded products, other than the defined term "Album," should be paid based upon the lower royalty rate associated with "Records other than Albums."

116.    "Records other than Albums" is not defined in the Recording Agreements.

117.    However, Compilation Albums are a category of Albums.   The use of the term "Album" in the name demonstrates that "Compilation Albums," as a category of Albums, were intended to be paid under the Album rate structure.

118.    Moreover, historical industry customs and practices demonstrate that "Compilation Albums" are paid under the royalty provision of recording agreements applicable to "Albums."  The practice of the parties before a dispute arises is the clearest indication of the intent of the parties in entering the Recording Agreements and before the instant dispute arose Sony always paid Compilation Albums at the Album rate.

119.    Additionally, Clause 7.4.2 of the Recording Agreements already contemplates a reduction to the standard Album rates for the category of Compilation Albums, so Sony's assertion would effectively result in a "double deduction" for the same thing. Moreover, Clauses 7.4.2(c) and (d) require that the specified fractional reduction is to be based on the "otherwise applicable rate" which, in the case of a Compilation Album, would be the rate applicable if the

product concerned were not a Compilation Album, which, because a Compilation Album is a special category of Album, would be a standard Album, and thus you must start with the basic "Album" rate and then apply the specified percentage reduction. Sony's claim is illogical and without merit.

### Sony's claim it overpaid 19 for Digital Track Downloads is Unsupported

120.    Sony wrongfully claims that it has incorrectly compensated 19 at a higher rate for digital Track downloads. Sony makes two claims, one being that 19 was improperly paid at the Album rate and should have been paid under the lower "Records other than Album" rate. Second, Sony contends that 19 should have been paid at 80% of the applicable royalty rate pursuant to Paragraph 7.7 of the Recording Agreements as Electronic Records were, according to Sony's allegation, a "new technology" when the sales concerned took place.

121.    Sony is incorrect that single Track downloads should not be compensated under the royalty rate associated with the Album configuration. As discussed above, "Album" is defined in Paragraph 1.1 of the Recording Agreements as "a Record containing not less than twelve (12) (or such lesser number as [Sony] may require) nor more than twenty-five (25) different Tracks and totaling no fewer than forty-five (45) minutes of playing time (unless otherwise agreed by [Sony] in writing in respect of a particular)."

122.    Paragraph 7.1 of the Recording Agreements explains that royalty rates shall be determined "according to the country of retail sale, the Contract Period of release, and the nature and configuration of the applicable Record…" As earlier noted, when an end user purchases an individual Track from a DSP, they rarely purchase it from a section listing it as a "single" but virtually always go to the Album section and pick and choose individual Tracks off the Album(s) of his or her choice. Therefore, if an individual download is purchased from an Album

configuration, the Album rate should apply as each individual download is certainly not a "single" as customarily understood in the music industry but is really just a "segment" of an Album. Imagine if someone elected to purchase 11 Tracks off a 12 Track Album. Should Sony be paying the reduced "singles" rate for those 11 Tracks (see earlier discussion as to why "singles" traditionally had a lower royalty rate) or should they pay 11/12 of the Album Rate? Moreover, as earlier noted, Sony almost always makes more money per Track on individual downloads than they do when an entire Album is purchased, so to pay a low rate on individual downloads is unconscionable and illogical.

123.   In fact, on iTunes, certain Tracks, which would have been historically considered "singles" within the industry custom and practice, are listed as "singles." However, those same Tracks are also available for purchase as a segment of an album. For instance, the Track "All I Ever Wanted" by Kelly Clarkson is available for purchase as both "All I Ever Wanted – Single" and as a segment of an Album from the Album *All I Ever Wanted*. This clearly demonstrates that Sony always considers certain releases which have been marketed, promoted and exploited in the manner of traditional "singles" to be singles and those same Tracks to be available as a segment of an Album.

