**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

19 RECORDINGS LIMITED,

                Plaintiff,

v.                                          14-CV-1056 (RA)(GWG)

SONY MUSIC ENTERTAINMENT,           ECF CASE

                Defendant.
-----------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF**
**SONY MUSIC ENTERTAINMENT'S MOTION TO DISMISS THE COMPLAINT**

**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018

*Attorneys for Defendant*
*Sony Music Entertainment*

TABLE OF CONTENTS

Table of Authorities .............................................................................................. ii

Preliminary Statement........................................................................................... 1

Statement of Facts ................................................................................................. 2

      A.      19 Enters into Comprehensive Artist-Specific License Agreements with
              SME. ........................................................................................................ 3

      B.      The Royalty Provisions of the Agreements between SME and 19....................... 4

      C.      Contractual Incontestability Provisions and the Tolling Agreement. ................... 9

Argument ............................................................................................................. 11

I.      The Clear and Unambiguous Language of the Agreements Requires Dismissal of
       Several of 19's Breach of Contract Claims...................................................... 11

      A.      Royalty Escalations Are Calculated Based on Sales of Recording
              Commitment Albums, and Not the Sale of Any Twelve Individual Tracks......... 11

      B.      19's Claim That SME Owes █████████████ From Streaming
              Agreements That Include "Distribution" or "Sales" Language Must Be
              Dismissed. ............................................................................................... 14

      C.      SME Can Deduct Advertising Costs for Compilation Albums from 19's
              Royalties. ................................................................................................ 16

      D.      19 Is Not Entitled to a Share of SME's Recoveries from Legal
              Proceedings Not Brought in the Name of 19 or Its Artists. ................................ 18

      E.      19's Claim Concerning Deduction of Foreign Advertising Expenditures
              from Its Royalties Should Be Dismissed, Because the Limits on Those
              Deductions Apply on a Per-Campaign, Not a Per-Album, Basis. ........................ 19

II.     Claims for Carrie Underwood and Kellie Pickler Royalties from 2006 Are Barred........ 20

III.    19 Has Failed to Plead Any of Its Claims with Sufficient Specificity............................. 21

IV.   19 Does Not State a Claim for Breach of the Duty of Good Faith and Fair
       Dealing. ........................................................................................................ 23

Conclusion ........................................................................................................... 25

i

TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&M Records, Inc. v. Napster, Inc.*,
  No. 99-CV-05183 (N.D. Cal. filed Dec. 6, 1999)....................................................11

*Allman v. UMG Recordings*,
  530 F. Supp. 2d 602 (S.D.N.Y. 2008)..............................................................10, 21

*Andrews v. Sotheby Int'l Realty, Inc.*,
  2014 WL 626968 (S.D.N.Y. Feb. 18, 2014)......................................................2, 11

*ARI & Co. v. Regent Int'l Corp.*,
  273 F. Supp. 2d 518 (S.D.N.Y. 2003)..............................................................24, 25

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010)................................................................................24

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*,
  90 F. Supp. 2d 401 (S.D.N.Y. 2000)....................................................................23

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*,
  375 F.3d 168 (2d Cir. 2004)................................................................................11

*Greenfield v. Philles Records, Inc.*,
  98 N.Y.2d 562 (2002)....................................................................................15, 17

*Hudson v. Artuz*,
  1998 WL 832708 (S.D.N.Y. Nov. 30, 1998)........................................................22

*JBCHoldings NY, LLC v. Pakter*,
  931 F. Supp. 2d 514 (S.D.N.Y. 2013)..................................................................24

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
  424 F.3d 195 (2d Cir. 2005)............................................................................12, 15

*Mastrovincenzo v. City of New York*,
  435 F.3d 78 (2d Cir. 2006)..................................................................................13

*Peabody v. Weider Publ'ns, Inc.*,
  2006 WL 3802214 (S.D.N.Y. Dec. 26, 2006), *aff'd*, 260 F. App'x 380
  (2d Cir. 2008)....................................................................................................23

*Salahuddin v. Cuomo*,
  861 F.2d 40 (2d Cir. 1988)..................................................................................22

*Schupak Group, Inc. v. Travelers Cas. & Sur. Of Am.*,
    716 F. Supp. 2d 262 (S.D.N.Y. 2010), *aff'd*, 425 F. App'x 23
    (2d Cir. 2011) .......................................................................................................22

*Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*,
    973 N.Y.S.2d 187 (1st Dep't 2013) ....................................................................18

*Wards Co. v. Stamford Ridgeway Assocs.*,
    761 F.2d 117 (2d Cir. 1985)...............................................................................13

*Wurtsbaugh v. Banc of Am. Secs.*,
    2006 WL 1683416 (S.D.N.Y. June 20, 2006) ....................................................11

OTHER AUTHORITIES

*Apple Launches the iTunes Music Store* (Apr. 28, 2003),
    https://www.apple.com/pr/library/2003/04/ 28Apple-Launches-the-
    iTunes-Music-Store.html ....................................................................................11

John Borland, *Pressplay to offer unlimited downloads*, CNET News (July 31, 2002),
    http://news.cnet.com/2100-1023-947507.html ...................................................11

Jon Healey, *Listen.com Gets Rights to Catalogs*, L.A. Times (July 1, 2002),
    http://articles.latimes.com/2002/jul/01/business/fi-listen1 ..................................11

Fed. R. Civ. P. 8 ............................................................................................................21

Fed. R. Civ. P. 12(b)(6).................................................................................................11

PRELIMINARY STATEMENT

In this action, plaintiff 19 Recordings Ltd. ("19") seeks to rewrite its agreements with Sony Music Entertainment ("SME") in order to claim millions of dollars in royalties that SME never agreed to pay.  19 claims that SME has not complied with the parties' agreements, but 19's Complaint and the plain terms of the agreements make clear that what 19 really seeks to do is to replace the parties' actual bargain with one more to 19's liking.

Beginning in 2002, 19 entered into a series of exclusive recording agreements with contestants on the television show *American Idol*.  19 then separately entered into detailed, comprehensive agreements licensing to SME the exclusive worldwide rights to exploit the sound recordings made by some of those contestants.  These agreements specify, in exacting detail, the royalties that SME must pay to 19 in connection with various uses of the sound recordings—royalties that have amounted to many millions of dollars over the past decade.

