**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
19 RECORDINGS LIMITED,

               Plaintiff,

v.                                14-CV-1056 (RA)(GWG)

SONY MUSIC ENTERTAINMENT,        ECF CASE

               Defendant.
-----------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF**
**SONY MUSIC ENTERTAINMENT'S MOTION TO DISMISS**
**THE FIRST AMENDED COMPLAINT**


**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018

*Attorneys for Defendant*
*Sony Music Entertainment*

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Preliminary Statement .................................................................................................... 1

Statement of Facts .......................................................................................................... 2

      A.      19 Enters into Comprehensive Artist-Specific License Agreements with SME. ....................................................................................................... 3

      B.      The Royalty Provisions of the Agreements between SME and 19. ...................... 4

      C.      Contractual Incontestability Provisions and the Tolling Agreement. .................. 10

Argument ....................................................................................................................... 11

I.      The Unambiguous Language of the Agreements Requires Dismissal of Several of 19's Breach of Contract Claims. ..................................................................................... 11

      A.      Royalty Escalations Are Calculated Based on Sales of Recording Commitment Albums, and Not the Sale of Multiple Individual Tracks. .............. 11

      B.      19's Claim That SME Underpaid Streaming Royalties Arising from "Distribution" or "Sales" Agreements Must Be Dismissed. ................................ 15

      C.      SME Can Deduct Advertising Costs for Compilation Albums from 19's Royalties. ............................................................................................................ 18

      D.      19 Is Not Entitled to a Share of SME's Recoveries from Legal Proceedings Not Brought in the Name of 19 or Its Artists. ................................ 20

      E.      Foreign Advertising Expenditure Thresholds for Royalty Deductions Apply on a Per-Campaign, Not a Per-Album, Basis. .......................................... 21

II.      Claims for Carrie Underwood and Kellie Pickler Royalties from 2006 Are Barred. ....... 22

III.      19 Does Not State a Claim for Breach of the Duty of Good Faith and Fair Dealing. ....................................................................................................................... 23

Conclusion ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allman v. UMG Recordings,*
530 F. Supp. 2d 602 (S.D.N.Y. 2008)..............................................................10, 23

*Andrews v. Sotheby Int'l Realty, Inc.,*
2014 WL 626968 (S.D.N.Y. Feb. 18, 2014)......................................................2, 12

*ARI & Co. v. Regent Int'l Corp.,*
273 F. Supp. 2d 518 (S.D.N.Y. 2003)....................................................................24

*Arista Records, LLC v. Doe 3,*
604 F.3d 110 (2d Cir. 2010)....................................................................................25

*Banco Espirito Santo, S.A. v. Concessionaria*
951 N.Y.S.2d 19 (1st Dep't 2012) ..........................................................................19

*Citibank, N.A. v. 666 Fifth Ave. Ltd. P'ship,*
769 N.Y.S.2d 268 (1st Dep't 2003) ........................................................................19

*Greenfield v. Philles Records,*
750 N.Y.S.2d 565 (2002)................................................................11, 15, 17, 19

*JBCHoldings NY, LLC v. Pakter,*
931 F. Supp. 2d 514 (S.D.N.Y. 2013)....................................................................25

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
424 F.3d 195 (2d Cir. 2005)............................................................................13, 16

*M/A-COM Sec. Corp. v. Galesi,*
904 F.2d 134 (2d Cir. 1990)....................................................................................24

*Mastrovincenzo v. City of New York,*
435 F.3d 78 (2d Cir. 2006)......................................................................................14

*Peabody v. Weider Publ'ns, Inc.,*
2006 WL 3802214 (S.D.N.Y. Dec. 26, 2006) .......................................................23

*Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.,*
30 N.Y.2d 34 (1972) ...............................................................................................24

*Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.,*
973 N.Y.S.2d 187 (1st Dep't 2013) ........................................................................20

*Wurtsbaugh v. Banc of Am. Secs.,*
2006 WL 1683416 (S.D.N.Y. June 20, 2006) .......................................................11

**OTHER AUTHORITIES**

*Apple Launches the iTunes Music Store* (Apr. 28, 2003),
     https://www.apple.com/pr/library/2003/04/28Apple-Launches-the-iTunes-Music-
     Store.html.................................................................................................................12

John Borland, *Pressplay to offer unlimited downloads*, CNET News (July 31, 2002),
     http://news.cnet.com/2100-1023-947507.html .......................................................12

Fed. R. Civ. P. 12(b)(6)....................................................................................................11

PRELIMINARY STATEMENT

In this action, plaintiff 19 Recordings Ltd. ("19") seeks to rewrite its agreements with Sony Music Entertainment ("SME") in order to claim millions of dollars in royalties that SME never agreed to pay. 19 claims that SME has not complied with the parties' agreements, but 19's Amended Complaint and the plain terms of the agreements make clear that what 19 really seeks to do is to replace the parties' actual bargain with one more to 19's liking.

Beginning in 2002, 19 entered into a series of exclusive recording agreements with contestants on the television show *American Idol*. 19 then separately entered into detailed, comprehensive agreements licensing to SME the exclusive worldwide rights to exploit the sound recordings made by some of those contestants. These agreements specify, in exacting detail, the royalties that SME must pay to 19 in connection with various uses of the sound recordings—royalties that have amounted to many millions of dollars over the past decade.

Now, under guise of contractual interpretation, 19's Amended Complaint seeks to constructively amend the agreements so as to improve the deal for 19. For example, the parties' agreements provide for an escalation in the royalty rate payable on sales of "Recording Commitment Albums" when sales of those albums reach a certain threshold. 19 now claims that SME must aggregate sales of single-track downloads into so-called "Track Equivalent Albums," and count such sales as "Album" sales when determining whether such thresholds have been reached. But the agreements expressly distinguish between "Albums" and "Records other than Albums" (the latter of which includes single-track downloads), and state that royalty escalations will be based solely on sales of "Recording Commitment Albums"—not single-track Records.

The parties' agreements also provide that the royalty rate payable on streaming uses will vary based on how the agreement between SME and the streaming service describes or characterizes the transaction: 19 is entitled to one royalty rate when the agreement describes the

transaction solely as a "broadcast" or "transmission," and a lower rate when the transaction is described differently or also is described as a "distribution" or "sale."  In only one instance did 19 agree that the royalty would *not* turn on the language of the streaming agreement—where the streaming service is operated by SME or an SME affiliate.  But now, 19 argues that it should *never* be bound by the description in the streaming agreement, and that it should receive the higher royalty rate on all streaming uses, regardless of what the streaming agreement says.

