Richard S. Busch (SB 5613)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone:  (615) 259-3456
Facsimile:   (615) 726-541

Kenneth E. Gordon (KG 5703)
GORDON, GORDON & SCHNAPP, P.C.
437 Madison Avenue, 39th Floor
New York, New York 10022
Telephone:  (212) 355-3200
Facsimile:   (212) 355-3292

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **19 RECORDINGS LIMITED**<br><br>        **Plaintiff,**<br>**v.**<br><br>**SONY MUSIC ENTERTAINMENT,**<br><br>        **Defendant.** | **Case No. 14-CV-I056 (RA)(GWG)**<br><br>**RESPONSE IN OPPOSITION TO DEFENDANT SONY MUSIC ENTERTAINMENT'S MOTION TO DISMISS**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

i

## TABLE OF CONTENTS

I.    Background Facts ....................................................................................................1

   A.  The Claims Relevant to this Motion  ..................................................................2

   B.  Sony Improperly Paid Royalties to 19 for Streaming Income ..............................3

   C.  Sony has Improperly Deducted TV Advertising Costs from 19's Royalties ........6

   D.  Sony has Improperly Deducted Advertising Costs from 19's Royalties .............7

   E.  Sony has Breached the Recording Agreements and Its Duty of Good Faith and
        Fair Dealing by not Counting Individual Track Downloads in the form of TEAs
        for Purposes of Royalty Escalations ...................................................................8

        1.  Sony Breached the Recording Agreements by not Counting TEAs for
            Escalation Purposes ......................................................................................8

        2.  Sony Breached Its Duty of Good Faith and Fair Dealing by Allowing for the
            Disaggregation of Albums, but not Counting TEAs towards Escalations....10

II.   Standard of Review ...............................................................................................13

III.  Sony's Motion to Dismiss Should be Denied .........................................................13

   A.  19's Breach of the Duty of Good Faith and Fair Dealing Claims are not
        Duplicative of the Breach of Contract Claims ...................................................13

   B.  Sony Breached Its Duty of Good Faith and Fair Dealing by Micharachterizing Its
        Agreements with Streaming Providers  .............................................................15

   C.  Sony Cannot Recoup an Unlimited Amount of Advertising Expenses by Claiming
        It is Starting and Restarting a "Campaign" Over and Over  .............................16

        1.  Adopting Sony's Interpretation
            Would Lead to an Absurd Result..................................................................18

        2.  The Minimum TV/Radio Spends and Maximum TV/Radio/Spends Amounts
            Reflect a "Per Album" Basis.......................................................................19

   D.  Sony Improperly Deducts Advertising Costs for Compilation Albums  ............19

        1.  Ambiguities Must Be Construed Against the Party Who Drafted Them......19

        2.  Sony's Interpretation Leads to Absurd Results ...........................................20

   E.  Sony has Failed to Account to and Pay 19 for Settlements Directly Attributable to
        the Masters ........................................................................................................21

   F.  Sony Failed to Correctly Calculate the Escalations in Certain Royalty Rates by
        Ignoring TEAs ...................................................................................................22

1.  The Recording Agreements make Electronic Sales Applicable to Escalation Rate Calculations ........................................................................................22

2.  Sony Ignores the Parties' Intent ................................................................23

3.  Extrinsic Evidence Shows TEAs must Count towards Escalations .............25

G.  Sony Breached Its Duty of Good Faith and Fair Dealing ..................................26

1.  Sony Improperly Entered Agreements which Deprived 19 of its Right to Escalated Royalty Rates.............................................................................26

H.  Limitations of 19's Claims...................................................................................27

# TABLE OF AUTHORITIES

*511 West 232nd Owners Corp. v. Jennifer Realty Co.,*
   *98 N.Y.2d 144 (N.Y. 2002)* ................................................................................15

*AFBT-II, LLC v. Country Vill. on Mooney Pond, Inc.,*
   *759 N.Y.S. 2d 149 (N.Y. Sup. Ct. App. Div. 2003)* ...........................................13

*Bell Atlantic Corp. v. Twombly,*
   *50 U.S. 544 (2007)* .......................................................................................13, 27

*Conley v. Gibson,*
   *355 U.S. 41 (1957)* .............................................................................................13

*Cortale v. Educational Testing Service,*
   *674 N.Y.S. 2d 753 (N.Y. Sup. Ct. App. Div. 1998)* ...........................................14

*Crossroads ABL, LLC v. Canara Capital Mgt., LLC,*
   *35 Misc. 3d 1238 (N.Y. Sup. Ct. 2012)* .............................................................14

*Dalton v. Educational Testing Service,*
   *87 N.Y.2d 384 (N.Y. 1995)* ......................................................................9, 14, 27

*Elmhurst Dairy v. Bartlett Dairy,*
   *2012 N.Y. App. Div. LEXIS 5659, at \*7-8 (N.Y. Sup. Ct. App. Div. July 25, 2012)* ...15, 16

*Empire Properties Corp. v. Manufacturers Trust Co.,*
   *288 N.Y. 242 (N.Y. 1942)* ..................................................................................23

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank,*
   *680 F. Supp. 2d 625 (S.D.N.Y. 2010)* ................................................................13

*Gray & Assoc., LLC v. Speltz & Weis LLC,*
   *22 Misc 3d 1124(A) (N.Y. Sup. Ct. 2009)* ........................................10

*Harris v. Provident Life & Accident Ins. Co.,*
   *310 F.3d 73 (2d Cir. 2002)* ................................................26

*Kass v. Kass,*
   *91 N.Y2d 554 (N.Y. 1998)* ..........................................13, 23

*Kassner v. 2nd Ave. Delicatessen, Inc.,*
   *496 F.3d 229 (2d Cir. 2007)* ................................................13

*Legend Autorama, Ltd. v. Audi of Am., Inc.,*
   *934 N.Y.S. 2d 34 (N.Y. Sup. Ct. 2011* ................................................13

*Marion Scott Real Estate, Inc. v. Rochdale Vil., Inc.,*
   *23 Misc.3d 1129(A) (N.Y. Sup. Ct. 2009)* ........................................16

*Mastrovincenzo v. City of New York,*
   *435 F.3d 78 (2d Cir. 2006)* ........................................19, 25

*McKenna v. Case,*
   *507 N.Y.S.2d 777 (N.Y. Sup. Ct. App. Div. 1986)* ................................16

*Medina v. State Farm Mut. Auto Ins. Co.,*
   *757 N.Y.S.2d 178 (N.Y. Sup. Ct. App. Div. 2003)* ................................16

*Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.,*
   *225 F.3d 270 (2d Cir. 2000)* ........................................25-26

*New York v. New York C.R. Co.,*
   *193 N.Y. 543 (N.Y. 1908)* ................................................26

*Robertson v. The Ongley Electric Co.,*
> ***146 N.Y. 20 (N.Y. 1895)*** ............................................................................9 n. 8, 23

*Toto, Inc. v. Sony Music Entertainment,*
> ***2012 WL 1416884 (S.D.N.Y. Apr. 23, 2012)*** ..................................................9 n.8

*Van Wagner Adver. Corp. v. S & M Enters.,*
> ***67 N.Y.2d 186 (N.Y. 1986)*** ..........................................................................24

*William C. Atwater & Co. v. Panama R. Co.,*
> ***246 N.Y. 519 (N.Y. 1927)*** ...........................................................................9 n. 8, 23

*Williams Press, Inc. v. New York,*
> ***37 N.Y. 242 (N.Y. 1975)*** .............................................................................23

*Wiser v. Enervest Operating, LLC,*
> ***803 F. Supp. 2d 109 (N.D.N.Y. 2011)*** ..........................................................20, 23

Plaintiff 19 Recordings Limited ("19"), by and through its counsel, hereby submits its Response to Defendant Sony Music Entertainment's ("Sony") Motion to Dismiss. As discussed fully below, Sony's motion to dismiss should be denied in its entirety since 19 has gone well beyond its pleading obligations, and has, with great detail, sufficiently pleaded facts supporting each element of each claim contained in the First Amended Complaint.[1]

## I.        Background Facts

19's affiliated company brought *American Idol*, the premier televised American talent competition, to the United States in 2002. DE 18 at ¶ 6. *American Idol* has made dozens of individual Artists household names. *Id.* As part of the *American Idol* competition, 19 signed the contestants to exclusive recording agreements and, as described below, entered into virtually identical licensing agreements with Sony with respect to the Idol winner and certain other finalists, allowing Sony to reap millions of dollars in profits by exploiting their respective works (the artists who recorded for Sony and for whom 19 has undertaken audits as identified below, are collectively referred to herein as the "Artists"). *Id.* at ¶ 6, 16.