124.   Sony's position regarding this so-called underpayment has only been developed in order to avoid paying 19 the full amounts due it. Before this dispute arose, Sony never attempted to claim individually downloaded Tracks from Albums were not to be paid at the Album rate. To the contrary, Sony repeatedly stated that individual Track downloads were to be paid at the Album rate. In a January 17, 2007 e-mail, Sony stated an individual Track was to be paid at "standard download royalty ([A]lbum rate x net receipts)." This position was confirmed in a January 31, 2007 e-mail.

125.    Julie Swidler, Sony's Vice President of Business Affairs and General Counsel, was copied on this e-mail and did not object to that characterization.

### Sony Wrongful Attempts to Take an Improper Deduction under New Technology Provision

126.    With respect to Sony's inaccurate position that individual Track downloads should be paid at 80% of the applicable royalty rate as digital downloads constitute "new technology," even if this position was correct, Sony can only apply the 20% deduction on digital track downloads until digital sales reach 15% market penetration, which, in the United States, where the vast majority of the sales occurred, occurred no later than July 1, 2004.

### Sony's Failure to Allow a Full and Fair Audit

127.    Paragraph 17.4 of each Recording Agreement gave 19 the explicit right to inspect Sony's books and records through an audit procedure.  Specifically, Sony agreed to allow 19 to "inspect examine and otherwise audit [Sony's] books and records for the purposes of determining the accuracy of [Sony's] statements to [19] hereunder."  However, Sony failed to allow 19 access to all its relevant books and records.

128.    Upon information and belief, Sony has underpaid 19 for certain foreign sales. However, Sony did not provide foreign source statements or foreign price lists as part of the Audits and thus prevented 19's auditors from verifying if 19 had been properly accounted to by Sony from all its substantial foreign sales and other exploitations of the Masters.

129.    Additionally, Sony has failed to provide numerous documents.  A small sample of these documents includes: (1) agreements between Sony and DSPs; (2) actual budgets and/or properly "approved" budgets for numerous Artists' videos, (3) back-up documentation and/or other information regarding expenses charged to 19's account, (4) invoices for amounts deducted from 19's royalties, (5) proof of royalty payments, such as for the use of the Clarkson Master,

"Respect," in the film *Ella Enchanted*, (6) agreements and approvals for the use of Archuleta Masters in the video games *Total Dance 2009* and *Idol Stars*, (7) backup information supporting producer deductions, (8) documentation showing the amount of fees paid for the use of the Aiken Master "This is the Night" during the Miss America Pageant broadcast, (9) label copy, (10) distribution reports, (11) perpetual inventory reports, (12) foreign source royalty reports, (13) foreign price lists, (14) source statements from DSPs, (15) Sony's intercompany license (or other agreements) between it and its affiliates, (16) unpaid suspense reports, and many other necessary documents and sources of information.  Further, the auditors are unable to determine if the documents provided are actually complete.

130.    This failure to provide all necessary documentation and information puts 19 and its auditors in the untenable position of not being able to properly uncover, calculate, and assert all the vast breach of contract claims it has against Sony.

## Individual Claims

### Failure to Correctly Pay for Kelly Clarkson Masters Used in Connection with Glaceau

131.    In 2007, Glaceau wanted to use certain Clarkson Masters in a Vitamin Water promotion.  After negotiations, 19 and Clarkson approved the use of the Masters.  However, Sony has failed to properly account and pay for this use of the Masters.

132.    In accounting for and paying 19 for Masters used in connection with Glaceau's Vitamin Water promotion, Sony has taken unwarranted producer deductions from the royalties due for this Glaceau release.  Sony is unable to provide any documentation relating to producer payments and has advised 19 that no producers were paid for the Glaceau release, but Sony has deducted more than $20,000 from the royalties due 19 as producer expenses.

### 19 is Due Reimbursement for its Accounting Fees

133.    The Recording Agreements provide that if settled findings revealed during an audit are in excess of 10% of the actual payments to 19 during the periods covered by the audit, then 19 is entitled to recover its costs in performing the audit.