19's Complaint now seeks to constructively amend the agreements to make up for what 19 could not extract at the bargaining table.  For example, the parties' agreements include a so-called escalation clause, which provides that the royalty rate payable on sales of "Recording Commitment Albums" will increase when sales of those albums reach a certain threshold.  19 now claims that SME should count the sale of any twelve individual downloads as an "Album" for purposes of determining whether such thresholds have been reached.  But 19's agreements with SME expressly distinguish between "Albums" and "Records other than Albums" (the latter of which includes single-track downloads), and state that royalty escalations will be based solely on sales of "Recording Commitment Albums"—not the sale of any twelve single-track Records.

The parties' agreements also provide that the royalty rate payable on streaming uses will vary based on how the service is described or characterized in the agreement between SME and the streaming service:  19 is entitled to one royalty rate when the agreement describes

the service solely as a "broadcast" or "transmission," and a lower rate when the service is described differently or also is described as a "distribution" or "sale."  In only one instance did 19 agree that the royalty would *not* turn on the language of the streaming agreement—where the streaming service is operated by SME or an SME affiliate.  But now, 19 argues that it should *never* be bound by the description in the streaming agreement, and that it should receive the higher royalty rate on all streaming uses, regardless of what the streaming agreement says.

Moreover, 19 obscures its claims by pleading them as a group.  19 concedes that some of the 13 categories of claims asserted in the Complaint are unique to one or more of the eight different artist-specific contracts at issue.  Yet with only one exception, 19 has failed to identify the contract(s) under which each claim arises, leaving SME and the Court in the dark about which claims relate to which artists.

The claims specified below should be dismissed with prejudice, because 19 cannot unilaterally alter contractual language that it agreed to repeatedly over several years.  And the balance of 19's Complaint should be dismissed for failure to link each claim to a particular artist agreement. If 19 believes that it has a basis to claim that SME has failed to pay royalties under a particular contract, it should be required to identify the artist-specific agreement that forms the basis for each claim.

### STATEMENT OF FACTS

For purposes of this motion, and despite the Complaint's numerous misstatements, SME treats plaintiff's factual allegations as if they were true, except where contradicted by the documents to which plaintiff refers and relies.  *See Andrews v. Sotheby Int'l Realty, Inc.*, 2014 WL 626968, at *3 (S.D.N.Y. Feb. 18, 2014) (Abrams, J.) (when reviewing a Rule 12(b)(6) motion to dismiss, "[i]n addition to the allegations in the Complaint, the Court

may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . ." (internal quotation omitted)).

### A.      19 Enters into Comprehensive Artist-Specific License Agreements with SME.

19 is a corporation affiliated with the company that launched the television show *American Idol*.  (Compl. ¶¶ 1, 6.)[1]  As part of the show's competition, 19 entered into exclusive recording agreements with some of the show's contestants.  (*Id*. ¶ 6.)

Starting in 2002, SME[2] and 19 entered into a series of agreements granting SME the exclusive worldwide license to exploit sound recordings by *American Idol* artists signed by 19.  (*Id*.)  Each agreement was specific to a single artist.  (*Compare e.g.*, Ex. C ¶ 1.2 (defining "Artist" to mean "Clay Aiken") *with* Ex. G ¶ 1.2 (defining "Artist" to mean "David Archuleta").)[3]  Each agreement contained from 49 to 60 pages of provisions that set forth, in meticulous detail, SME's rights and its royalty and other obligations to 19 in connection with a particular artist's sound recordings.  (Ex. B.)[4]  The agreements begin with a list of at least 45 precisely defined terms, and include at least 17 subsections on royalty calculations.  (*Id*., Arts. 1 & 7.)  While the agreements contained similar terms, they were *not* identical.  Each agreement contains a New York choice-of-law clause.  (*Id*. ¶ 28.1.)

19's lawsuit alleges that SME breached at least eight license agreements, dated between 2002 and 2008 (collectively, the "Agreements"):  Kelly Clarkson, dated September 25,

---

[1]      A copy of the Complaint is attached as Exhibit A to the Declaration of Christopher Y. L. Yeung, dated April 25, 2014.

[2]      As used here and in the Complaint, SME refers to Sony Music Entertainment and its predecessors-in-interest.  (Compl. ¶ 2.)

[3]      "Ex." refers to the exhibits attached to the Declaration of Christopher Y. L. Yeung, dated April 25, 2014.

[4]      As 19 does in the Complaint (*see* Compl. ¶ 16), SME will cite to the provisions in the Kelly Clarkson agreement, dated September 25, 2002, unless otherwise noted.

2002 (Ex. B); Clay Aiken, dated June 25, 2003 (Ex. C); Carrie Underwood, dated 2005 (Ex. D);

Chris Daughtry, dated September 25, 2006 (Ex. E); Kellie Pickler, dated December 21, 2006

(Ex. F); David Archuleta, dated August 15, 2008 (Ex. G); David Cook, dated August 15, 2008

(Ex. H); and Jordin Sparks, dated October 30, 2009 (Ex. I).   (Compl. ¶¶ 15–16, 24–25.)   The

Complaint also alleges that SME breached its duty of good faith and fair dealing by "wrongfully

with[holding] the benefits of the . . . Agreements from 19." (*Id.* ¶ 145.)

19 claims that SME underpaid royalties due to 19 under the Agreements in at least

13 different ways.   (*See generally id.*)   19 concedes that not all the purported underpayments are

common to all the artists; some of the alleged "breaches were unique to one or more given

Artists." (*Id.* ¶¶ 24–25.)   With one exception, however (a single alleged breach specific to the

Kelly Clarkson agreement), the Complaint does not specify which alleged underpayment applies

to which artist and for what time periods.   Instead, it broadly asserts that "this action also

includes claims and damages through the royalty period June 30, 2013." (*Id.* ¶ 26.)

**B.      The Royalty Provisions of the Agreements between SME and 19.**

Article 7 of each of the Agreements contains the principal provisions governing

SME's royalty obligations to 19.