19 even argues that the Court should read contractual terms inconsistently.  For example, 19 asserts that for purposes of determining whether royalties are owed on sales of Compilation Albums, Compilation Albums should be considered "Records Sold"—a defined term.  But for purposes of calculating whether certain deductions can be taken in calculating those royalties, 19 claims that Compilation Albums should *not* be considered Records Sold.

The claims addressed below should be dismissed with prejudice, because 19 cannot unilaterally alter contractual language that it agreed to repeatedly over several years.

### STATEMENT OF FACTS

For purposes of this motion, and despite the Amended Complaint's numerous misstatements, SME treats plaintiff's factual allegations as if they were true, except where contradicted by the documents to which plaintiff refers.  *See Andrews v. Sotheby Int'l Realty, Inc.*, 2014 WL 626968, at *3 (S.D.N.Y. Feb. 18, 2014) (Abrams, J.) (when reviewing a Rule 12(b)(6) motion to dismiss, "[i]n addition to the allegations in the Complaint, the Court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . ." (internal quotation omitted)).  A copy of the Amended Complaint is attached as Exhibit A to the Declaration of Christopher Y. L. Yeung, dated June 19, 2014.

### A. 19 Enters into Comprehensive Artist-Specific License Agreements with SME.

19 is a corporation affiliated with the company that launched the television show *American Idol*. (Am. Compl. ¶¶ 1, 6.) As part of the show's competition, 19 entered into exclusive recording agreements with some of the show's contestants. (*Id.* ¶ 6.)

Starting in 2002, SME[1] and 19 entered into a series of artist-specific agreements granting SME the exclusive worldwide license to exploit sound recordings by *American Idol* artists signed by 19. (*Id.* ¶¶ 15–16; *compare e.g.*, Ex. C ¶ 1.2 (defining "Artist" to mean "Clay Aiken") *with* Ex. G ¶ 1.2 (defining "Artist" to mean "David Archuleta").).)[2] Each agreement broadly "granted [SME] the exclusive right to manufacture, advertise, promote, distribute, sell, and otherwise exploit, and to license such rights to others, the individual recordings of the Artists in all configurations throughout the world." (Am. Compl. ¶ 16; *see also, e.g.*, Ex. B ¶ 12.1.1(a).)[3]

Each agreement contained anywhere from 49 to 60 pages of provisions that set forth, in meticulous detail, SME's rights and its royalty and other obligations to 19 in connection with a particular artist's sound recordings. (*Compare* Ex. B (60 pages) *with* Ex. C (49 pages).) The agreements begin with a list of 45 or more precisely defined terms, and include at least 17 subsections on royalty calculations. (*See, e.g.*, Ex. B. Arts. 1 & 7.) The agreements contain a New York choice-of-law clause. (*Id.* ¶ 28.1.)

---

[1]     As used here and in the Amended Complaint, SME refers to Sony Music Entertainment and its predecessors-in-interest. (Am. Compl. ¶ 2.)

[2]     "Ex." refers to the exhibits attached to the Declaration of Christopher Y. L. Yeung, dated June 19, 2014.

[3]     As 19 does in the Amended Complaint (*see* Am. Compl. ¶ 16), SME will cite to the provisions in the Kelly Clarkson agreement, dated September 25, 2002, unless otherwise noted.

19's lawsuit alleges that SME breached eight license agreements dated between 2002 and 2009 (collectively, the "Agreements"): Kelly Clarkson, dated September 25, 2002 (Ex. B); Clay Aiken, dated June 25, 2003 (Ex. C); Carrie Underwood, dated 2005 (Ex. D); Chris Daughtry, dated September 25, 2006 (Ex. E); Kellie Pickler, dated December 21, 2006 (Ex. F); David Archuleta, dated August 15, 2008 (Ex. G); David Cook, dated August 15, 2008 (Ex. H); and Jordin Sparks, dated October 30, 2009 (Ex. I).  (Am. Compl. ¶¶ 15–16, 24–25.)  The Amended Complaint also alleges that SME breached its duty of good faith and fair dealing by "wrongfully with[holding] the benefits of the . . . Agreements from 19 by performing in bad faith and abusing its discretion."  (*Id.* ¶ 160.)  19 asserts claims through the royalty period ending June 30, 2013.  (*Id.* ¶ 26.)

**B.     The Royalty Provisions of the Agreements between SME and 19.**

Article 7 of each of the Agreements contains the principal provisions governing SME's royalty obligations to 19.

1.     *Basic Royalty Rates for "Albums" and "Records other than Albums"*

Paragraph 7.1 sets forth the basic royalty rates for Records Sold in the United States and other territories worldwide.  The rates vary by artist.

For each territory, there is a royalty rate for "Albums," and a separate, ▮▮▮▮ rate for "Records other than Albums." (Ex. B ¶ 7.1.)  "Record" is defined as "a reproduction of Audio Material in any form now or later developed (including but not limited to discs and tapes) in which sounds alone excluding visual images (other than technical data such as credits or lyrics) can be perceived reproduced or otherwise communicated directly and/or with the aid of a machine or other device."  (*Id.* ¶ 1.27.)  The term "Record" thus encompasses any reproduction—including a single-track download, a full-album download, a full-length compact disc, or a 45-rpm vinyl single.  The Agreements define "Album" as a particular kind of Record:

4

"a Record containing not less than twelve (12) . . . nor more than twenty-five (25) different Tracks and totalling no fewer than forty-five (45) minutes of playing time[.]"  (*Id*. ¶ 1.1.)

2.   *Royalty Escalations Based on "the number of Records Sold . . . of any Recording Commitment Album".*

Paragraph 7.1 also contains a so-called "escalation clause," which provides for an increase in the royalty rate payable on Recording Commitment Albums—and not any other type of Records—when certain sales thresholds for such Recording Commitment Albums are met:

> [O]n an Album by Album basis, in the event that the number of Records Sold during the Term *of any Recording Commitment Album* throughout the world ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, then the royalty rate in respect of Records Sold of such Album in excess of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ shall increase ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in every territory.