Prior to the selection of the first American Idol winner, in September of 2002, 19 entered into a master agreement (the "Master Recording Agreement") with Ronagold Limited granting Ronagold the right to designate the RCA Record Label, a unit of BMG Music and the predecessor-in-interest of Sony, as the "exclusive record label" for all American Idol finalists during the first nine seasons[2] of American Idol. *Id.* at ¶ 16. Attached thereto was the template agreement 19 was required to use in licensing Sony the rights to future acts "picked up" each season by Sony (including, without limitation, each of the Artists), and thus was the master "form" for the series of exclusive licensing agreements thereafter entered into by 19 and Sony for each of the Artists (individually and collectively referred to, as each may have been amended,

---

[1] While 19 has thoroughly set forth the facts in this brief, there are additional background and related facts in 19's First Amended Complaint which give context for the arguments made herein.

[2] The original agreement with Ronagold was for four seasons of the *American Idol* series, but was subsequently extended.

the "Recording Agreement," and the "Recording Agreements," respectively).[3]  *Id.*  Because the Master Recording Agreement negotiated and entered into in 2002 mandated the use of the aforesaid attached template or "form" agreement, the only differences in the Recording Agreements, with limited exceptions, are the names of the Artists.  *Id.*  Through the Recording Agreements, 19 granted Sony the exclusive right to manufacture, advertise, promote, distribute, sell, and otherwise exploit, and to license such rights to others, the individual recordings of the Artists in all configurations throughout the world. *Id.*

In consideration of 19's performance under the Recording Agreements, Sony agreed to account to and pay 19 under a certain royalty structure set forth in detail therein.  *Id.* at 19.  In order to ensure Sony correctly accounted to and paid 19 under the Recording Agreements, Paragraph 17.4 of each Recording Agreement gave 19 the explicit right to inspect Sony's books and records through an audit procedure.  *Id.*  19 conducted audits of Sony's books and records (collectively the "Audits") for the Recording Agreements concerning Kelly Clarkson, Clay Aiken, Carrie Underwood, Chris Daughtry (and the band "Daughtry"), Kellie Pickler, Jordin Sparks, David Archuleta, and David Cook (collectively "Artists").  *Id.* at 20-22. The Audits revealed, for the first time, a wide array of underpayments by Sony, including systematically incorrect calculations, which resulted in significant underpayments.  Sony now moves to dismiss a portion of the claims revealed by the Audits and asserted in this action. *Id.* at 24.

### A.  Overview of Claims Relevant To This Motion

As discussed more fully below, Sony now moves to dismiss 19's claims that: (i) Sony breached its duty of good faith and fair dealing by purposefully mischaracterizing in the streaming agreements it entered into with streaming companies that the transaction between the streaming service and an end user for streams is a "distribution" or "sale" rather than a "broadcast" or "transmission," even though the latter was precisely what the transaction was and

---

[3] The first such Recording Agreement has an effective date of September 4, 2002 for the recordings of Kelly Clarkson (the paragraph references herein, unless otherwise specified, refer to paragraph numbers in this first Recording Agreement; the subsequent Recording Agreements contain the same or substantially the same language discussed herein, but in some limited instances may have different paragraph numbering).  *Id.* at 16.

is;  (ii) Sony breached the Recording Agreements by wrongfully recouping, in certain specified foreign countries, a portion of the excess television and radio advertising expenditures above the amount they were entitled to spend , without 19's required written consent; (iii) Sony breached the Recording Agreements by recouping television and radio advertising expenditures with respect to Compilation Albums when it had absolutely no right to do so; (iv) Sony breached the Recording Agreements by failing to account to and pay 19 for industry-wide litigation settlements directly attributable to Artists' Masters; and (v) Sony breached the Recording Agreements by not counting individual Track downloads, in the form of TEAs (as defined below), in the calculation of royalty escalations applicable to Recording Commitment Albums, notwithstanding that the Recording Agreements specifically provide that Electronic Sales in the form of individual Track downloads do count toward sales escalations, a fact that Sony itself confirmed through its actions and correspondence stating that individual Track downloads constitute the sale of a part of a Recording Commitment Album for royalty purposes.  Sony also moves to dismiss the claim that it breached the duty of good faith and fair dealing by allowing for the disaggregation of Albums and the download of individual Tracks therefrom (receiving an undeserved windfall by doing so), while depriving 19 and the Artists of the financial benefit of the bargained for royalty escalations on Recording Commitment Albums.

As discussed below, the Amended Complaint satisfies 19's pleading obligations for each claim, and sets forth much more than the required plausible entitlement to relief.  Therefore, Sony's Motion should be denied in its entirety.

## B. Sony Violated the Duty of Good Faith and Fair Dealing in Accounting to 19 for Streaming Income

The Audits revealed that Sony failed to properly account to and pay 19 for Masters licensed to third party streaming services by wrongfully stating that the underlying licenses between Sony and its third-party streaming providers describe or characterize the streaming services' exploitation with the end user as "sales" or "distributions" rather than as "broadcasts"

or "transmissions." *Id*. at ¶ 32.  As set forth in the Recording Agreements, and explained further below, it was the parties' intent that 19 would be paid 50% of Sony's net receipts (referred to in the Recording Agreements as "Company's Receipts") for non-permanent streaming of the Artists' Masters, which is implemented by "broadcasts" or "transmissions" of such Masters over the Internet (commonly referred to in the digital world as "streaming"), but would receive a substantially lower royalty rate for permanent downloads of those Masters. *Id*. at ¶ 33.

Thus, Paragraph 7.16 of the Recording Agreements provides for two different potential royalty rates for "Internet Radio Services or any other kind of streaming service not specifically provided for above." *Id*.  The royalty rate is either (i) 50% of Company's [Sony's net] Receipts if the "license or other agreement pursuant to which moneys are received by [Sony] describes or characterizes the exploitation [by the streaming services] as [a] 'broadcast' or 'transmission'" or (ii) the substantially lower Album rate times Company's [Sony's net] Receipts if such exploitation is described or characterized as a "distribution" or "sale." *Id*.  This distinction was meant to differentiate between the sale of permanent downloads to an end user, and the transmission of streams to end users.[4] *Id*. at ¶ 35.

Rhapsody, a major early streaming service launched approximately two months before the execution of the Master Recording Agreement in 2002. *Id*. at 34. The second iteration of Napster (then working in conjunction with the major record labels) launched in 2003. *Id*.  At that time, many of these nascent streaming services were offering the consumer not only a streaming option for a set monthly fee, but also the ability to permanently download individual Tracks. *Id*.  At the time of the drafting of the Master Recording Agreement, Sony and 19 were aware of this industry norm; namely, this dual exploitation potential (i.e. via streaming and via permanent downloads) by streaming services, and drafted the language of paragraph 7.16 of the

---

[4] With regard to the foregoing, it is important to note, the dispositive "exploitation" referenced above is the exploitation of the Masters as between the streaming service and the end user (the "Streamer/End User Exploitation"), and is not the exploitation or use of such Master that takes place between Sony and the streaming service.