134.    Sony has failed to settle this claim, but Sony's underpayments to 19 as revealed by the Audits far exceed 10% of the payments made to 19 for the royalty periods in question.  As such, 19 is entitled to recover its costs in performing the Audits.

135.    The underpayments described above, including 19's right to prejudgment interest, along with Sony's wrongful actions, have resulted in direct financial losses to 19 well in excess of $9,000,000.

## Claim I
## Breach of Contract

136.    19 realleges each and every allegation in paragraphs above as if fully set forth herein.

137.    19 and Sony have valid and enforceable contracts, the Recording Agreements.

138.    Sony has failed to comply with the terms of the Recording Agreements, and failed to fulfill its obligations under the Recording Agreements, by failing to properly account to and pay 19 royalties for licensing, sales, and other exploitations of the Masters.  Sony's failures include, but are not limited to, incorrectly calculating products sold, incorrectly paying 19 based on products sold, failing to allow 19 a full and fair opportunity to conduct an audit, attempting to recoup monies not owed to Sony, and failing to account to and pay 19 fifty percent (50%) of Sony's Receipts from its leasing or licensing of the Masters to streaming services.

139.    Indeed, by reason of Sony's failure to provide all documents and information required by the Recording Agreements, which is in and of itself a breach of the Recording Agreements, 19 has been additionally damaged in ways not presently known or quantifiable.

140.     By reason of the foregoing and other acts not presently known by 19, Sony has knowingly and materially breached its contractual obligations to 19 under the Recording Agreements.

141.     Sony's material breach of the Recording Agreements is the legal cause of substantial damage to 19 for which 19 seeks monetary damages in an amount to be determined at the time of trial, which upon information and belief is in excess of $9,000,000, inclusive of prejudgment interests and other costs to which 19 is entitled.

### Claim II
### Breach of the Duty of Good Faith and Fair Dealing

142.     19 realleges each and every allegation in paragraphs above as if fully set forth herein.

143.     19 and Sony have valid and enforceable contracts, i.e., the Recording Agreements.

144.     19 has performed all its obligations under the Recording Agreements.

145.     Sony, by and through its conduct and actions described in the Complaint, and by other actions not presently known by 19, wrongfully withheld the benefits of the Recording Agreements from 19.  These actions include, but are not limited to Sony's entry into agreements which allowed the Masters to be exploited at less than fair market value in exchange for payments to Sony which Sony claims do not trigger a royalty obligation and, in the alternative in respect to its streaming claim, Sony's mischaracterization of its streaming agreements in order to avoid its royalty obligations.  Such actions by Sony frustrated the purpose of the Recording Agreements.

146.     Sony's actions in wrongfully withholding the benefits of the Recording Agreements from 19 and frustrating the purpose of the Recording Agreements is the legal cause

of substantial damage to 19 for which 19 seeks monetary damages in an amount to be determined at the time of trial.

**Prayer for Relief**

WHEREFORE, 19 prays for judgment against Sony as follows:

1. Compensatory damages in excess of $7,000,000, the exact amount of which is to be determined at the time of trial;

2. The costs of the Audits;

3. An award of actual and reasonable attorneys' fees and costs for services rendered to 19 in this action;

4. An award of pre- and post-judgment interest in the amount of at least $3,000,000;

5. A trial by jury on all triable issues; and,

6. Such other and further relief as the Court deems just and proper.

By:     /s/ Richard S. Busch
        Richard S. Busch (SB 5613)
        KING & BALLOW
        315 Union Street, Suite 1100
        Nashville, Tennessee 37201
        Telephone:  (615) 259-3456
        Facsimile:  (615) 726-541

By:     _____
        Kenneth E. Gordon (KG 5703)
        GORDON, GORDON & SCHNAPP, P.C.
        437 Madison Avenue, 39th Floor
        New York, New York 10022
        Telephone:  (212) 355-3200
        Facsimile:  (212) 355-3292