1.      *Basic Royalty Rates for "Albums" and "Records other than Albums"*

Paragraph 7.1 sets forth the basic royalty rates for Records Sold in the United

States and other territories worldwide.   For each territory, there is a royalty rate for "Albums,"

and a separate, ███ rate for "Records other than Albums." (Ex. B ¶ 7.1.)   The rates vary by

artist.   Each capitalized term in ¶ 7.1 is defined in the Agreements.   "Record" is defined as "a

reproduction of Audio Material in any form now or later developed (including but not limited to

discs and tapes) in which sounds alone excluding visual images (other than technical data such as

credits or lyrics) can be perceived reproduced or otherwise communicated directly and/or with

4

the aid of a machine or other device." (*Id.* ¶ 1.27.)  The term "Record" thus encompasses any reproduction—including a single-track download, a full-album download, a full-length compact disc, or a 45-rpm vinyl single.  The Agreements define "Album" as a particular kind of Record: "a Record containing not less than twelve (12) . . . nor more than twenty-five (25) different Tracks and totalling no fewer than forty-five (45) minutes of playing time[.]" (*Id.* ¶ 1.1.)

> 2. *Royalty Escalations Based on "the number of Records Sold . . . of any Recording Commitment Album".*

Paragraph 7.1 also contains a so-called "escalation clause," which provides for an increase in the royalty rate payable on Recording Commitment Albums—and not any other type of Records—when certain sales thresholds for such Recording Commitment Albums are met:

> [O]n an Album by Album basis, in the event that the number of Records Sold during the Term of any Recording Commitment Album throughout the world exceeds ███████████████, then the royalty rate in respect of Records Sold of such Album in excess of █████████████ shall increase by ███████████████ in every territory.

(*Id.* ¶ 7.1)[5]

A "Recording Commitment Album" is "an Album forming part of the Recording Commitment". (*Id.* ¶ 1.30.)  The "Recording Commitment" is defined as "the minimum quantity of Audio Material to be Delivered to [SME] . . . sufficient to comprise: (a) during the First Contract Period one (1) Album in respect of which the track listing and sequencing has been finalised . . . (the 'First Album')" and "(b) during each Contract Period after the First Contract Period one (1) Album in respect of which the track listing and sequencing has been finalised . . . (the 'Second Album' et seq as applicable)." (*Id.* ¶ 1.29.)

---

[5]     Agreements for certain artists excepted the royalty escalation from applying in the United States. (*See* Ex. G ¶ 7.1 (providing that the royalty escalation applies "in every territory of the World excluding USA"); Ex. H (same); Ex. I (same).)

Thus, the escalation clause is not applicable to all Records or even to all Albums. Rather, it applies only to a Recording Commitment Album—which is defined as an Album with a specific track listing and sequence—when the sales of "such Album" exceed the threshold.

3.      *Royalties for Streaming Income.*

Each of the eight Agreements contains a separate royalty provision specific to income from streaming music services. With one exception, SME and 19 agreed that the royalty rate applicable to such income would hinge on the language of the underlying agreement between SME and the streaming service provider.

Specifically, different royalty rates apply depending on whether the streaming agreement (1) "describes or characterises the exploitation as 'broadcast' or 'transmission'"; or (2) "does not so describe the exploitation as indicated above"—*i.e.*, as a "broadcast" "transmission"—or also "describes or characterizes the exploitation as 'distribution' or 'sales'":

> [I]n the event that the licence or other agreement pursuant to which such moneys are received by [SME] *describes or characterises the exploitation* as "broadcast" or "transmission" [SME] shall (subject to the provisions of clause 7.17 below) credit [19]'s royalty balance hereunder with ████████████████, but where the licence or other agreement *does not so describe the exploitation as indicated above or describes or characterises the exploitation* as "distribution" or "sales" then such monies shall be treated in accordance with the provisions of sub-clause 7.7 above [which provides for a royalty based on a percentage that varies by artist of the otherwise applicable royalty rate].

(*Id.* ¶ 7.16 (emphasis added).)

19 bargained for an exception to this approach only for streaming services "operated by [SME] or its affiliates." (*Id.*) In such cases, 19 and SME agreed that the nature of such services—and with it the appropriate royalty treatment—"shall be characterised by the basis upon which [SME] accounts to the majority of its then current roster in respect of exploitation by such service." (*Id.*) Thus, while 19 recognized the possibility that in some instances it would not

wish to be bound by the language contained in SME's agreement with the streaming service, it specifically agreed that so long as the streaming agreement was between SME and an unaffiliated third party, the characterization contained in that agreement would control.

4.    *Credits for SME's Excess Recovery from Legal Proceedings.*

Each Agreement provides that, with 19's consent, SME can "institute . . . legal proceedings in the name of [19] and/or Artist as [SME] may deem suitable" in connection with preventing, *inter alia*, the unauthorized manufacture, sale, or distribution of Records.  (*Id.* ¶ 20.1.)   In such circumstances, SME "shall be entitled to deduct such costs incurred from all sums recovered as a result of such proceedings, and shall credit one half of any excess recovery to [19]'s royalty balance."  (*Id.*)

By its term, this provision was limited to proceedings instituted in the name of 19 or the relevant Artist—and not to anti-piracy proceedings conducted by SME in its own name in connection with broad-based infringements of a substantial portion of SME's entire catalog. Lest there be any doubt about that, the parties separately provided that, "notwithstanding anything contained herein to the contrary, [19] shall not be entitled to a share of income received by or credited to [SME] on a general or label basis . . . ."  (*Id.* ¶ 7.17.)

5.    *Deductions from Royalties for Advertising Expenditures.*

The parties agreed that 19's royalties would be reduced where SME incurs the costs of television and radio advertising to promote sales of a particular Record.  There are two relevant provisions, ¶ 7.5.1 and ¶ 7.5.2.  (*See* Compl. ¶¶ 42–43.)

The default provision is paragraph 7.5.1, which provides for a royalty reduction in connection with each separate advertising campaign.   It states that "[i]n respect of Records Sold by [SME] or its licensees the marketing of which is supported by a major advertising campaign on radio and/or television . . . the Royalty shall be at fifty per cent (50%) of the otherwise

applicable rate in respect thereof." (Ex. B ¶ 7.5.1.) This 50% royalty reduction is temporally limited to accounting periods that occur around the time of each advertising campaign: "The half-rate reduction . . . shall be limited in application to Records Sold in the accounting period in which the sell-in period prior to the campaign occurs, in the accounting period(s) in which the campaign is conducted and in the next two accounting periods thereafter." (*Id.*) The reduction also is limited by the cost of the specific campaign: the reduction "shall cease when the amount retained by [SME] equals 50% of the cost of the radio or TV campaign concerned[.]" (*Id.*)

For certain territories, paragraph 7.5.2 sets forth exceptions that "will apply in place of sub-clause 7.5.1." The first two exceptions provide that the costs of television and radio advertising campaigns, respectively, in the United States will be considered on a *per-Album* basis, rather than on a *per-campaign* basis as provided in paragraph 7.5.1. Specifically, subparagraph (a) provides that 50% of SME's television advertising expenditures could be deducted from 19's royalties if those expenditures were between a specified minimum "for each such Album" and a maximum on "any one Album":

> [I]f the TV spend . . . in the USA for each such Album is in excess of ▮▮▮▮▮▮, fifty per cent (50%) of the TV spend in the USA shall be treated as an advance recoupable from the Royalty (it being acknowledged and agreed that [SME] shall not spend more than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on TV advertising any one Album in the USA without [19]'s consent, not to be unreasonably withheld or delayed)[.]