(*Id*. ¶ 7.1 (emphasis added).)[4]

A "Recording Commitment Album" is "an Album forming part of the Recording Commitment".  (*Id*. ¶ 1.30.)  The "Recording Commitment" is defined as "the minimum quantity of Audio Material to be Delivered to [SME] . . . sufficient to comprise: (a) during the First Contract Period one (1) Album in respect of which the track listing and sequencing has been finalised . . . (the 'First Album')" and "(b) during each Contract Period after the First Contract Period one (1) Album in respect of which the track listing and sequencing has been finalised . . . (the 'Second Album' et seq as applicable)."  (*Id*. ¶ 1.29.)

Thus, the escalation clause is not applicable to all Records, or even to all Albums. It applies only to a Recording Commitment Album—which is defined as an Album with a specific track listing and sequence—when the sales of "such Album" exceed the threshold.

---

[4]     Agreements for certain artists excepted the royalty escalation from applying in the United States.  (*See* Ex. G ¶ 7.1 (providing that the royalty escalation applies "in every territory of the World excluding USA"); Ex. H (same); Ex. I (same).)

3.      *Royalties for Digital Downloads and Streaming Income.*

Paragraph 7.7 of each of the eight Agreements contains the royalty provision that applies to online sales of individual track downloads and full album downloads.  The provision sets the royalty for "Electronic Sales" (Ex. B ¶ 7.7), which are "the sale or rental or on-demand or near on-demand delivery or distribution of Records and/or Audio Visual Devices where the orders for such sales, rentals or distributions are made electronically (directly or indirectly) by the individual consumer and such sales are fulfilled . . . electronically[.]"  (Ex. B ¶ 1.15.)

The Agreements contain a separate royalty provision specific to income from streaming music services.  By its terms, this provision does not apply to any sale of digital downloads; the provision, which appears after the Electronic Sales provision, only applies to income "arising from the exploitation of Audio Material . . . not specifically provided for above[.]"  (Ex. B ¶ 7.16.)

With one exception, SME and 19 agreed that the royalty rate applicable to income from streaming music services would hinge on how the underlying agreement between SME and the streaming service provider described the transaction between SME and the streaming service provider.  Specifically, different royalty rates apply depending on whether the streaming agreement (1) "describes or characterises the exploitation as 'broadcast' or 'transmission'"; or (2) "does not so describe the exploitation as indicated above"—*i.e.*, as a "broadcast" "transmission"—or also "describes or characterizes the exploitation as 'distribution' or 'sales'":

> [I]n the event that the licence or other agreement pursuant to which such moneys are received by [SME] *describes or characterises the exploitation* as "broadcast" or "transmission" [SME] shall (subject to the provisions of clause 7.17 below) credit [19]'s royalty balance hereunder with ███████████████, but where the licence or other agreement *does not so describe the exploitation as indicated above or describes or characterises the exploitation* as "distribution" or "sales" then such monies shall be treated in accordance with the provisions of sub-clause 7.7 above [which

provides for a royalty based on a percentage that varies by artist of the otherwise applicable royalty rate].

(*Id.* (emphasis added).)

19 bargained for an exception to this approach only for streaming services "operated by [SME] or its affiliates." (*Id.*)  In such cases, 19 and SME agreed that the nature of such services—and with it the appropriate royalty treatment—"shall be characterised by the basis upon which [SME] accounts to the majority of its then current roster in respect of exploitation by such service." (*Id.*)  Thus, while 19 recognized the possibility that in some instances it would not wish to be bound by the language contained in SME's agreement with the streaming service, it specifically agreed that so long as the streaming agreement was between SME and an unaffiliated third party, the characterization contained in that agreement would control.

4.    *Credits for SME's Excess Recovery from Legal Proceedings.*

Each Agreement provides that, with 19's consent, SME can "institute . . . legal proceedings in the name of [19] and/or Artist as [SME] may deem suitable" in connection with preventing, *inter alia*, the unauthorized manufacture, sale, or distribution of Records.  (*Id.* ¶ 20.1.)   In such circumstances, SME "shall be entitled to deduct such costs incurred from all sums recovered as a result of such proceedings, and shall credit one half of any excess recovery to [19]'s royalty balance." (*Id.*)

By its term, this provision was limited to proceedings instituted in the name of 19 or the relevant Artist—and not to anti-piracy proceedings conducted by SME in its own name in connection with broad-based infringements of a substantial portion of SME's entire catalog. Lest there be any doubt about that, the parties separately provided that, "notwithstanding anything contained herein to the contrary, [19] shall not be entitled to a share of income received by or credited to [SME] on a general or label basis . . . ." (*Id.* ¶ 7.17.)

5.     *Deductions from Royalties for Advertising Expenditures.*

The parties agreed that 19's royalties would be reduced where SME incurs the costs of television and radio advertising to promote sales of a particular Record.  There are two relevant provisions, ¶ 7.5.1 and ¶ 7.5.2.  (*See* Am. Compl. ¶¶ 45–46.)

The default provision is paragraph 7.5.1, which provides for a royalty reduction in connection with each separate advertising campaign.   It states that "[i]n respect of Records Sold by [SME] or its licensees the marketing of which is supported by a major advertising campaign on radio and/or television . . . the Royalty shall be at fifty per cent (50%) of the otherwise applicable rate in respect thereof."  (Ex. B ¶ 7.5.1.)  This 50% royalty reduction is temporally limited to accounting periods that occur around the time of each advertising campaign:  "The half-rate reduction . . . shall be limited in application to Records Sold in the accounting period in which the sell-in period prior to the campaign occurs, in the accounting period(s) in which the campaign is conducted and in the next two accounting periods thereafter."  (*Id*.)  The reduction also is limited by the cost of the specific campaign:  the reduction "shall cease when the amount retained by [SME] equals 50% of the cost of the radio or TV campaign concerned[.]"  (*Id*.)

For certain territories, paragraph 7.5.2 sets forth exceptions that "will apply in place of sub-clause 7.5.1."  The first two exceptions provide that the costs of television and radio advertising campaigns, respectively, in the United States will be considered on a *per-Album* basis, rather than on a *per-campaign* basis as provided in paragraph 7.5.1.  Specifically, subparagraph (a) provides that 50% of SME's television advertising expenditures could be deducted from 19's royalties if those expenditures were between a specified minimum "for each such Album" and a maximum on "any one Album":

> [I]f the TV spend . . . in the USA for each such Album is in excess
> of ████, fifty per cent (50%) of the TV spend in the USA
> shall be treated as an advance recoupable from the Royalty (it

> being acknowledged and agreed that [SME] shall not spend more
> than ██████████████████████████████████████ on TV
> advertising any one Album in the USA without [19]'s consent, not
> to be unreasonably withheld or delayed)[.]