Master Recording Agreement accordingly, with the intent to distinguish between these two forms of exploitation of the Masters, and to provide a different royalty structure for each.  *Id.*

Over the course of the Recording Agreements, Sony entered into agreements with a variety of streaming services.  *Id.* at ¶ 36.  All of these streaming services primarily or exclusively exploited the Masters by broadcasting or otherwise transmitting non-permanent copies of those Masters to end users so those end users may listen to the Masters at will.  *Id.*  The ephemeral nature of that exploitation of such Masters, as between the streaming services and these end users, can only be fairly described as "transmissions" or "broadcasts," and, upon information and belief, is so described in the agreements between Sony and the streaming services.  *Id.*  However, Sony has nevertheless accounted to 19 for all streaming income at the lower Album rate as if the primary or exclusive transaction taking place between the streaming services and the end users (i.e. the Streamer/End User Exploitation) was described in Sony's underlying agreements with those services as a "distribution" or "sale" and, by so doing, Sony breached the Recording Agreements.[5]  *Id.*

19 alternatively claims that Sony breached its duty of good faith and fair dealing because, even if the underlying licenses or other agreements between Sony and the streaming services do not describe the Streamer/End User Exploitation as a "broadcast" or "transmission," that is true only because the agreements have been purposefully drafted or edited by Sony in a manner which mischaracterizes such Streamer/End User Exploitation.  *Id.* at ¶ 38.  As 19 was not party to the agreements, Sony had complete discretion and ability to (wrongfully and in bad faith) mischaracterize the nature of the exploitation of Sony's Masters taking place to avoid its obligation to 19 and destroy a significant part of the fruits of 19's Recording Agreements with Sony.  *Id.* at ¶ 40.  This claim is thus not duplicative of the breach of contract claim, as Sony claims, and more than sets out a plausible entitlement to relief.

---

[5] Sony has only moved to dismiss 19's breach of the duty of good faith and fair dealing claim and has not moved to dismiss 19's breach of contract claim to the extent the streaming agreements at issue actually refer to streaming as a broadcast or transmission.  Nor has Sony attached the streaming agreements at issue to its Motion to Dismiss so that 19 or the Court could understand the language used by the streaming agreements.

**C. Sony has Improperly Deducted TV Advertising Costs from 19's Royalties**

In instances where Sony elects to spend money on TV and/or radio advertising of an Album and/or a Track derived therefrom (sometimes, as applicable, a "TV/Radio Spends"), the Recording Agreements permit Sony to recover up to fifty percent (50%) of those TV/Radio Spends before paying 19 any royalties. *Id.* at ¶ 42, 45. However, in certain territories specified in the Recording Agreements, that recoupment right requires that certain specific criteria must be met for Sony to be able to exercise its recoupment right. *Id.* at ¶ 46. Specifically, in each of those enumerated territories, such recoupment right only arises, absent 19's written consent to the contrary, if Sony has spent in excess of a specified "floor" for that territory (the "Minimum TV/Radio Spends") and no more than a specified "ceiling" for that territory (the "Maximum TV/Radio Spends").[6] *Id.* at ¶ 43. The dispute between Sony and 19 is whether the Minimum TV/Radio Spends and Maximum TV/Radio Spends are based on (i) as 19 contends, the aggregate TV/Radio Spends incurred by Sony in the territory concerned with respect to a particular Artist's Album over the life of that Album or (ii) as Sony contends, those TV/Radio Spends incurred by Sony in the territory concerned over the course of a single undefined "campaign" for an Album or a Track derived therefrom. By way of example, Sony claims that it can spend, $100,000 on advertising calling it a "campaign" on an Album, and then repeat ad infinitum $100,000 purchases, claiming that each such purchase is an individual "campaign" on the same album within the minimum and maximum spends allowable. *Id.* at ¶ 48. As described below, this interpretation leads to an absurd result.

While there is no dispute between the parties whether this calculation is "per Album" based or "per campaign" based in the United States, as the language is incredibly clear that it is

---

[6] In order to recoup any portion of an amount above or below the Minimum TV/Radio Spends or Maximum TV/Radio Spends, respectively, Sony must get written consent from 19. *Id.* at ¶ 42. Sony is aware of this obligation to get 19's consent. *Id.* at ¶ 43. For instance, in July 2007, Sony requested a "royalty break" based on a proposed TV ad spend in New Zealand and the United Kingdom for the Kelly Clarkson Album *My December*, asking 19 to confirm in writing its consent. *Id.* However, Sony generally failed to seek such written consent, finding it more convenient to simply ignore these limitations and underpay 19 by utilizing 19's royalties to recoup fifty percent (50%) of the money spent in excess of the Maximum TV/Radio Spends. *Id.* at ¶ 44.

the former, 19 believes, for the reason discussed above, and for all of the reasons set forth below, that this calculation is "per Album" based in all the other enumerated foreign territories as well.

The Audit thus revealed that Sony calculated TV/Radio Spends on the more lenient "per campaign" basis, rather than the more stringent "per Album" basis, to avoid exceeding the applicable maximum TV/Radio Spends for the territory(ies) concerned and thereby allowed itself to deduct more than the agreed upon amounts from 19's royalties.  *Id*.  The plain language of the Recording Agreements prohibits such a calculation.

As above noted, the Recording Agreements set forth the aforesaid limitation by referring to minimum and maximum aggregate TV and radio "spends" in discussing the circumstances under which a permitted portion of these amounts can be recouped.  This use of the plural "spends" clearly shows the intention of the parties was to aggregate each individual TV or radio spend into the total "spends" that had to be achieved (i.e. the Minimum TV/Radio Spends), and not exceeded (i.e. the Maximum TV/Radio Spends), in order to become recoupable as permitted under the Recording Agreements.  DE 20-2 at ¶ 7.5.2.  The Recording Agreements are clear that Sony cannot spend an unlimited amount of money on TV/Radio Spends for a particular Album and then recoup any unapproved portion of such spends over the Maximum TV/Radio Spends specified for the territory(ies) concerned from 19's royalties.  DE 18 at ¶ 50.  In fact, as mentioned above, and as discussed below, such an interpretation would create absurd results allowing unlimited money to be spent and partially recouped so long as Sony claimed that each time it reached the Maximum TV/Radio Spends, a new "campaign" began.  Sony has, in fact, done just that by restarting the counter every time it reaches the maximum TV/Radio Spends amount, and by claiming that a new "campaign" had begun, in violation of the express terms of the Recording Agreements.  *Id*. at ¶ 48.

**D.  Sony has Improperly Deducted Advertising Costs for Compilation Albums**

The Audits also revealed that Sony improperly reduced the royalty rate owed to 19 for television or radio advertised sales for Compilation Albums (i.e. Albums comprised of Tracks from different artists).  *Id*. at ¶ 120-21.  Paragraph 7.5.1 of the Recording Agreements provides

7

that the royalty rate for Records Sold through marketing, utilizing a major television or radio advertising campaign, may be reduced by not more than 50% of the otherwise applicable rate, for a specified period of time, so that Sony may recoup an amount not in excess of 50% of the amount of the cost of the radio or television advertising campaign concerned.  *Id*. at ¶ 121.

Paragraph 7.5.1, however, does not apply to Compilation Albums because that paragraph is only applicable to "Records Sold," which term does not, under the Recording Agreement's definitions, include Compilation Albums for the purposes of deducting advertising expenses.  *Id*. at 122-23.  Not only is this clear from the plain language of the Recording Agreements, but additionally paragraphs 7.5.1 and 7.5.2 of the Recording Agreements do not logically apply to Compilation Albums.  *Id*. at ¶ 125.  Under these paragraphs, Sony has the right to recover up to one-half of the costs of the TV and radio advertising campaign spends for the Album concerned.  As noted, a Compilation Album contains multiple artists and each 19 Artist is always just one of the usually 20 to 30 artists on the Compilation Album concerned. *Id*.  It would be inequitable, unprecedented, and absurd to charge 19, who is receiving only a small pro-rata percentage of the total royalties due, with 50% of the advertising costs of the <u>entire</u> Compilation Album.  *Id*. Lastly, such a conclusion is supported by the custom and practice in the industry which is to not charge an individual artist for TV and radio advertising spent on a Compilation Album since the advertising undertaken benefits <u>all the artists</u> (and their labels) on the Compilation Album, not just the artist (and its label) on a single individual track.  *Id*. at ¶ 126.