(*E.g.*, Ex. C ¶ 7.5.2(a).)[6]

Similarly, subparagraph (b) provides that 50% of SME's radio advertising expenditures could be deducted from 19's royalties as long as that expenditure exceeded a

---

[6] The words "shall not spend more than ▮▮▮▮▮▮▮▮▮▮▮▮▮" does not appear in ¶ 7.5.2(a) of the Kelly Clarkson agreement. (Ex. B ¶ 7.5.2(a).)

minimum amount "for each such Album": "[I]f the radio spend . . . in the USA for each such Album is in excess of ███████ fifty per cent (50%) of the radio spend in the USA shall be treated as an advance recoupable from the Royalty."  (Ex. B ¶ 7.5.2(b).)  Thus, under ¶¶ 7.5.2(a) and (b), the relevant thresholds apply to the total of all TV or radio advertising campaigns conducted in connection with a particular Album in the United States.

The third exception, contained in subparagraph (c), lists the maximum and minimum expenditures from which SME could recover without 19's prior consent in connection with advertising campaigns in 15 specified foreign countries.  (*See* ¶ 7.5.2(c).)  Unlike subparagraphs (a) and (b), however, none of the spending thresholds listed in ¶ 7.5.2(c) state that they apply "for each such Album" or on "any one Album."  Instead—like the default provision in paragraph 7.5.1—these limits apply to each separate *campaign*:

> [I]f the TV and/or radio spend . . . is in excess of the following minimum TV spends . . . in the following countries, the royalty payable to [19] on Records Sold in the relevant country shall be reduced . . . until such time as 50% of the TV/radio spend in the country concerned has been recovered from the royalty retained by [SME] on the Album the subject of *the TV/radio advertising campaign* and . . . FURTHER PROVIDED THAT TV/radio spends in the following countries in respect of which [SME] wishes to apply the foregoing royalty reduction shall require [19]'s prior consent, not to be unreasonably withheld or delayed, in the event that the applicable spends exceed the applicable maximum TV/radio spends[.]

(*Id*. (emphasis added).)

### C.    Contractual Incontestability Provisions and the Tolling Agreement.

The Agreements provide for SME to issue royalty statements to 19 on a semi-annual basis for each artist, with each statement detailing the royalties credited to 19 for a single artist in the preceding six-month period.  (*See id*. ¶ 17.1.)  As is common in the music industry, each Agreement contains a contractual incontestability provision that limits the time in which 19

9

can contest the accuracy of royalty accountings.  *See generally Allman v. UMG Recordings*, 530 F. Supp. 2d 602, 605–06 (S.D.N.Y. 2008) (discussing contractual incontestability clauses in recording agreements).  Under the Agreements, 19 must notify SME "within (3) years of the date of [SME's] rendering of any statement furnished hereunder . . . in writing of any bona fide objections thereto[.]"  (Ex. B ¶ 17.3.)  Otherwise, "such statement shall be conclusive evidence as to the accuracy of accountings made to [19] hereunder during the period covered by such statement and final and binding on and not open to dispute by either [SME] or [19]."  (*Id.*)

Starting in 2008, 19 retained two different firms to audit, on an artist-by-artist basis, the royalty statements associated with each of the eight Agreements.  (Compl. ¶¶ 20–22, 29.)  On August 14, 2012, SME and 19 entered into a Tolling Agreement that stopped the running of the applicable contractual and statutory limitation periods, and also allowed 19 to pursue claims arising from royalty periods whose limitations periods already had expired.  (*See id.* ¶ 28.)

The Tolling Agreement excepted from the toll certain royalty periods in 2006 for Carrie Underwood and Kellie Pickler:

> Notwithstanding anything to the contrary contained herein, 19 acknowledges that, even though Sony has agreed to provide certain information on Carrie Underwood for the period 1/1/06 through 12/31/06 and on Kellie Pickler for the period 7/1/06 through 12/31/06 (respectively, up to 12 months and 6 months beyond their otherwise applicable Contractual Statute of Limitations), *Sony is not at this time waiving any defenses they may otherwise be entitled to under each such Contractual Statute of Limitations with respect to those periods of time*.

(Ex. J ¶ 1 (emphasis added).)  It also tolled the "Audits and Claims for the Next Audit Periods" for each of the eight artists.  (*Id.* ¶ 2)  19 terminated the Tolling Agreement and all applicable tolls expired on February 21, 2014.  (Compl. ¶ 28.)

**ARGUMENT**

I.   THE CLEAR AND UNAMBIGUOUS LANGUAGE OF THE AGREEMENTS
     REQUIRES DISMISSAL OF SEVERAL OF 19'S BREACH OF CONTRACT
     CLAIMS.

"'[I]f an agreement is complete, clear and unambiguous on its face' . . . a breach

of contract claim may be dismissed on a Rule 12(b)(6) motion." *Wurtsbaugh v. Banc of Am.*

*Secs.*, 2006 WL 1683416, at *5 (S.D.N.Y. June 20, 2006) (quoting *Eternity Global Master Fund*

*Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004).  Here, the clear

and unambiguous language of the Agreements require dismissal of 19's claims that SME

improperly calculated (A) royalty escalations; (B) streaming income; (C) advertising reductions

for Compilation Albums; (D) royalty credits for excess recovery from anti-piracy legal

proceedings; and (E) foreign advertising deductions.