(*E.g.*, Ex. C ¶ 7.5.2(a).)[5]

Similarly, subparagraph (b) provides that 50% of SME's radio advertising expenditures could be deducted from 19's royalties as long as that expenditure exceeded a minimum amount "for each such Album": "[I]f the radio spend . . . in the USA for each such Album is in excess of ████████ fifty per cent (50%) of the radio spend in the USA shall be treated as an advance recoupable from the Royalty." (Ex. B ¶ 7.5.2(b).) Thus, under ¶¶ 7.5.2(a) and (b), the relevant thresholds apply to the total of all TV or radio advertising campaigns conducted in connection with a particular Album in the United States.

The third exception, contained in subparagraph (c), lists the maximum and minimum expenditures from which SME could recover without 19's prior consent in connection with advertising campaigns in 15 specified foreign countries. (*See* ¶ 7.5.2(c).) Unlike subparagraphs (a) and (b), however, none of the spending thresholds listed in ¶ 7.5.2(c) state that they apply "for each such Album" or on "any one Album." Instead—like the default provision in paragraph 7.5.1—these limits apply to each separate *campaign*:

> [I]f the TV and/or radio spend . . . is in excess of the following
> minimum TV spends . . . in the following countries, the royalty
> payable to [19] on Records Sold in the relevant country shall be
> reduced . . . until such time as 50% of the TV/radio spend in the
> country concerned has been recovered from the royalty retained by
> [SME] on the Album the subject of *the TV/radio advertising
> campaign* and . . . FURTHER PROVIDED THAT TV/radio
> spends in the following countries in respect of which [SME]
> wishes to apply the foregoing royalty reduction shall require [19]'s

---

[5]     The words "shall not spend more than ████████████████████" does not appear in ¶ 7.5.2(a) of the Kelly Clarkson agreement. (Ex. B ¶ 7.5.2(a).)

> prior consent, not to be unreasonably withheld or delayed, in the
> event that the applicable spends exceed the applicable maximum
> TV/radio spends[.]

(*Id*. (emphasis added).)

### C.    Contractual Incontestability Provisions and the Tolling Agreement.

The Agreements provide for SME to issue royalty statements to 19 on a semi-

annual basis for each artist, with each statement detailing the royalties credited to 19 for a single

artist in the preceding six-month period.  (*See id*. ¶ 17.1.)  As is common in the music industry,

each Agreement contains a contractual incontestability provision that limits the time in which 19

can contest the accuracy of royalty accountings.  *See generally Allman v. UMG Recordings*, 530

F. Supp. 2d 602, 605–06 (S.D.N.Y. 2008) (discussing contractual incontestability clauses in

recording agreements).  Under the Agreements, 19 must notify SME "within (3) years of the date

of [SME's] rendering of any statement furnished hereunder . . . in writing of any bona fide

objections thereto[.]"  (Ex. B ¶ 17.3.)  Otherwise, "such statement shall be conclusive evidence

as to the accuracy of accountings made to [19] hereunder during the period covered by such

statement and final and binding on and not open to dispute by either [SME] or [19]."  (*Id*.)

Starting in 2008, 19 retained two different firms to audit, on an artist-by-artist

basis, the royalty statements associated with each of the eight Agreements.  (Am. Compl. ¶¶ 20–

22, 29.)  On August 14, 2012, SME and 19 entered into a Tolling Agreement that stopped the

running of the applicable contractual and statutory limitation periods, and allowed 19 to pursue

claims arising from royalty periods whose limitations periods already had expired.  (*See id*. ¶ 28.)

The Tolling Agreement excepted from the toll certain royalty periods in 2006 for

Carrie Underwood and Kellie Pickler:

> Notwithstanding anything to the contrary contained herein, 19
> acknowledges that, even though Sony has agreed to provide certain
> information on Carrie Underwood for the period 1/1/06 through

12/31/06 and on Kellie Pickler for the period 7/1/06 through 12/31/06 (respectively, up to 12 months and 6 months beyond their otherwise applicable Contractual Statute of Limitations), *Sony is not at this time waiving any defenses they may otherwise be entitled to under each such Contractual Statute of Limitations with respect to those periods of time*.

(Ex. J ¶ 1 (emphasis added).)  19 terminated the Tolling Agreement and all applicable tolls expired on February 21, 2014.  (Am. Compl. ¶ 28.)

ARGUMENT

## I.   THE UNAMBIGUOUS LANGUAGE OF THE AGREEMENTS REQUIRES DISMISSAL OF SEVERAL OF 19'S BREACH OF CONTRACT CLAIMS.

"Despite the technological innovations that continue to revolutionize the recording industry, long-settled common-law contract rules still govern the interpretation of agreements between artists and their record producers." *Greenfield v. Philles Records*, 750 N.Y.S.2d 565, 569 (2002).  "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.*; *see also Wurtsbaugh v. Banc of Am. Secs.*, 2006 WL 1683416, at *5 (S.D.N.Y. June 20, 2006) ("[I]f an agreement is complete, clear and unambiguous on its face . . . a breach of contract claim may be dismissed on a Rule 12(b)(6) motion." (internal quotation omitted)).  Here, the unambiguous language of the Agreements requires dismissal of 19's claims that SME improperly calculated (A) royalty escalations; (B) streaming income; (C) advertising reductions for Compilation Albums; (D) royalty credits for excess recovery from anti-piracy legal proceedings; and (E) foreign advertising deductions.

### A.   Royalty Escalations Are Calculated Based on Sales of Recording Commitment Albums, and Not the Sale of Multiple Individual Tracks.

19 alleges that SME improperly calculated royalty escalations under ¶ 7.1 of the Agreements because SME failed to treat the sale of multiple individual Tracks as the sale of an

11

Album for royalty escalation purposes.  (Am. Compl. ¶¶ 76–90.)  But the unambiguous language of the Agreements—all of which were executed after single-track downloads were a fixture of the music business[6]—refutes 19's claim.  The royalty escalation applies only when certain thresholds have been met "on an Album by Album basis" for "the number of Records Sold . . . of any Recording Commitment Album".  (Ex. B ¶ 7.1.)