### E. Sony has Breached the Recording Agreements and Its Duty Of Good Faith And Fair Dealing by not Counting Individual Track Downloads in the form of TEAs for Purposes Of Royalty Escalations

#### 1. Sony Breached the Recording Agreements by not Counting TEAs for Escalation Purposes

It is undisputed that the Recording Agreements clearly set forth that "Recording Commitment Album sales" above a certain unit threshold will be paid to 19 at escalated royalty rates.  *Id*. at ¶ 73.  Sony has improperly failed to calculate and apply these escalated rates by

systematically ignoring most, and perhaps all, of Electronic Sales for escalation purposes.[7] *Id.* at 72, 85. Sony has breached the Recording Agreements by so doing.

The Recording Agreements specifically provide that "Electronic Sales" count toward royalty rate escalations. *Id.* at ¶ 87. "Electronic Sales" is a term defined by the Recording Agreements to mean, among other things, the sale of any "Record" in digital format, while "Record," in turn, is defined in the broadest sense to include the "reproduction of Audio Material in any form known or later developed . . . on which sounds alone . . . can be perceived, reproduced or otherwise communicated directly or with the aid of a machine or other device." DE 20-2 at ¶ 1.15, 1.27. Accordingly, individual Track downloads are encompassed within Electronic Sales, and all Electronic Sales, without any limitation whatsoever, were intended by the parties to count toward royalty escalations.[8] *Id.* at ¶ 87.

It is also clear that individual Track downloads do not constitute "Singles" under the Recording Agreements (which are defined to mean Records, all of which contain no fewer than two (2) nor more than four (4) Tracks), and that individual Track downloads also do not constitute "sales of Records other than Albums," under the Recording Agreements since, as discussed in much more detail below, the individual Tracks are indeed taken from and are part of Recording Commitment Albums and are therefore really segments or constituent parts of such Albums. *Id.* at ¶ 86. Sony itself has confirmed this interpretation of the Recording Agreements by specifically stating as much, when it advised 19 that individual Track downloads would be

---

[7] It is unclear whether Sony excluded, in the calculation of Recording Commitment Album sales triggering royalty escalations, only Electronic Sales of all the individual segments of Recording Commitment Albums or if they also failed to include Electronic Sales of these Albums in their entirety.

[8] Sony claims, however, that individual Track downloads, or portions or segments of a Recording Commitment Albums, cannot be aggregated into a TEA, based on its isolated interpretation of the definitions of "Album," "Recording Commitment," and "Recording Commitment Album." As discussed in detail, however, in the Argument section of this Memorandum, Sony's interpretation does not, as required, read the Recording Agreement as a whole, and give meaning to what the parties were intending to accomplish. *Toto, Inc. v. Sony Music Entertainment,* No. 12 Civ. 1434(LAK), 2012 WL 14146884, at *1 (S.D.N.Y. Apr. 23, 2012); *see also William C. Atwater & Co. v. Panama R. Co.*, 246 N.Y. 519, 524 (N.Y. 1927)); *Robertson v. The Ongley Electric Co.*, 146 N.Y. 20, 24 (N.Y. 1895). Reading those provisions correctly, and in tandem, as discussed below, shows that the obligation to deliver different tracks must relate to the obligation of the Artist to deliver a certain number of distinct commercially viable Tracks for inclusion on an Album, but was never intended to defeat the right of 19 and the Artists to receive escalated royalty rates for Electronic Sales of parts of or all of Commitment Albums.

paid at the Album royalty rate and not the lower royalty rate applicable to sales of Records other than Albums such as Singles.  *Id*. at ¶ 84.  Sony simply cannot inconsistently admit that sales of individual Tracks taken from a Recording Commitment Album are to be treated the same as that Album for purposes of royalty calculation purposes, but then claim that those same individual Track downloads do not count at all toward royalty escalations applicable to that Album. As a result, Sony breached the Recording Agreements, as discussed more fully below, when it failed to count the sale of 10 or 12 individual Track downloads from a Recording Commitment Album (Track Equivalent Album sales or "TEAs"), as the sale of a Recording Commitment Album for escalation purposes.[9]  *Id*. at ¶ 85.

### 2. Sony Breached Its Duty of Good Faith and Fair Dealing by Allowing for the Disaggregation of Albums, but not Counting TEAs towards Escalations.

Alternatively, Sony has breached its duty of good faith and fair dealing by unilaterally entering into licenses with DSPs which allowed for *disaggregated* segments of Recording Commitment Albums to be sold,[10] while robbing 19 of the bargained for fruit of the Recording Agreements: the inclusion of TEAs in determining when Recording Commitment Album sales thresholds are achieved that trigger royalty rate escalations. *Id*. at ¶ 88.

Starting in 2003, without consent from 19, Sony unilaterally allowed iTunes and other DSPs to disaggregate every Album into individual Track downloads and allowed them to sell those individual Tracks at anywhere between $.99 and $1.29 per Track. *Id*. at ¶ 82.  Sony willingly entered these agreements permitting such disaggregation of the Album format, to reap enormous financial benefits from selling millions of individual Track downloads, without passing on a critical portion of those benefits to 19 and the Artists with respect to royalty escalations.  *Id*. at 85.  As earlier noted, the parties intended to include this new medium of

---

[9] The RIAA has concluded that the sale of 10 individual track downloads from an album should count as the sale of an album for determining whether an album has reached Gold or Platinum status.  19 concedes that it might be reasonable to require 12 individual track downloads to count as a TEA sale if there are 12 tracks on an album.

[10] This deviated from the business model that existed when the Master Recording Agreement was negotiated in 2002, when the consumer had to purchase the entire Album to get the "hit" Track.

Electronic Sales in the escalation calculation. As it has turned out, most Electronic Sales consisted of downloads of Album segments (i.e. individual Track downloads from that Album) and thus arose the necessity and practice of aggregating these segments into TEAs or Track Equivalent Albums (more fully described below), and counting them as Records Sold. *Id*. As stated earlier and below noted, this practice is supported by the language of the Recording Agreement, by Sony's own communications to 19, and by the manner Sony accounted to 19 on these individual Track downloads pre-Audit.

Since most albums have an average 11 to 13 individual tracks, and given that most <u>entire</u> Album downloads generally sell for $9.99 to $11.99, it's easy to see that the labels can come out 20% to 40% (or even more) ahead if they sell 11 to 13 tracks individually to the same or multiple buyers, rather than the entire album in a single transaction to a single buyer. *Id*. at ¶ 82. They can come out even more ahead if they try to claim individual Track downloads from Albums are "Singles" or "Records other than Albums," which typically bore a lower royalty rate.[11] This is what Sony is currently attempting to do, by way of a counterclaim after the Audit results were reported, claiming that is what the Recording Agreements required. As set forth herein, this does not make economic sense (at least for 19 and the Artists) and certainly individual Track downloads are not equivalent to the low margin "single" prevalent in the business model that underpinned the industry in 2002. *Id*. at ¶ 135-40. Labels, including Sony (notwithstanding the aforesaid counterclaim), eventually acknowledged this "new world order" and, as mentioned above, nearly universally started paying artists their "album rate" on these individual track downloads. *Id*. at ¶ 84. Once again, Sony's own correspondence with 19 confirms that individual

---

[11] In 2002, when the Master Recording Agreement was negotiated and executed, the digital download retail model was still being developed and iTunes and its competitors were still over a year away from beginning business. *Id*. at ¶ 79. At that time, there essentially existed two primary sources of revenue for labels and artists, to wit, singles and albums. *Id*. at ¶79-81. The "single" was long considered a loss leader in the industry, but was a necessary marketing component to get broad radio exposure and public awareness for artists and their album product. *Id*. at ¶ 80. Because of the relatively high costs of manufacturing, shipping, and promoting singles, virtually all record labels paid lower royalty rates to artists on this less profitable "singles" format and artists accepted this business reality. *Id*. In contrast, the album format, with its relatively small incremental additional costs to manufacture and distribute, but with its 3 to 4-fold higher selling price, permitted labels to achieve a substantially higher profit margin and thus the labels were able to pay a significantly higher royalty rate on album sales, including escalations in that rate based on album sales. *Id*.