A.   **Royalty Escalations Are Calculated Based on Sales of Recording
     Commitment Albums, and Not the Sale of Any Twelve Individual Tracks.**

19 alleges that SME improperly calculated royalty escalations under ¶ 7.1 of the

Agreements because SME failed to treat the sale of twelve individual Tracks as the sale of an

Album for royalty escalation purposes.  (Compl ¶¶ 66–79.)  But the unambiguous language of

the Agreements—all of which were executed after single-track downloads were a fixture of the

music business[7]—refutes 19's claim.   The royalty escalation applies only when certain

---

[7]      *See A&M Records, Inc. v. Napster, Inc.*, No. 99-CV-05183 (N.D. Cal. filed Dec. 6,
1999); John Borland, *Pressplay to offer unlimited downloads*, CNET News (July 31, 2002),
http://news.cnet.com/2100-1023-947507.html; Jon Healey, *Listen.com Gets Rights to Catalogs*,
L.A. Times (July 1, 2002), http://articles.latimes.com/2002/jul/01/business/fi-listen1; *Apple
Launches the iTunes Music Store* (Apr. 28, 2003), https://www.apple.com/pr/library/2003/04/
28Apple-Launches-the-iTunes-Music-Store.html.  This Court may consider "matters of which
judicial notice may be taken" on a 12(b)(6) motion.  *See Andrews*, 2014 WL 626968, at *3
(Abrams, J.).

11

thresholds have been met "on an Album by Album basis" for "the number of Records Sold . . . of any Recording Commitment Album".  (Ex. B ¶ 7.1.)

19 claims that "[u]nder the terms of paragraph 1.1 of the Recording Agreements, when 12 Tracks (or segments of an Album) are sold totaling no fewer than forty-five (45) minutes of playing time, Sony is obligated to count such sales . . . as the sale of an Album." (Compl. ¶ 72.)  That is not true.

*First*, ¶ 1.1 defines the term "Album" as a single Record that contains any number of tracks between twelve and twenty-five: "'Album' shall mean *a Record* containing *not less than twelve (12) . . . nor more than twenty-five (25)* different Tracks and totalling no fewer than forty-five (45) minutes of playing time (unless otherwise agreed by [SME] in writing in respect of *a particular Record*."  (Ex. B (emphasis added).)    Nothing in the definition supports 19's argument that the sale of twelve *separate* single-track Records (often to twelve different consumers at twelve different times), none of which is an Album, somehow becomes an Album for royalty purposes.  If the parties intended the sale of every twelve Records that are *not* Albums to count as an Album, they would have said so—and they certainly would not have referred to an Album as containing *a range* of twelve to twenty-five Tracks.

Indeed, adopting 19's interpretation of ¶ 1.1 would improperly read several terms—among them, "Record containing", "not less than," and "in respect of a particular Record"—out of the provision.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (noting that "under New York law . . . the contract should be construed so as to give full meaning and effect to all of its provisions. . . . [and a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible" (internal quotations, alterations, and citation omitted)).

*Second*, ¶ 7.1's royalty escalation is triggered not by sales of just any Album, but by sales of "Recording Commitment Albums."  (Ex. B ¶ 7.1.)  Recording Commitment Albums are "Album[s] forming part of the Recording Commitment," (*id*. ¶ 1.30), which per the definition of "Recording Commitment," are Albums for which, *inter alia,* "the track listing and sequencing has been finalised" (*id*. ¶¶ 1.29(a), (b)).  Thus, a Recording Commitment Album—the only relevant type of Record for purposes of the escalation clause—is a specific Album with a specific track listing and sequence.  Recording Commitment Albums are not just an aggregated amalgam of any twelve sales of Records other than Albums, as 19 claims.  (Compl. ¶¶ 70–72.)

*Third*, 19's interpretation of the royalty escalation provision introduces ambiguity in the Agreements where none would otherwise exist.  *See Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985) ("A Court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity[.]" (internal quotations and citation omitted)).  If ¶ 1.1 is interpreted to mean that the sale of some number of Records other than Albums counts as an Album, the contract would be ambiguous as to what number of such Records between twelve and twenty-five should be considered an Album.  And if, as 19 contends, every twelve Tracks equals an Album, then the agreement would be ambiguous as to how to count the sale of a single Album containing twenty-four tracks:  Since any number of Tracks between twelve and twenty-five can qualify as an Album under ¶ 1.1, the sale of twenty-four Tracks arguably could equal the sale of two twelve-Track Albums, or one twenty-four-Track Album. No such ambiguity exists when "Album" is interpreted precisely the way the parties defined it—as a single Record containing anywhere from twelve to twenty-five tracks.

*Finally*, 19's interpretation leads to absurd results.  *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) ("[A]bsurd results should be avoided." (internal quotation

13

and citation omitted)).  In each of the Agreements, ¶ 7.1 specifies three royalty rates for sales of Albums, and six rates for sales of "Records other than Albums."  (Ex. B ¶ 7.1.)  These nine royalty rates also are different for different artists, and ███████████████████.  (*Compare, e.g.*, Ex. B ¶ 7.1 *with* Ex. G ¶ 7.1.)  If, as 19 posits, the sale of every twelve Tracks counts as the sale of an Album, then the six royalty rates listed for Records other than Albums could, at most, apply to the sale of eleven Tracks—the remainder after the number of individual Tracks sold in a given royalty period is divided by twelve.  In that case, *no matter how many millions of Records were sold in a given period*, the economic consequence of having a different royalty rate for "Records other than Albums" would be, at most, one dollar and change.[8]  It would be absurd for SME and 19 to have negotiated and agreed to different royalty rates for Albums and Records other than Albums, in agreement after agreement, if the financial consequence in an entire royalty period would necessarily be so trifling.

**B.      19's Claim That SME Owes ██████████████████ From Streaming Agreements That Include "Distribution" or "Sales" Language Must Be Dismissed.**

Paragraph 7.16 of the Agreements sets forth two different royalty rates that can apply to income from streaming services.  One rate—██████████████████—applies "in the event that the licence or other agreement pursuant to which such moneys are received by [SME] describes or characterises the exploitation as 'broadcast' or 'transmission'".  (Ex. B ¶ 7.16.)  Another rate—the rate provided under ¶ 7.7—applies "where the licence or other agreement does

---

[8]      The largest difference in any of the Agreements between the U.S. rates for Albums and Records other than Albums, respectively, is ███.  Thus, assuming that all eleven single track downloads were sold at iTunes's highest rate of $1.29, and assuming (unrealistically) that SME receives 100% of that amount, the total royalty difference in any period that would result from having a rate for Records other than Albums is $███  ($1.29 x 11 x ███).