19's claim relies on the assertion that the sale of an individual Track should be treated as the sale of a segment of an Album for royalty escalation purposes.  (*See* Am. Compl. ¶¶ 83, 86.)  Nothing in the Agreements supports this claim.

*First*, Paragraph 1.1 defines the term "Album" as a single Record that contains between twelve and twenty-five different Tracks: "'Album' shall mean *a Record* containing not less than twelve (12) . . . nor more than twenty-five (25) *different* Tracks and totalling no fewer than forty-five (45) minutes of playing time (unless otherwise agreed by [SME] in writing in respect of *a particular Record*)."  (Ex. B (emphasis added).)   The Agreements refer to other Records as "Records other than Albums." (Ex. B ¶ 7.1.)  By its plain terms, this definition refutes 19's argument that the sale of any combination of multiple, *separate* single-track Records, none of which is an Album—including, for example, twelve separate sales of the same track to different consumers at different times—constitutes the sale of an Album for royalty escalation purposes.  If the parties intended multiple separate sales of Records that are *not*

---

[6]      *See A&M Records, Inc. v. Napster, Inc.*, No. 99-CV-05183 (N.D. Cal. filed Dec. 6, 1999); John Borland, *Pressplay to offer unlimited downloads*, CNET News (July 31, 2002), http://news.cnet.com/2100-1023-947507.html; *Apple Launches the iTunes Music Store* (Apr. 28, 2003), https://www.apple.com/pr/library/2003/04/28Apple-Launches-the-iTunes-Music-Store.html.  This Court may consider "matters of which judicial notice may be taken" on a 12(b)(6) motion.  *See Andrews*, 2014 WL 626968, at *3 (Abrams, J.).  Even 19 alleges that individual track downloads obtained 15% market penetration in the United States no later than July 1, 2004—before all but 2 of the agreements at issue were executed.  (Am. Compl. ¶ 141.)

Albums to count as an Album, they would have said so.  And if they intended multiple sales of a single track to count as an Album, they would not have specified that an Album consists of between twelve and twenty-five *different* Tracks.

Indeed, treating single-track Records as segments of Albums would improperly read several terms—among them, "Record containing", "different Tracks," and "in respect of a particular Record"—out of ¶ 1.1.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[U]nder New York law . . . the contract should be construed so as to give full meaning and effect to all of its provisions. . . . [and a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible" (internal quotations, alterations, and citation omitted.).

*Second*, ¶ 7.1's royalty escalation is triggered not by sales of just any Album, but by sales of "Recording Commitment Albums."  (Ex. B ¶ 7.1.)  Recording Commitment Albums are "Album[s] forming part of the Recording Commitment," (*id*. ¶ 1.30), which per the definition of "Recording Commitment," are Albums for which, *inter alia,* "the track listing and sequencing has been finalised" (*id*. ¶¶ 1.29(a), (b)).  Thus, a Recording Commitment Album—the only relevant type of Record for purposes of ¶ 7.1's escalation clause—is a specific Album with a unique set of Tracks that appear in a particular sequence.

*Third*, 19 alleges that because ¶ 7.1 states that "[f]or the purposes of the foregoing escalation, reference to Records Sold shall be deemed to refer to Records Sold . . . embodying Electronic Sales," the agreement "expressly requires" that any "Electronic Sales," including sales of "downloads of individual Tracks, segments of Albums, or [Track Equivalent Albums], are to be included" in calculating escalations.  (Am. Compl. ¶ 87.)  But the agreement does not provide for escalations to paid based on any "Records Sold."  It provides for escalations based only on

"Records Sold during the Term *of any Recording Commitment Album . . . .*"  The agreement's clarification that this includes "Electronic Sales" of any such Recording Commitment Album under certain circumstances in no way implies that Electronic Sales of Records that are *not* Recording Commitment Albums are to be counted towards the escalation threshold.

        *Fourth*, 19's interpretation leads to absurd results.  *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) ("[A]bsurd results should be avoided." (internal quotation and citation omitted)).  In each of the Agreements, ¶ 7.1 specifies three royalty rates for sales of Albums, and six rates for sales of "Records other than Albums."  (Ex. B ¶ 7.1.)  These nine royalty rates also are different for different artists, and ███████████████████.  (*Compare, e.g.*, Ex. B ¶ 7.1 *with* Ex. G ¶ 7.1.)  If, as 19 posits, the sale of individual Tracks must be treated as the partial sale of an Album for all royalty purposes, then the six royalty rates listed for Records other than Albums could, at most, apply to the sale of twenty-four Tracks—the remainder after the number of individual Tracks sold in a given royalty period is divided by twenty-five, the maximum number of Tracks that an Album can contain.  In that case, *no matter how many millions of Records were sold in a given period*, the economic consequence of having a different royalty rate for "Records other than Albums" would be, at most, two dollars and change.[7]  It would be absurd for SME and 19 to have negotiated and agreed to different royalty rates for Albums and Records other than Albums, in agreement after agreement, if the financial consequence in an entire royalty period would necessarily be so trifling.

---

[7]     The largest difference in any of the Agreements between the U.S. rates for Albums and for Records other than Albums, respectively, is ███.  Thus, assuming that all twenty-four single track downloads were sold at iTunes's highest rate of $1.29, and assuming (unrealistically) that SME receives 100% of that amount, the total royalty difference in any period that would result from having a rate for Records other than Albums is ███ ($1.29 x 24 x ███).

*Finally*, as the Amended Complaint makes clear, 19's real argument is that the industry uses the concept of Track Equivalent Albums in calculating album sales for other purposes, and that this concept therefore "reasonably" and "equitably" should be grafted onto the escalation provision of the Agreements.  (Am. Compl. ¶ 85.)  This argument is flawed both legally and factually.  As a legal matter, because "the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."  *Greenfield*, 98 N.Y.2d at 569–70, 573–74 (2002) (rejecting claim that recording contract should not be enforced as written, "[h]owever sympathetic plaintiffs' plight").  Likewise, SME's alleged practice of applying the Album rate to individual track downloads cannot change the unambiguous facial meaning of the Agreements.  *See id*. at 569 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous[.]").  And factually, 19's assertion that the Agreements did not contemplate the changes to the music industry caused by the rise of individual track downloads is refuted by the fact—of which this Court can take judicial notice (*see supra* note 6)—that all of the Agreements were executed *after* individual track downloads became a fixture in the music industry.