Tracks from Albums are effectively segments of Albums and not traditional "Singles," nor sales of Records other than Albums (a position Sony attempted to take only after these issues were raised in the Audits and despite the fact that Sony was clearly contradicting itself), and thus each such individual Track download entitled 19 to the Album royalty ("standard download royalty ([A]lbum rate x net receipts)." *Id*.  In other words, like all other major labels, prior to these TEA claims being raised in the Audits, Sony treated individual Track downloads as a subset of Recording Commitment Album download sales. *Id*.  It was only after 19 submitted its Audits did Sony, in retribution, attempt to claim that the lower "Records other than Albums" rate should have been paid on these Track downloads.  DE 18 at ¶ 137.

Moreover, because the Album royalty rate applies to individual Track downloads, it logically follows that all aspects of and calculation terms applicable to this royalty rate also must apply to individual Track downloads, including the provision that rewards 19 with royalty escalations on achieving certain Recording Commitment Album sales success (i.e. a million worldwide units sold). Therefore, if a Recording Commitment Album, for example, originally contains 12 Tracks on it when released, then the sale of 12 Tracks or segments from that Album should count as the equivalent of the sale of an Album (known in the music industry, as earlier noted, as a Track Equivalent Album or "TEA") for purposes of calculating sales escalations for royalties on that Album. *Id*. at ¶ 85.  Arguably, from an economic perspective, an even lower common industry standard should apply, given that the amount of payment Sony receives from the DSPs on just nine individual Track downloads from a particular Recording Commitment Album likely exceeds, in terms of dollars received by Sony, the download of that Album in its entirety.  *Id*. at ¶ 82, 85.  The Recording Industry Association of America's ("RIAA") and their member record labels in general (including Sony) have reasonably (and favorably to these member labels) concluded the sale of 10 Track downloads equals one TEA and thus it  is not unreasonable to conclude this even lower 10 track TEA equivalancy should be applied under the Recording Agreements. *Id*. at ¶ 85.  While the TEA calculation threshold (i.e. actual number of Tracks from the Album or the RIAA industry standard 10 tracks) may be debated, Sony cannot

ignore the TEAs and rob 19 of the negotiated escalation rate while Sony lined its own pockets from increased individual Track downloads, which benefitted 19 to a far lesser extent.

Indeed, instead of being content with the windfall from DSP individual Track exploitations, Sony abused its discretion and its duty of good faith and fair dealing by unilaterally deciding to allow for the *disaggregation* of the Recording Commitement Albums for its own financial benefit, while ignoring its duties and obligations to 19 and the Artists.  *Id*. at ¶ 137.  Instead of counting TEAs for Recording Commitment Album escalation purposes , so that 19 and the Artists would receive their bargained for escalated royalties on successful Recording Commitment Albums, Sony has permitted the DSP to allow its customers to purchase as many individual Tracks as they wanted off a Recording Commitment Album, which resulted in a huge increase in individual Track downloads primarily to Sony's benefit, but Album sales (under Sony's interpretation) dropped as a result so less escalated rates on Recording Commitment Albums became payable to 19's detriment.  *Id*. at ¶ 89.  Sony chose to take a bargained for benefit under the Recording Agreements from 19 and breached its duty of good faith and fair dealing in so doing.

## II.    Standard of Review

In deciding a motion to dismiss . . ., a court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  "[A] complaint should not be dismissed . . . unless it appears beyond doubt that the plaintiff can prove no set of facts . . . which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Only where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [can its] complaint [] be dismissed."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.    Sony's Motion To Dismiss Should Be Denied

### A.  19's Breach Of The Duty Of Good Faith And Fair Dealing Claims Are Not Duplicative of The Breach of Contract Claims

As an initial matter, Sony moves to dismiss 19's breach of the implied covenant of good faith and fair dealing claims by claiming that those claims are merely duplicative of 19's breach of contract claim.  DE 24 at 23.  Sony is wrong.

19 has raised two breach of the duty of good faith and fair dealing claims: (1) an alternative claim that Sony purposefully mischaracterized the description of the Streamer/End User Exploitation in its streaming agreements with third parties, in bad faith, in order to avoid its royalty obligations; and (2) as discussed later in this brief, that Sony abused its discretion in allowing third party DSPs to sell permanent downloads of "disaggregated" segments of Recording Commitment Albums in the form of individual Track downloads without then counting TEAs toward sales thresholds needed to escalate royalty rates.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2002).  The implied covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id*.  The duty of good faith and fair dealing encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995); *see also Legend Autorama, Ltd. v. Audi of Am., Inc.*, 934 N.Y.S. 2d 34, 11-13 (N.Y. Sup. Ct. 2011).  Parties to a contract may not exercise discretion in a way which would somehow prevent an opposing party from receiving the value it bargained for. *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank*, 680 F. Supp. 2d 625, 631-32 (S.D.N.Y. 2010); *see also AFBT-II, LLC v. Country Vill. on Mooney Pond, Inc.*, 759 N.Y.S.2d 149, 151 (N.Y. Sup. Ct. App. Div. 2003).  In a series of cases, including *Dalton* and *Cortale v. Educ. Testing Serv.*, 674 N.Y.S. 2d 753 (Sup. Ct. App. Div. 1998), New York courts have held that, under the terms of a contract, arbitrary actions were impermissible and actionable.  674 N.Y.S. 2d 753 at 755.

As discussed fully above in the fact section, and pleaded in the Amended Complaint, the breach of the duty of good faith and fair dealing claims are not simply restatements of 19's breach of contract claims, as baldly claimed by Sony, but are based upon Sony abusing the discretion afforded it in bad faith for its own gain and in order to deprive 19 of the benefits of the Recording Agreements.  With regard to streaming, 19 has raised a breach of contract claim based on Sony's failure to properly pay 19 with respect to its agreements with streaming services which characterize streaming as a "broadcast" or "transmission."  Completely separately, and in the alternative, 19 alleged Sony breached its duty of good faith and fair dealing by intentionally mischaracterizing the Streamer/End User Exploitation to avoid its contractually required higher royalty obligation.

### B. Sony Breached Its Duty of Good Faith and Fair Dealing by Mischaracterizing Its Agreements with Streaming Providers

More specifically, as described in detail in the Amended Complaint, Sony could use its own judgment in order to enter into streaming agreements and permanent download agreements. What Sony could not do was enter into agreements with streaming services and then purposefully mischaracterize the Streamer/End User Exploitation under those agreements in order to pay 19 a lower royalty rate.  This robs 19 of the fruits of the Recording Agreements by purposefully avoiding using the correct operative words when Sony knew a "broadcast" or "transmission" was precisely what was occurring.

In order to prevail on this Motion, Sony would have to convince the Court that even if it purposefully mischaracterized the underlying subject exploitation of the streaming agreements in order to avoid its full royalty obligation, 19 does not have a claim because the Recording Agreements allow for Sony to take any action it wants in regard to characterizing the Streamer/End User Exploitations under its agreements.  In effect, Sony's argument, in order to prevail, must be that the law does not require it to act in good faith.  The contrary is true.

Depriving a party "of what it ultimately sought from the parties' contractual arrangement" cannot be allowed.  *Gray & Assoc., LLC v. Speltz & Weis LLC*, 22 Misc. 3d

1124(A) (N.Y. Sup. Ct. 2009). Thus, under New York law, even if a party is not in breach of its express contractual obligations, it "may be in breach of the implied duty of good faith and fair dealing when it exercises a contractual right as part of a scheme . . . to deprive the other party of the fruit or benefit of its bargain." *Elmhurst Dairy v. Bartlett Dairy*, 2012 N.Y. App. Div. LEXIS 5659, at *7-8 (N.Y. Sup. Ct. App. Div. July 25, 2012) (quoting *Marion Scott Real Estate, Inc. v. Rochdale Vil., Inc.*, 23 Misc.3d 1129(A) (N.Y. Sup. Ct. 2009)).