14

not so describe the exploitation as indicated above *or* describes or characterises the exploitation as 'distribution' or 'sales'".  (*Id*. (emphasis added).)

19 now claims that royalties on income from *all* third-party streaming services must be calculated at the rate of ██████████████, on the grounds that streaming services "can only be fairly described as 'transmissions' or 'broadcasts.'"  (Compl. ¶ 34; *see also id*. ¶ 37 ("As a matter of law, the underlying agreements . . . allow the streaming services to 'broadcast' or provide a 'transmission' . . . .).)

This claim improperly attempts to circumvent the parties' agreement.  Paragraph 7.16 unambiguously provides that royalties to 19 will be calculated pursuant to the ¶ 7.7 rate if the underlying license or agreement describes or characterizes streaming as anything other than a "broadcast" or "transmission", or also describes it as a "distribution" or "sale" (*i.e.*, even if the agreement also characterizes it as a "broadcast" or "transmission.")   Under 19's argument, however, the entirety of ¶ 7.16 would serve no purpose at all; the provision should simply recite that the royalty for all streaming income shall be ████████████.  This is not the bargain the parties struck.  *LaSalle*, 424 F.3d at 206 ("[T]he contract should be construed so as to give full meaning and effect to all of its provisions . . . ." (internal quotations and citation omitted)).

Recognizing that its claim is at odds with the plain terms of the Agreements, 19 alleges that it would somehow be unfair to hold it to the terms to which it agreed.  (Compl. ¶¶ 34–37.)  But "if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569–70, 573–74 (2002) (rejecting claim that it would be inequitable to enforce recording contract as written, "[h]owever sympathetic plaintiffs' plight").

This is especially true here, because 19 was clearly sensitive to the possibility that it would disagree with the characterization contained in the streaming agreement.  It bargained for the right not be bound by that characterization where the service in question "is operated by [SME] or its affiliates," and the language in the streaming agreement therefore may not be the result of arm's-length bargaining.  By contrast, in every other circumstance, 19 agreed to be bound by the characterization in the streaming agreement between SME and an unaffiliated third party.  Moreover, even where the streaming service is operated by SME or its affiliates, 19 agreed that the service's "nature shall be characterised by the basis upon which [SME] accounts to the majority of its then current roster in respect of exploitation by such service"—*not* that the service would necessarily be treated as a "broadcast" or "transmission."  (Ex. B ¶ 7.16.)

In short, 19's claim that all streaming services must be accounted for as a "broadcast" or "transmission" simply seeks to rewrite the plain terms to which it agreed over and over, in agreement after agreement.  19's claim for underpayment of streaming royalties where the agreement between SME and the streaming service includes language describing or characterizing the exploitation as "distribution" or "sales" should be dismissed.

## C.   SME Can Deduct Advertising Costs for Compilation Albums from 19's Royalties.

19 asserts that SME improperly reduced the royalty rate for Compilation Albums sold through television advertising under ¶ 7.5.1.  Paragraph 7.5.1 applies only to "Records Sold," and 19 contends that Compilation Albums cannot qualify as Records Sold.  (Compl. ¶¶ 108–11.)  A "Record" is a reproduction of "Audio Material," and according to 19, "Audio Material" is defined to mean a recording consisting solely of Masters performed by a single Artist. (*Id.* ¶ 111.)

19's claim should be dismissed.  *First*, nothing in the definition of Record precludes a recording that includes a performance by both the Artist and another performer from qualifying.  In fact, ¶ 7.11 is a royalty provision for sales of Records that embody "joint performances"—where the "Artist performs pursuant hereto jointly with any artist(s) in favour of whom [SME] or its licensees is obliged to accrue royalties[.]"  (Ex. B ¶ 7.11.)  The parties' inclusion of such a provision makes clear that a "Record" can include Masters performed by multiple artists.

*Second*, Compilation Albums are expressly listed as types of "Records Sold" under the Agreements.  Paragraph 7.4.2 sets forth the royalties for "Records Sold" by SME and its licensees "in the following categories."  (*Id*. ¶ 7.4.2.)  Two different types of Compilation Albums are listed among the categories of "Records Sold" that follow:  (1) "Compilation Albums which are released by Company or as part of its joint venture arrangements or by an affiliate of [SME]"; and (2) "Compilation Albums which are released by third parties".  (*Id*. ¶¶ 7.4.2(c) and (d).)

In fact, if 19 were correct that Compilation Albums cannot be "Records Sold," then there would be no royalty provision in the Agreements covering Compilation Albums at all (since ¶¶ 7.4.2(c) and (d) are the only royalty provisions in the Agreements that govern Compilation Albums, and they only apply to Records Sold).  Thus, rather than allegedly being liable for taking improper deductions on Compilation Album royalties, SME would not have been liable for *any* Compilation Album royalties in the first place, and would have a counterclaim for royalties paid on such uses.[9]  *See Greenfield*, 98 N.Y.2d at 573–74 (allowing

---

[9]      As such, if this Court holds that Compilation Albums cannot be Records Sold, SME requests the dismissal of the claim that SME underpaid 19 for royalties on Compilation Albums. (Compl. ¶¶ 59–65.)

defendants to issue synchronization licenses without paying plaintiffs royalties, because contract did not include a royalty for that use).  19's claim therefore should be dismissed.

### D. 19 Is Not Entitled to a Share of SME's Recoveries from Legal Proceedings Not Brought in the Name of 19 or Its Artists.

19 alleges that ¶ 20.1 of the Agreements "requires Sony to credit 19's royalty balance based on 'one half of any excess recovery' from sums received as a result of a legal proceeding[.]"  (Compl. ¶ 87.)  19 does not identify any such legal proceedings, claiming only that it is entitled to additional monies from lawsuits whose subjects "include[]"—but are not limited to—"the Artists' Masters[.]"  (*Id.* ¶ 86.)

19 is mistaken.  By its terms, ¶ 20.1 provides for 19 to share in excess recoveries only from legal proceedings SME instituted "in the name of [19] and/or Artist[.]"  (Ex. B ¶ 20.1.)  It does not apply to proceedings that are brought in SME's name, including those aimed at stopping broad-based copyright infringement of a substantial portion of Sony's catalog.