**B.    19's Claim That SME Underpaid Streaming Royalties Arising from "Distribution" or "Sales" Agreements Must Be Dismissed.**

Paragraph 7.16 of the Agreements sets forth two different royalty rates that can apply to income from streaming services.  One rate—███████████████—applies "in the event that the licence or other agreement pursuant to which such moneys are received by [SME] describes or characterises the exploitation as 'broadcast' or 'transmission.'"  (Ex. B ¶ 7.16.)  Another rate—the rate provided under ¶ 7.7—applies "where the licence or other agreement does not so describe the exploitation as indicated above *or* describes or characterises the exploitation as 'distribution' or 'sales.'"  (*Id*. (emphasis added).)

15

19 now claims that royalties on income from *all* third-party streaming services must be calculated at the rate of ███████████████████, on the grounds that streaming services "can only be fairly described as 'transmissions' or 'broadcasts.'"  (Am. Compl. ¶ 36; *see also id*. ¶ 39 ("As a matter of law, the underlying agreements . . . allow the streaming services to 'broadcast' or provide a 'transmission' . . . .).)

This claim improperly attempts to circumvent the parties' agreement.  Paragraph 7.16 unambiguously provides that royalties to 19 will be calculated pursuant to the ¶ 7.7 rate if the underlying license or agreement describes or characterizes the transaction between SME and the streaming service provider as anything other than a "broadcast" or "transmission", or also describes it as a "distribution" or "sale" (*i.e.*, even if the agreement also characterizes it as a "broadcast" or "transmission").   Under 19's argument, however, the entirety of ¶ 7.16 would serve no purpose at all; the provision should simply recite that the royalty for all streaming income shall be ██████████████.  This is not the bargain the parties struck.  *See LaSalle*, 424 F.3d at 206 ("[T]he contract should be construed so as to give full meaning and effect to all of its provisions . . . ." (internal quotations and citation omitted)).

Recognizing that its claim is at odds with the plain terms of the Agreements, 19 asserts that ¶ 7.16 includes references to "distribution" and "sale" solely to address royalties on permanent digital downloads sold by services that also offer digital streaming.  (Am. Compl. ¶¶ 34–35.)  That is pure revisionism, and it is at odds with the plain language of the Agreements. Paragraph 7.16 cannot apply to sales of permanent digital downloads, because (i) ¶ 7.16 is expressly limited by its terms to "the exploitation of Audio Material . . . not specifically provided for above,"  (Ex. B ¶ 7.16); and (ii) above ¶ 7.16 is ¶ 7.7, which sets forth the royalty treatment for all Electronic Sales, including sales of permanent digital downloads.  (*Id.* ¶ 7.7; *see also* ¶

16

1.15 (defining "Electronic Sales" as "the sale . . . or on-demand or near on-demand delivery or distribution of Records . . . where the orders for such sales . . . or distributions are made electronically (directly or indirectly) by the individual consumer and such sales are fulfilled . . . electronically[.]").)   Moreover, 19's argument—that ¶ 7.16 simply sets forth one rate for streaming services and another rate for downloads sold by providers of streaming services—fails to account for the parties' express provision that the royalty treatment is contingent on how the transaction is described in the agreement between SME and the streaming service, rather than on the objective nature of the transaction.

19 also alleges that it would somehow be unfair to hold it to the terms to which it agreed.   (Am. Compl. ¶¶ 36–40.)   Again, however, the New York Court of Appeals has expressly held that recording agreements must be enforced as written regardless of such claims. *See Greenfield*, 98 N.Y.2d at 569–70, 573–74 (2002) (dismissing claim in light of unambiguous terms of recording contract, "[h]owever sympathetic plaintiffs' plight").

This is especially true here, because 19 was clearly sensitive to the possibility that it would disagree with the characterization contained in the streaming agreement.   It bargained for the right not be bound by that characterization where the service in question "is operated by [SME] or its affiliates," and the language in the streaming agreement therefore may not be the result of arm's-length bargaining.   By contrast, in every other circumstance, 19 agreed to be bound by the characterization of the streaming agreement between SME and an unaffiliated third party.   Moreover, even where the streaming service is operated by SME or its affiliates, 19 agreed that the service's "nature shall be characterised by the basis upon which [SME] accounts to the majority of its then current roster in respect of exploitation by such service"—*not* that the service would necessarily be treated as a "broadcast" or "transmission."   (Ex. B ¶ 7.16.)

In short, 19's claim that all streaming services must be accounted for as a "broadcast" or "transmission" simply seeks to rewrite the plain terms to which it agreed over and over, in agreement after agreement.  19's claim for underpayment of streaming royalties where SME's agreement with the streaming service provider describes or characterizes the transaction between SME and the provider as "distribution" or "sales" should be dismissed.

### C.    SME Can Deduct Advertising Costs for Compilation Albums from 19's Royalties.

19 asserts that SME improperly reduced the royalty rate for Compilation Albums sold through television advertising under ¶ 7.5.1.  Paragraph 7.5.1 applies only to "Records Sold," and 19 contends that Compilation Albums cannot qualify as Records Sold because Records Sold must be comprised of recordings of a single artist.  (Am. Compl. ¶¶ 122–23, 125.)

19's claim should be dismissed.  *First*, nothing in the definition of Record excludes a recording that includes a performance by both the Artist and another performer.  In fact, ¶ 7.11 is a royalty provision for sales of Records that embody "joint performances"—where the "Artist performs pursuant hereto jointly with any artist(s) in favour of whom [SME] or its licensees is obliged to accrue royalties[.]"  (Ex. B ¶ 7.11.)  The inclusion of such a provision makes clear that a "Record" can include Masters performed by multiple artists.

*Second*, as 19 acknowledges in ¶ 124 of the Amended Complaint, Compilation Albums are expressly listed as types of "Records Sold" under the Agreements.  Paragraph 7.4.2 sets forth the royalties for "Records Sold" by SME and its licensees "in the following categories."  (*Id*. ¶ 7.4.2.)  Two different types of Compilation Albums are listed among the categories of "Records Sold" that follow:  (1) "Compilation Albums which are released by Company or as part of its joint venture arrangements or by an affiliate of [SME]"; and (2) "Compilation Albums which are released by third parties."  (*Id*. ¶¶ 7.4.2(c) and (d).)