19's allegation of bad faith are sufficient to withstand a Motion to Dismiss.  New York courts have held that questions of bad faith should not be decided on summary judgment motions, before discovery is conducted because such claims "rest on the practices and procedures followed by defendant, and the fact relevant to those causes of action are in the sole possession and control of defendant."  *Medina v. State Farm Mut. Auto Ins. Co.*, 757 N.Y.S.2d 178, 190 (N.Y. Sup. Ct. App. Div. 2003); *see also McKenna v. Case*, 507 N.Y.S.2d 777, 777 (N.Y. Sup. Ct. App. Div. 1986) ("[T]he issue of 'bad faith' usually raises a question of fact precluding summary judgment.").

As is plainly pled in the Complaint, Sony mischaracterized the Streamer/End User Exploitation under its streaming agreements in order to rob 19 of the benefit of its bargain, and thus, if those facts are proven true, Sony breached its duty of good faith and fair dealing.

In *Crossroads ABL, LLC v. Canara Capital Mgt., LLC*, 35 Misc. 3d 1238 (Sup. Ct. 2012), the Court held the "eradicat[ion of] a contractual right for which [plaintiff] had bargained" was a breach of the duty of good faith and fair dealing.  *See also Elmhurst Dairy y*, 2012 N.Y. App. Div. LEXIS 5659, at *7-8. Allegations of bad faith in regard to depriving a party "of what it ultimately sought from the parties' contractual arrangement" state a claim for breach of the duty of good faith and fair dealing and should not be dismissed.  *Gray & Assoc., LLC*, 22 Misc. 3d at 28-29.[12]

### C. Sony Cannot Recoup an Unlimited Amount of Advertising Expenses by Claiming it is Starting and Restarting a "Campaign" Over and Over

---

[12] 19 specifically addresses Sony's breach of the duty of good faith and fair dealing with respect to the failure to count individual Track downloads for purposes of escalations in part III(G) of its Response.

The Audits also revealed that Sony has incorrectly deducted excess advertising expenses from royalties due 19.  As discussed above, the Recording Agreements set forth Minimum TV/Radio Spends and the Maximum TV/Radio Spends that Sony can incur in each specified foreign territory advertising an Album or a Track therefrom in order to be permitted to recoup up to fifty percent (50%) of such costs from 19's royalties.  Should Sony fail to hit the specified Minimum TV/Radio Spends or exceed the specified Maximum TV/Radio Spends, Sony must then secure 19's written consent thereto in order to exercise its recoupment rights.  The issue in this claim is whether these "floors" and "ceilings" apply to <u>each campaign</u> in each specified territory, individually, or whether they are to be applied to all campaigns in the aggregate, undertaken for <u>each Album</u> or Track therefrom in each such territory.  Stated another way, are these parameters calculated on a "per Album/per country" basis or on a "per campaign/per country" basis?

Paragraphs 7.5.2(a) and (b), which deal with TV/Radio Spends in the United States, clearly state that each "spend" applies to the total amount spent on any one Album.  Paragraph 7.5.2(c) does not contain such language.  However, it does not contain language to the contrary and it is obvious that subsection (c) is based on the consideration contained in (a) and (b), and simply extends it to numerous foreign territories.  This indicates that Sony meant "per Album/per country" in dealing with TV/Radio Spends overseas.  Sony argues, however, that subsections (a) and (b) demonstrate Sony knew how to define TV/Radio Spends as only applicable "per Album" and that Sony's choice not to include the "per Album" term in subsection (c) was a deliberate change meant to indicate that TV/Radio Spends were to be calculated "per campaign" and not "per Album" when those spends were in the foreign territories encompassed by subsection (c).

The plain language of the Recording Agreements shows Sony's interpretation is unsupported.  Paragraph 7.5.2. of the Recording Agreements rebuts Sony's argument, stating:

> Contractor agrees that if Company releases Albums hereunder in conjunction with television and/or radio advertising campaigns in the following countries the following terms will apply in place of sub-clause 7.5.1 . . .

17

(c) if the TV and/or radio spend (including the production costs of the applicable advertisement) is in excess of the following minimum TV spends (including in each case the production costs of the relevant advertisement(s)) in the following countries, the royalty payable to Contractor on Records Sold in the relevant country shall be reduced . . . until such time as 50% of the TV/radio spend in the country concerned has been recovered from the royalty retained by Company on the Album the subject of the TV/ radio advertising campaign and PROVIDED THAT Contractor's royalty rate shall in no event be reduced to more than fifty percent (50%) of the otherwise applicable rate and FURTHER PROVIDED THAT TV/ radio spends in the following countries in respect of which Company wishes to apply the foregoing royalty reduction shall require Contractor's prior consent . . . in the event that the applicable spends exceed the applicable maximum TV/ radio spends

The Recording Agreements' refer to "the TV and/or radio spend" not "a TV and/or radio spend," because the Recording Agreements contemplate that the amounts at issue would be calculated based on one total aggregated spend and would not apply individually to multiple spends. In fact, the paragraph goes on to state that the spends will include the cost of multiple "advertisement(s)." Thus, the plain language of the Recording Agreements supports the fact that Sony is not allowed to break down its spends into bite-size chunks in order to recoup an unlimited amount from 19's account, but must instead aggregate the spends on an "Album by Album" basis in order to remain within the prescribed amounts.

### 1. Adopting Sony's Interpretation Would Lead to an Absurd Result

Logic also dictates that the "spends" are to be calculated on a "per Album/per country" basis, not on a "per campaign/per country" basis. If Sony undertook several "campaigns," but each campaign was less than the Minimum TV/Radio Spends, Sony would argue it had the right to recoup that money if all such spends exceeded the amount of the Minimum TV/Radio Spends in the aggregate. Alternatively, the amount of the Maximum TV/Radio Spends loses all meaning if Sony can exceed it, without 19's permission, simply by ending one "campaign" (a term undefined in the Recording Agreements, which certainly would not be the case were it to be as critically important as Sony contends) and starting another "campaign." It would be an absurd result to allow Sony to repeatedly spend to the maximum allowed and then simply start over so

as to never have to request 19's permission to go above the Maximum TV/Radio Spends amounts while recouping from 19's royalties up to fifty percent (50%) of the unlimited amount of money Sony would be able to spend. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) ("[A]bsurd results should be avoided." (internal quotation and citation omitted)).

### 2.  The Minimum TV/Radio Spends and Maximum TV/Radio Spends Amounts Reflect a "Per Album" Basis

Finally, the specific amounts reflected in the chart for the specified foreign territories are in proportion to (and in many instances proportionally exceed) the amounts allowed for the United States (a territory for which there is no dispute that the "floor" and "ceiling" for the TV/Radio Spends is on an Album by Album basis), given the relative size of the territory concerned. For example, the Minimum TV/Radio Spends and the Maximum TV/Radio Spends in the United States is $150,000 and $600,000, respectively.  For Canada, a territory with a music market 1/10[th] the size of the United States, the Minimum TV/Radio Spends and the Maximum TV/Radio Spends is $50,000 and $200,000, respectively.  Given that the United States numbers are specified "per Album," could there be any doubt that the Canadian number could not possibly be "per campaign?"  A determination that those numbers were on a "per campaign" basis would be absurd.