Moreover, to the extent that limitation is not clear from the face of ¶ 20.1, ¶ 7.17 prohibits 19 from sharing in any income "received by or credited to [SME] on a general or label basis[.]"  This provision applies "notwithstanding anything contained herein to the contrary," and thus supersedes all other provisions in the Agreements.  *See Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 191 (1st Dep't 2013) ("It is well settled that trumping language such as a 'notwithstanding' provision controls over any contrary language in a contract." (citation and internal quotation marks omitted)).  19's claim for a share of monetary awards and settlements received by SME on a general or label basis, or from any proceedings not brought in the name of 19 or the Artist (even if the amounts received were specific to such Artist's sound recordings), should therefore be dismissed.

18

E.      **19's Claim Concerning Deduction of Foreign Advertising Expenditures from Its Royalties Should Be Dismissed, Because the Limits on Those Deductions Apply on a Per-Campaign, Not a Per-Album, Basis.**

19 alleges that SME improperly deducted foreign television and radio advertising expenditures from 19's royalties by applying the specified "maximum" spend thresholds listed in ¶ 7.5.2(c) on a per campaign, rather than a per Album, basis.  (Compl. ¶¶ 43–47.)  Not so.

Both ¶¶ 7.5.1 and 7.5.2 permit SME to reduce 19's royalties based on television and radio advertising expenditures.  Paragraph 7.5.1 generally provides for a 50% reduction in the royalty payable to 19 for records sold "the marketing of which is supported by a major advertising campaign on radio and/or television[.]"  (Ex. B ¶ 7.5.1.)  The royalty reduction applies on a per-campaign basis to each separate advertising campaign:  ¶ 7.5.1 provides that the reduction will be limited to (1) "the accounting period in which the sell-in period prior to the campaign occurs"; (2) "in the accounting period(s) in which the campaign is conducted"; (3) "in the next two accounting periods thereafter"; and (4) in any event, "shall cease when the amount retained by the Company equals 50% of the cost of the radio or TV campaign concerned[.]"  *Id.*

Paragraph 7.5.2 lists certain exceptions that "will apply in place of sub-clause 7.5.1[.]"  (*Id.* ¶ 7.5.2.)  Subparagraphs 7.5.2(a) and (b) permit SME to deduct 50% of its television and radio advertising expenditures in the United States from 19's royalties as long as those expenditures are within specified minimum and maximum amounts.  (*Id.* ¶¶ 7.5.2(a) and (b).)  Those maximums and minimums plainly apply on a per-Album basis (*i.e.*, they are aggregate thresholds for all campaigns conducted in connection with a particular Album):  each is listed either as an amount that applies for "each such Album" or on "any one Album".  (*Id.*)

In contrast, ¶ 7.5.2(c), which sets forth the minimum and maximum deductible advertising expenditures that apply in 15 specifically enumerated foreign countries, contains no language limiting those amounts to "each such Album" or "any one Album."  Instead, like the

19

default provision in ¶ 7.5.1, ¶ 7.5.2(c) unambiguously provides for SME's deduction of television and radio advertising expenditures on a per campaign basis:  19 royalties "shall be reduced . . . until such time as 50% of the TV/radio spend in the country concerned has been recovered from the royalty retained by [SME] on the Album *the subject of the TV/radio advertising campaign.*"  (*Id.* ¶ 7.5.2(c) (emphasis added).)  Thus, the royalty reduction provisions contained in ¶ 7.5.2(c) unambiguously apply on a per-campaign, rather than a per-Album basis. 19's claim that the thresholds specified in ¶ 7.5.2(c) apply on a per-Album basis therefore must be dismissed.

## II.    CLAIMS FOR CARRIE UNDERWOOD AND KELLIE PICKLER ROYALTIES FROM 2006 ARE BARRED.

To the extent 19 seeks damages in connection with royalties from certain periods in 2006 for Carrie Underwood and Kellie Pickler, that portion of its claim must be dismissed as barred by the applicable contractual incontestability provisions.

The Tolling Agreement excluded claims related to both semi-annual royalty periods in 2006 for Carrie Underwood (from January 1 to June 30, 2006, and July 1 to December 31, 2006) and to the second royalty period in 2006 (July 1 to December 31, 2006) for Kellie Pickler.  Paragraph 1 of the Tolling Agreement states that "Sony is not at this time waiving any defenses they may otherwise be entitled to under each such Contractual Statute of Limitations with respect to those periods of time."  (Ex. J ¶ 1.)[10]  This exception applies "[n]otwithstanding anything to the contrary contained herein." (*Id.*)

---

[10]    "Contractual Statute of Limitations" is defined as the provision in SME's agreements with 19 containing "specified periods of time beyond which royalty accountings . . . become 'final and binding' and within which claims for underpayment and/or nonpayment of royalties for these periods must be made and/or legal actions must be filed".  (Ex. J, at 1.)  These are the contractual incontestability provisions found in ¶ 17.3 of the Carrie Underwood and Kellie Pickler agreements.  (Ex. D ¶ 17.3; Ex. F ¶ 17.3.)

These three royalty periods are thus subject to the three-year contractual incontestability provision contained in the Carrie Underwood and Kellie Pickler agreements. (Ex. D ¶ 17.3; Ex. F ¶ 17.3.)   The royalty statements for the latest of these periods were issued by March 31, 2007.  (Ex. D ¶ 17.1; Ex. F 17.1.)  The three-year period in which to contest these royalty periods therefore expired long ago; even the Tolling Agreement described the royalty periods as "up to 12 months and 6 months beyond their otherwise applicable Contractual Statute of Limitations."  (Ex. J ¶ 1.)  Accordingly, any claim concerning those royalty periods therefore must be dismissed.  *See Allman*, 530 F. Supp. 2d at 605 ("Courts applying New York law routinely uphold the enforceability of contractual incontestability provisions[.]").

III.    19 HAS FAILED TO PLEAD ANY OF ITS CLAIMS WITH SUFFICIENT SPECIFICITY.

While several of 19's claims are clearly barred under the language of each of the Agreements at issue, the remaining claims should be dismissed because the Complaint fails to put SME on notice as to which claims 19 is asserting in connection with which artists.