18

Thus, if 19 were correct that Compilation Albums cannot be "Records Sold," then there would be no royalty provision in the Agreements covering Compilation Albums at all (since ¶¶ 7.4.2(c) and (d) are the only royalty provisions in the Agreements that govern Compilation Albums, and they only apply to Records Sold).  As a result, rather than allegedly being liable for taking improper deductions, SME would not have owed *any* Compilation Album royalties in the first place, and would have a counterclaim for royalties paid on such uses.[8]  *See Greenfield*, 98 N.Y.2d at 573–74 (allowing defendants to issue synchronization licenses without paying plaintiffs royalties, because contract did not include a royalty for that use).

19's response is to argue that the Court should hold that the defined term "Records Sold" encompasses sales of Compilation Albums for purposes of determining whether royalties are owed (*i.e.*, for purposes of ¶¶ 7.4.2(c) and (d)), but does not encompass sales of Compilation Albums for purposes of determining whether advertising deductions can be taken in calculating those royalties (*i.e.*, pursuant to ¶ 7.5.1).  (Am. Compl. ¶ 124.)  19 cannot have it both ways.  *See Banco Espirito Santo, S.A. v. Concessionaria do Rodoanel Oeste, S.A.*, 951 N.Y.S.2d 19, 25 (1st Dep't 2012) (deeming argument that single defined term should be given different meanings, even where differently punctuated, "unreasonable and even irrational").[9]  The defined term Records Sold either includes sales of Compilation Albums (in which case the deduction is

---

[8]    As such, if this Court holds that Compilation Albums cannot be Records Sold, SME requests the dismissal of the claim that SME underpaid 19 for royalties on Compilation Albums. (Am. Compl. ¶¶ 65–71.)

[9]    19 asserts that this Court should interpret any ambiguity against SME as drafter of the Agreements (Am. Compl. ¶ 124), but 19's own allegations make clear that the Agreements were derived from a template that 19 agreed to with Ronagold Limited, an entity that is not affiliated with SME in any way.  (*Id*. ¶ 16.)  As such, no ambiguity in the Agreements can be construed against SME.  *See Citibank, N.A. v. 666 Fifth Ave. Ltd. P'ship,* 769 N.Y.S.2d 268, 269 (1st Dep't 2003) (refusing to construe ambiguities against defendants where "plaintiff failed to show that it had no voice in the selection of [agreements'] language" (internal quotations and citation omitted)).

appropriate) or it does not (in which case no royalty is owed at all); either way, 19's claim must be dismissed.

      **D.**     **19 Is Not Entitled to a Share of SME's Recoveries from Legal Proceedings Not Brought in the Name of 19 or Its Artists.**

19 alleges that ¶ 20.1 of the Agreements "requires Sony to credit 19's royalty balance based on 'one half of any excess recovery' from sums received as a result of a legal proceeding[.]"  (Am. Compl. ¶ 98.)  19 does not identify any such legal proceedings, claiming only that it is entitled to additional monies from lawsuits whose subjects "include[]"—but are not limited to—"the Artists' Masters."  (*Id.* ¶ 97.)

19 is mistaken.  By its terms, ¶ 20.1 provides for 19 to share in excess recoveries only from legal proceedings that SME institutes "in the name of [19] and/or Artist[.]"  (Ex. B ¶ 20.1.)  It does not apply to proceedings that are brought in SME's name, including those aimed at stopping broad-based copyright infringement of a substantial portion of Sony's catalog.

Moreover, ¶ 7.17 also prohibits 19 from sharing in any income "received by or credited to [SME] on a general or label basis[.]"  This provision applies "notwithstanding anything contained herein to the contrary," and thus supersedes all other provisions of the Agreements.  *See Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 191 (1st Dep't 2013) ("It is well settled that trumping language such as a 'notwithstanding' provision controls over any contrary language in a contract." (citation and internal quotation marks omitted)).  19's claim for a share of SME's monetary awards and settlements received on a general or label basis, or from any proceedings not brought in 19's or the Artist's name (even for amounts received specifically for such Artist's recordings), should therefore be dismissed.

E.      **Foreign Advertising Expenditure Thresholds for Royalty Deductions Apply on a Per-Campaign, Not a Per-Album, Basis.**

19 alleges that SME improperly deducted foreign television and radio advertising expenditures from 19's royalties by applying the specified "maximum" spend thresholds listed in ¶ 7.5.2(c) on a per-campaign, rather than a per-Album, basis.  (Am. Compl. ¶¶ 47–48.)  Not so.

Both ¶¶ 7.5.1 and 7.5.2 permit SME to reduce 19's royalties based on television and radio advertising expenditures.  Paragraph 7.5.1 generally provides for a 50% reduction in the royalty payable to 19 for records sold "the marketing of which is supported by a major advertising campaign on radio and/or television."  (Ex. B ¶ 7.5.1.)  The royalty reduction applies on a per-campaign basis to each separate advertising campaign:   ¶ 7.5.1 provides that the reduction will be limited to (1) "the accounting period in which the sell-in period prior to the campaign occurs"; (2) "the accounting period(s) in which the campaign is conducted"; and (3) "the next two accounting periods thereafter"; and in any event "shall cease when the amount retained by the Company equals 50% of the cost of the radio or TV campaign concerned."  *Id.*

Paragraph 7.5.2 lists certain exceptions that "will apply in place of sub-clause 7.5.1[.]"  (*Id.* ¶ 7.5.2.)  Subparagraphs 7.5.2(a) and (b) permit SME to deduct 50% of its television and radio advertising expenditures in the United States from 19's royalties as long as those expenditures are within specified minimum and maximum amounts.  (*Id.* ¶¶ 7.5.2(a) and (b).)  Those maximums and minimums plainly apply on a per-Album basis (*i.e.*, they are aggregate thresholds for all campaigns conducted in connection with a particular Album):  each is listed either as an amount that applies for "each such Album" or on "any one Album."  (*Id.*)

In contrast, ¶ 7.5.2(c), which sets forth the minimum and maximum deductible advertising expenditures that apply in 15 specifically enumerated foreign countries, contains no language limiting those amounts to "each such Album" or "any one Album."  Instead, like the

21

default provision in ¶ 7.5.1, ¶ 7.5.2(c) unambiguously provides for SME's deduction of television and radio advertising expenditures on a per campaign basis:  19's royalties "shall be reduced . . . until such time as 50% of the TV/radio spend in the country concerned has been recovered from the royalty retained by [SME] on the Album *the subject of the TV/radio advertising campaign.*"  (*Id.* ¶ 7.5.2(c) (emphasis added).)  Thus, the royalty reduction provisions contained in ¶ 7.5.2(c) unambiguously apply on a per-campaign, rather than a per-Album basis.