### D.  Sony Improperly Deducts Advertising Cost for Compilation Albums

### 1.  Ambiguities Must Be Construed Against the Party Who Drafted Them

The Audits revealed that Sony has improperly deducted advertising costs from the royalties due 19 for the sale of Compilation Albums, due to their erroneous reliance on the provisions of paragraph 7.5.1 (see above) in the context of Compilation Albums.[13]  However, Paragraph 7.5.1 applies only to "Records Sold," and Compilation Albums cannot qualify as Records Sold as a "Record," under the terms of the Recording Agreement, is defined as a

---

[13] Even if Sony was allowed to deduct such expenses, Sony did not provide documentation or evidence (as required by the Agreement) to support that it, in fact, incurred any TV advertisement costs related to such compilations or that the campaign concerned was "major."

reproduction of "Audio Material," and "Audio Material" is defined to mean a recording consisting solely of Masters performed by a single Artist, the exact opposite of what is embodied on a Compilation Album.

Sony claims that 19 is attempting to interpret the same term, "Records Sold," in two different and contradictory manners, but, as discussed below, it is Sony's drafting that has defined this term in just such a way. Sony's drafting of the Recording Agreement creates an unusual ambiguity in which Sony included two definitions with contradictory definitions.  Such drafting must be read against Sony.  *Wiser v. Enervest Operating, LLC*, 803 F. Supp. 2d 109, 117 (N.D.N.Y. 2011).

As noted above, literally reading the wording of the Agreement and its definitions, it must be concluded that the terms "Record" and "Records Sold" do not include "Compilation Albums" because Compilation Albums by their very nature consist of Masters recorded by more than just a single artist. On the other hand, Sony is correct in pointing out that paragraph 7.4.2, ignores the definition of "Record" and makes "Compilation Albums" a "category" or "subset" of "Records Sold." The bottom line, there is an ambiguity here about Compilation Albums and how to treat them and, because Sony drafted the Agreement, this ambiguity should be construed in 19's favor. *Id.*

### 2. Sony's Interpretation of the Recording Agreement Leads to an Absurd Result

Under paragraphs 7.5.1 and 7.5.2, Sony has the right to recover up to 50% of the costs of the TV and radio advertising campaign spends for the Album concerned.  But, since by definition, a Compilation Album contains multiple artists and 19's Artist is always just one of the likely 20 plus artists on the Album, it makes no sense to charge 19, who at best is getting $1/20^{th}$ of the Royalty accruing on the Compilation Album sale for each of its Artists on that Album, with 50% of the advertising costs of the <u>entire</u> Album. Thus, in construing this ambiguity against Sony, 19 should bear none of these costs. Such an interpretation is consistent with industry custom and practice which is to not charge an individual artist for advertising spent

on a compilation album since the advertising benefits <u>all the artists</u> on the album, not just the artist on a single track. This is especially appropriate because there is no indication that Sony prorated the advertising costs. It is possible, for example, on a 24 track compilation album that Sony recouped 1200% (100% for each included Track times 50%) of its costs. Certainly, the Agreement should not be interpreted to allow for such an incredible windfall for Sony.

Instead of complying with the strange plain language of the Master Recording Agreement and its obligations, Sony has ignored this issue and baselessly deducted a hugely disproportionate amount of the advertising expenses for Compilation Albums from 19's royalties. This is a breach of the Recording Agreements.

### E. Sony has Failed to Account to and Pay 19 for Settlements Directly Attributable to the Masters

Paragraph 20.1 of the Recording Agreements requires Sony to credit 19's royalty balance based on "one half of any excess recovery" from sums received as a result of a legal proceeding. As set forth in the Complaint, Sony has brought a number of suits against third parties for copyright infringement of the Masters (as well as other master recordings). Sony's suits have resulted in payments or awards that are clearly attributable to Artists' Masters and 19 is entitled to one half that portion of these total amounts received allocable to Artists' Masters.

Sony claims the Recording Agreements only allow 19 to recover for suits brought in 19 or the specific artists' name. However, there is no such requirement in the Recording Agreement. While paragraph 20.1 gives Sony the right to sue in the Artists' name, it also in its very first sentence grants Sony the right to bring suit in its own name and to compel cooperation from 19 or the Artist. Thus, Sony has multiple ways to bring suit. The manner in which Sony brings suit is of no consequence as to 19's right to receive a portion of any money which is attributable to Artist's Masters. In fact, in making this argument, Sony fails to point to any specific language in the Recording Agreement, but instead simply makes the unsupported statement that because the Recording Agreement gives it the right to sue in an Artist's name, this

is the only type of suit for which 19 and the Artists are entitled to compensation. This ignores the plain language of the Recording Agreement and Sony's failure to account to 19 for these proceeds is a breach of the Recording Agreements.

### F. Sony Failed to Correctly Calculate the Escalation in Certain Royalty Rates by Ignoring TEAs

Sony has underpaid 19 by failing to properly apply the escalated royalty rates set forth in the Recording Agreements by failing in include TEAs in calculating when a royalty rate escalation is to occur.[14]

#### 1. The Recording Agreements make Electronic Sales Applicable to Escalations

The plain language of the last two paragraphs of paragraph 7.1 in the Recording Agreements specifically do not restrict escalations to Electronic Sales of full Albums, but instead states that "Records Sold embodying Electronic Sales" shall generally be included in determining when escalation rates apply. As earlier stated, if Sony intended to restrict Electronic Sales only to sales of Recording Commitment Albums in the Album format and not individual Tracks as is the case in the first of such paragraphs dealing with the physical world, Sony would have said so in the second paragraph when it included Electronic Sales in the escalation calculation. Therefore, the only rational reading of that provision is that escalations apply to individual Track downloads, which are the vast majority of all downloads and are to be included in the form of TEAs in the calculation of when royalty escalations take effect.

Paragraph 7.1 of the Recording Agreement states: "For purposes of the foregoing escalation, reference to Records Sold shall be deemed to refer to Records Sold . . . embodying Electronic Sales . . . ." "Electronic Sales," as defined by the Recording Agreements, includes downloads of individual Tracks, which is the most prevalent form of Electronic Sales (and sales in general), because Electronic Sales include all formats of "Records" sold over the Internet. "Record" is defined broadly in the Recording Agreements in order to encompass all forms of

---

[14] This claim does not apply to the Carrie Underwood Recording Agreement.

media now known or hereafter created.  Thus, by its plain language, the Recording Agreements state that individual Track downloads are to be counted towards escalations.

As such, the language of the Recording Agreements requires, as discussed in detail in the fact section, *supra*, that TEAs are to be counted in determining when escalations rates apply. Reading the Recording Agreements in this manner is especially required by Sony who (through its affiliated predecessor) drafted the Recording Agreements.  *Wiser*, 803 F. Supp. 2d at 117.

### 2. Sony Ignores the Parties' Intent

Sony argues that, regardless of how many millions of individual Track downloads from a particular Album are sold, it is only the sale of an entire Recording Commitment Album download that is to be included in the escalation calculation.

Under New York law, this Court must read the Recording Agreements as a whole and not in isolation.  *Kass*, 91 N.Y.2d at 566 (citing *William C. Atwater & Co.*, 246 N.Y. at 524; *see also Robertson*, 146 N.Y. at 24 ("Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expression without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish.").  In interpreting a contract, courts are to consider its "particular words" not in isolation, "but in the light of the obligation as a whole and intention of the parties as manifested thereby."  *Kass*, 91 N.Y.2d at 566.  "Where the document makes clear the parties' over-all intention, courts examining an isolated provision should then choose that construction which will carry out the plain purpose and object of the [agreement]." *Id.*; *see also Empire Properties Corp. v. Manufacturers Trust Co.*, 288 N.Y. 242, 249 (N.Y. 1942).

Paragraph 1.1 of the Recording Agreement defines the term "Album" stating:

> **"Album"** shall mean a Record containing not less than twelve (12) (or such lesser number as Company may require) nor more than twenty-five (25) different Tracks and totaling no fewer than forty-five (45) minutes of playing time (unless otherwise agreed by Company in writing in respect of a particular Record).

Paragraph 1.29 of the Recording Agreement defines the term "Recording Commitment" stating:

> **"Recording Commitment"** shall mean the minimum quantity of Audio Material required to be Delivered to Company during the relevant Contract Period.  Such Audio Material shall be sufficient to comprise:

> (a) During the First Contract Period one (1) Album in respect of which the track listing and sequencing has been finalized in accordance with the terms hereof (the "First Album") . . . .