The Complaint alleges 13 different categories of contractual breaches arising from at least eight different artist-specific agreements between 19 and SME that were executed over a six-year period, between 2002 and 2008.  (*See* Compl. ¶¶ 15–16, 32–113, 131–32; Exs. B to I.) 19 concedes that not all the alleged breaches are common to all the artist-specific agreements. (Compl. ¶ 25.)  Nonetheless, with the exception of a single claim identified as being specific to Kelly Clarkson (*id*. ¶¶ 131–32), 19 makes no effort to identify which alleged breaches relate to which artist-specific agreement(s).

Allowing 19 to plead its multi-agreement breach of contract claims as an undifferentiated group runs afoul of the Federal Rules.  Under Rule 8, 19 must "give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive

answer and prepare an adequate defense." *Hudson v. Artuz*, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (internal quotations, alterations, and citations omitted); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("[T]he principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial."); *Schupak Group, Inc. v. Travelers Cas. & Sur. Of Am.*, 716 F. Supp. 2d 262, 267 (S.D.N.Y. 2010) ("The claimant must allege the specific provisions of the contract upon which the breach of contract claim is based."), *aff'd*, 425 F. App'x 23 (2d Cir. 2011).  By failing to identify the specific Agreement and artist to which each claim relates, 19's Complaint fails to do that.

　　　　　For example, without being told which of the eight artist-specific agreements give rise to which of 19's different breach of contract claims, SME cannot assess whether applicable statute of limitations and contractual incontestability periods have expired or continue to run. The parties' Tolling Agreement (1) allowed 19 to assert certain already-expired claims for each artist until 120 days after either party noticed termination of the Tolling Agreement; and (2) tolled the running of the applicable incontestability and limitations periods for each artist for the periods that had yet to expire until the end of that same 120-day period.  (Compl. ¶ 28; Ex. J ¶ 1.) According to 19, all tolls expired on February 21, 2014.  (Compl. ¶ 28.)  Thus, under the terms of the Tolling Agreement, any already-expired claim (category 1) left un-asserted can no longer be asserted, while the limitations period for any other claims (category 2) continues to run.  But 19's group pleading prevents SME from telling which is which.

　　　　　Similarly, the Complaint alleges that 19 is entitled to recover its audit costs because its claims "exceed 10% of the payments made to 19 for the royalty periods in question." (Compl. ¶ 134.)  But SME's potential liability for audit costs is a contract-specific obligation:  19

is only entitled to recover its costs of auditing SME's payments under a particular Artist-specific agreement if the underpayments exceed 10% of the royalties paid under that particular agreement.  (Ex. B ¶ 17.4 ("If such Audit reveals an underpayment to [19] of ten per cent (10%) of total royalties *due hereunder* . . . then [SME] shall pay all reasonable audit costs . . . of such Audit." (emphasis added)).)  Because 19 has not even identified which claims are asserted in connection with which agreement, it is impossible to assess whether 19 has stated a claim.

In addition, without knowing which artists' sound recordings are at issue in each claim, SME also cannot know which artists' sales and royalty calculations it must consider in order to prepare its defenses.  Likewise, SME cannot know which artists' sales and royalty calculations are relevant for discovery purposes in connection with any given claim.  Because the Complaint fails to give SME fair notice of the claims being asserted in connection with the use of each Artist's sound recordings, it should be dismissed for failure to state a claim.

## IV.    19 DOES NOT STATE A CLAIM FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING.

"Under New York law, a claim for breach of the implied covenant will be dismissed as duplicative if the conduct allegedly violating the implied covenant is also the predicate for breach of the underlying contract."  *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000); *see also Peabody v. Weider Publ'ns, Inc.*, 2006 WL 3802214, at *5 (S.D.N.Y. Dec. 26, 2006) (holding that plaintiff could not maintain implied covenant claim that was based on the same conduct as his breach of contract claim), *aff'd*, 260 F. App'x 380 (2d Cir. 2008). In addition, "where the relief sought by the plaintiff in claiming a breach of the implied covenant of good faith is 'intrinsically tied to the damages allegedly resulting from the breach of contract,' there is no separate and distinct wrong that would give

23

rise to an independent claim." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (citation omitted).

Here, 19's implied covenant claim unquestionably is based on the same conduct, and seeks the same damages, as its breach of contract claims. The express contract claim alleges that SME "has failed to comply with the terms of the Recording Agreements, and failed to fulfill its obligations under the Recording Agreements, by failing to properly account to and pay 19 royalties for licensing, sales, and other exploitations of the Masters." (Compl. ¶ 138.) The implied covenant claim, in turn, contends that SME "wrongfully withheld the benefits of the Recording Agreements from 19." (*Id*. ¶ 145.) Thus, the second cause of action is duplicative of the breach of contract claim and must be dismissed.

In particular, 19's allegation that SME mischaracterized its streaming agreements to avoid royalty obligations does not separately state an implied covenant claim. (Compl. ¶¶ 37–38, 145.) The Complaint alleges both that this conduct "is a breach of paragraph 7.16 of the Recording Agreements" (*id*. ¶ 38) and that it breaches the implied covenant (*id*. ¶ 145). Thus, the implied covenant claim is based on the same conduct and seeks the same damages as the express contract claim.

Nor does 19 state an implied covenant claim by pleading on "information and belief" that SME purposefully exploited Masters at below-market value. (*Id*. ¶¶ 94, 145.) 19 is permitted to plead facts on information and belief only "where the facts are peculiarly within the possession and control of the defendant" or "where the belief is based on factual information that makes the inference of culpability plausible[.]" *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). But to do so, 19 must plead "such allegations . . . accompanied by a statement of the facts upon which the belief is founded." *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d

514, 527 (S.D.N.Y. 2013) (internal quotations omitted).   The Complaint contains no such statement.

Finally, in either case, "New York law is clear that the implied covenant cannot be used to create independent obligations beyond the contract." *ARI*, 273 F. Supp. 2d at 523. Here, the Agreements expressly contemplate that SME would describe and characterize streaming services in a number of different ways, and there is nothing obligating SME to negotiate particular prices for any use of any recordings.  The duty of good faith and fair dealing cannot be used to impose on SME obligations that are inconsistent with the Agreements.

CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint.

Dated:   New York, New York
         April 25, 2014

Respectfully submitted,

COVINGTON & BURLING LLP

By: _____
        Christopher Y. L. Yeung

Jonathan M. Sperling
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
(212) 841-1010 (fax)
jsperling@cov.com
cyeung@cov.com

*Attorneys for Defendant*
*Sony Music Entertainment*