The only language in the Agreements to which 19 points in support of its argument that the advertising expenses that SME can deduct under ¶ 7.5.2(c) are capped on a per-Album rather per-campaign basis is 7.5.2(c)'s use of the plural term "spends."  19 contends that the use of this term "clearly supports that the intention of the parties was to aggregate each individual TV or radio spend into the total spends that had to be achieved, and not exceeded, in order for a portion of these amounts to be recouped."  (Am. Compl. ¶ 49.)  Even if this were true, however, it is beside the point.  The issue is not whether multiple expenditures should be aggregated for the purposes of ¶ 7.5.2(c)'s minimum and maximum thresholds, but whether they should be aggregated on a per-campaign or per-Album basis.  19 does not even allege how a reference to aggregated "spends" supports its position that the aggregation should be per-Album, rather than per-campaign as the Agreements provide.  19's claim that ¶ 7.5.2(c)'s thresholds apply on a per-Album basis therefore must be dismissed.

## II.   CLAIMS FOR CARRIE UNDERWOOD AND KELLIE PICKLER ROYALTIES FROM 2006 ARE BARRED.

Certain claims for royalty underpayments from 2006 for Carrie Underwood and Kellie Pickler are barred by the applicable contractual incontestability provisions.

The Tolling Agreement excluded claims related to both semi-annual royalty periods in 2006 for Carrie Underwood (from January 1 to June 30, 2006, and July 1 to December

31, 2006) and to the second royalty period in 2006 (July 1 to December 31, 2006) for Kellie

Pickler.  Paragraph 1 of the Tolling Agreement states that "Sony is not at this time waiving any

defenses they may otherwise be entitled to under each such Contractual Statute of Limitations

with respect to those periods of time."  (Ex. J ¶ 1.)[10]  This exception applies "[n]otwithstanding

anything to the contrary contained herein." (*Id*.)

These three royalty periods are thus subject to the three-year contractual

incontestability provision contained in the Carrie Underwood and Kellie Pickler agreements.

(Ex. D ¶ 17.3; Ex. F ¶ 17.3.)   The royalty statements for the latest of these periods were issued

by March 31, 2007.  (Ex. D ¶ 17.1; Ex. F 17.1.)  The three-year period in which to contest these

royalty periods therefore expired long ago.   Accordingly, any claim concerning those royalty

periods must be dismissed.  *See Allman*, 530 F. Supp. 2d at 605 ("Courts applying New York law

routinely uphold the enforceability of contractual incontestability provisions.").

### III.   19 DOES NOT STATE A CLAIM FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING.

Under New York law, a claim for breach of the implied covenant must be

dismissed if the conduct allegedly violating the implied covenant is also the predicate for an

express breach of contract claim.  *See Peabody v. Weider Publ'ns, Inc.*, 2006 WL 3802214, at *5

(S.D.N.Y. Dec. 26, 2006) (holding that plaintiff could not maintain implied covenant claim

based on the same conduct as his breach of contract claim), *aff'd*, 260 F. App'x 380 (2d Cir.

2008).  Even if the implied covenant claim is not based on the same conduct, moreover, "where

---

[10]     "Contractual Statute of Limitations" is defined as the provision in SME's agreements
with 19 containing "specified periods of time beyond which royalty accountings . . . become
'final and binding' and within which claims for underpayment and/or nonpayment of royalties
for these periods must be made and/or legal actions must be filed".  (Ex. J, at 1.)  These are the
contractual incontestability provisions found in ¶ 17.3 of the Carrie Underwood and Kellie
Pickler agreements.  (Ex. D ¶ 17.3; Ex. F ¶ 17.3.)

the relief sought by the plaintiff in claiming a breach of the implied covenant of good faith is 'intrinsically tied to the damages allegedly resulting from the breach of contract,' there is no separate and distinct wrong that would give rise to an independent claim." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (citation omitted).

Here, 19's implied covenant claim unquestionably is based on the same conduct, and seeks the same damages, as its breach of contract claims. The express contract claim alleges that SME "has failed to comply with the terms of the Recording Agreements, and failed to fulfill its obligations under the Recording Agreements, by failing to properly account to and pay 19 royalties for licensing, sales, and other exploitations of the Masters." (Am. Compl. ¶ 153.) The implied covenant claim, in turn, seeks the same relief based on the contention that, by engaging in the conduct that is the subject of the express contract claims, SME "wrongfully withheld the benefits of the Recording Agreements from 19 by performing in bad faith and abusing its discretion." (*Id.* ¶ 160.) Thus, the claim is duplicative of the breach of contract claim and must be dismissed.

In addition, 19's claim that SME abused its discretion by entering into streaming agreements and individual Track download sales agreements in a manner that benefitted SME and purportedly reduced 19's expected profits would fail to state a claim even if not duplicative. (*See* Am. Compl. ¶¶ 40, 88–89, 160.) "[T]he implied covenant does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 45 (1972)).

24

Similarly meritless is 19's claim that SME abused its discretion by failing to escalate royalties based on sales of individual Track downloads.  (*See* Am. Compl. ¶¶ 88–89, 160.)  SME has no implied obligation to pay 19 more than is provided for in the Agreements.

Finally, 19 cannot state an implied covenant claim by pleading on "information and belief" that SME purposefully exploited Masters at below-market value.  (Am. Compl. ¶ 107.)  19 can plead facts on information and belief only "where the facts are peculiarly within the possession and control of the defendant" or "where the belief is based on factual information that makes the inference of culpability plausible[.]"  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  Even then, 19 must plead "such allegations . . . accompanied by a statement of the facts upon which the belief is founded."  *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013) (internal quotations omitted).  The Amended Complaint contains no such statement.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the claims identified above.

Dated:   New York, New York          Respectfully submitted,
              June 19, 2014

                                                   COVINGTON & BURLING LLP


                                                   By:   ___s/ Jonathan M. Sperling___
                                                            Jonathan M. Sperling

                                                   The New York Times Building
                                                   620 Eighth Avenue
                                                   New York, NY 10018
                                                   (212) 841-1000
                                                   (212) 841-1010 (fax)
                                                   jsperling@cov.com

                                                   *Attorneys for Defendant Sony Music Entertainment*

25