Paragraph 1.30 of the Recording Agreement defines the term "Recording Commitment Album" stating:   **"Recording Commitment Album"** shall mean an Album forming part of the Recording Commitment.

Sony then conflates these three definitions, which are clearly put into the Recording Agreements for different purposes, in an attempt to establish that individual Track downloads, or portions or segments of a Recording Commitment Album, cannot be aggregated into a TEA, something their own trade industry organization, the RIAA, agreed is proper in today's digital world.

The Recording Agreements, and how they deal with the record process from start to finish, can be separated into two basic parts – the first part deals with the creative process during which the artist creates the product to exploit, and the second part deals with the exploitation process during which the product created is monetized by Sony.  In the first part, it is exceedingly important to Sony to get product they can successfully exploit, and thus they want to make sure the artist gives them the full benefit of the bargain for which Sony has paid.  This is the primary purpose of the above three paragraph sections and when their words should be read literally and strictly, in order to make sure the Artist lives up to his or her side of the bargain. These same terms, in the context of the exploitation process, however, were never intended to be so rigidly interpreted by the parties.  In this context, the most important factor is having something commercially exploitable so Sony can sell lots of Artist's Records and be rewarded financially.  Accordingly, whether the Album or other product being sold has 10 tracks, thirty-

five (35) minutes of playing time, two versions of the same Track, etc . . . is not important if it sells.

Knowing that the intent of the parties does not support its position, in order to bolster its argument Sony goes on to state that reading the Recording Agreements in the manner put forth by 19 would create an absurd result.  The parties agree the Recording Agreements should not be read in a manner that creates an absurd result.  *See Mastrovincenzo*, 435 F.3d at 104. However, it is actually Sony's reading that creates an absurd result.  Under Sony's reading, an Artist would be entitled to be paid at the escalated royalty rate if that Artist sold one million downloads of a particular Recording Commitment Album, each in its entirety and each at $9.99.  Such sales would generate less than ten million dollars in revenue to Sony.  However, an Artist who sold 24 million individual Track downloads from such Album, would not have sold even one Album towards the escalation rate, while generating almost $24 million dollars in revenue to Sony.[15] Thus, it is obvious that TEAs from a Recording Commitment Album must count towards escalation figures if you are to avoid "an absurd result."

### 3.  Extrinsic Evidence Shows TEAs must Count towards Escalations

"Whether . . . a contract provision is ambiguous is a question of law."  *Van Wagner Adver. Corp. v. S & M Enters.*, 67 N.Y.2d 186, 191 (N.Y. 1986) (citation omitted).  "An ambiguity exists where the . . . contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Morgan Stanley Grp Inc. v. New Eng.*

---

[15] In order to distract attention from this financially absurd result, which Sony requests the Court reach as a matter of law, Sony provides the Court with unbelievable mathematical calculations claiming the difference at issue is at most around $2.00.  First, as set forth in the Complaint, the Audits determined that Sony had underpaid 19 by more than $960,000 by failing count TEAs toward Artists' eligibility for escalated royalty rates.  Further, that such a failure is extremely costly to 19 is obvious.  Sony's own filing states escalations could result in an upward adjustment of royalties by eight percent.  DE at n7.  This adjustment would be due for sales involving some of the world's most popular entertainers who have broken sales record after sales record.  Thus, Sony's discounting of the importance of this claim is unbelievable and shows its disregard for compensating the Artists which are the backbone of its current catalog.

*Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000).  Where "[r]easonable minds could differ" as to the interpretation, courts may consider parol evidence.  *Id*.  When parol evidence is admissible, the practice of the parties before a dispute arises is the clearest indication of the intent of the parties. *New York v. New York C. R. Co.*, 193 N.Y. 543, 548-49 (N.Y. 1908).

Until the Audit, Sony always paid 19 the Album rate on individual Track downloads under the Recording Agreements. Sony's correspondence, from Heidi Herman to 19 (with a copy to senior Sony legal staff including Julie Swidler), states that the royalty rate for individual Tracks is the "standard download royalty ([A]lbum rate x net receipts)." In other words, like all other major labels, Sony, in its own words, treats individual Track downloads as a subset of Recording Commitment Albums sales, recognizing that individual Track downloads are neither by definition "Single," nor "Records other than Albums" *See id*. (conduct prior to dispute is the best parol evidence of the parties' intention).  Accordingly, if they are Album segments, when aggregated together they must be considered a TEA and Sony's failure to count TEAs towards escalations is a breach of contract.

### G.  Sony Breached Its Duty of Good Faith and Fair Dealing

19 has raised two distinct claims related to TEAs and escalation:  (1) its breach of contract claim; and (2) that Sony, by entering into agreements with DSPs and unilaterally giving them the right to sell *disaggregated* segments of Recording Commitment Albums while not compensating 19 for its loss of escalated rate Recording Commitment Album sales, breached its duty of good faith and fair dealing.  These two claims require separate proof and are distinct. The necessity of proving additional facts in prevailing on these distinct claims means 19 has stated an actionable claim for Sony's breach of the duty of good faith and fair dealing.  *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).

### 1.  Sony Improperly Entered Agreements which Deprived 19 of its Right to Escalated Royalty Rates

Sony abused its discretion under the Recording Agreements by unilaterally entering into licenses with DSPs which allowed for *disaggregated* segments of Recording Commitment Albums to be downloaded and individually sold (unlike the old business model that existed when the Master Recording Agreement was negotiated in 2002 under which the consumer had to purchase the <u>entire</u> Album to get the "hit" Track embodied on it), while robbing 19 of the bargained for fruit of the Recording Agreements: the application of properly calculated escalated royalty rates for achieving Recording Commitment Album sales targets.

As discussed in detail above, Sony had basically unfettered discretion to enter agreements with third parties for the exploitation of the Masters, but abused that by entering agreements with third parties while simultaneously failing to apply the "new" manner of sales contemplated by those agreements (i.e. permitting the end user to disaggregate a Recording Commitment Album and, instead of having to buy the entire Album as before, pick and choose the segments he or she wants to purchase and download) to the bargained for escalation rates in the Recording Agreements.

Whenever a party has discretion to act under a contract, and exercises that discretion in a manner that robs its contracting partner of the fruits of the contract, that party has breached its duty of good faith and fair dealing. *See Dalton*, 87 N.Y.2d at 389. Under New York law, all discretion in a contract must be used in good faith and cannot be abused. Here, Sony abused its discretion in robbing 19 of its right to the application of an escalated royalty rate. Again, this claim more than sets forth a plausible entitlement to relief and must be allowed to proceed. *Twombly*, 550 U.S. at 570.

### H.  Limitations of 19's Claims

Finally, Sony moves to dismiss the claims relating to Carrie Underwood and Kellie Pickler's 2006 royalties. While, the Audits did reveal that Sony under paid 19 for under the Underwood and Pickler Recording Agreements during 2006, 19 is not raising any claims related to those periods in this suit.

27

Dated: July 17, 2014                                   Respectfully submitted,


                                                       By:     /s/Richard S. Busch


                                                               Richard S. Busch (SB 5613)
                                                               KING & BALLOW
                                                               315 Union Street, Suite 1100
                                                               Nashville, Tennessee 37201
                                                               Telephone:  (615) 259-3456
                                                               Facsimile:   (615) 726-541

                                                               Kenneth E. Gordon (KG 5703)
                                                               GORDON, GORDON & SCHNAPP, P.C.
                                                               437 Madison Avenue, 39th Floor
                                                               New York, New York 10022
                                                               Telephone:  (212) 355-3200
                                                               Facsimile:   (212) 355-3292

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of July 2014, the preceding document was filed with the CM/ECF system which served the document on:

Jonathan M. Sperling, Esq.
Christopher Yeung, Esq.
COVINGTON & BURLING LLP
620 Eighth Avenue
The New York Times Building
New York, New York 10018


/s/Richard S. Busch

28
