USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED MAR 1 7 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

19 RECORDINGS LIMITED,

                Plaintiff,

      -against-

SONY MUSIC ENTERTAINMENT,

                Defendant.

No. 14-cv-1056 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Since 2002, Plaintiff 19 Recordings Limited ("19"), a record company, has entered into exclusive recording agreements with contestants on the popular television show *American Idol*. For the winners and some finalists of *American Idol*, 19 has also entered into licensing agreements with Defendant Sony Music Entertainment ("Sony"), which grant Sony the exclusive right to exploit the recordings of these artists signed by 19. In the instant diversity action, 19 brings state-law claims for breach of contract and of the implied duty of good faith and fair dealing. 19 alleges that Sony failed to pay 19 the royalties to which it was entitled under the terms of the licensing agreements. Sony seeks dismissal of 19's complaint pursuant to Fed. R. Civ. P. 12(b)(6), arguing that 19's claims are precluded by the plain language of the licensing agreements.

## BACKGROUND[1]

In 2002, 19's affiliate launched *American Idol* in the United States. (Am. Compl. ¶ 6.) For each of *American Idol*'s twelve seasons, 19 has signed the show's contestants to exclusive recording agreements. (Id.) These recording agreements assign 19 the right to enter into individual

---

[1] For the purposes of deciding this motion, the Court accepts as true all facts alleged by 19. See Kassner v. 2nd Ave Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

licensing agreements with Sony (collectively, the "Licensing Agreement"). (Id. ¶ 15.) For the winners and certain finalists of the show, including Kelly Clarkson, Clay Aiken, Carrie Underwood, Chris Daughtry, Kellie Pickler, Jordin Sparks, David Archuleta, and David Cook (collectively, the "Artists"), 19 signed such agreements with Sony. (Id. ¶ 17.) Pursuant to each largely identical Licensing Agreement,[2] Sony was granted the exclusive right to "manufacture, promote, distribute, sell, and otherwise exploit, and to license such rights to others, the individual recordings of the Artists in all configurations throughout the world." (Id. ¶ 16. See also Licensing Agreement ("LA") Dkt. 20, Exs. B–I ¶ 12.1.1(a).)[3] Among those recordings produced by 19 and delivered to Sony are "some of the biggest hits of the 21st Century." (Id. ¶ 18.)

As consideration for 19's delivery of the Artists' recordings, Sony agreed to pay 19 pursuant to a highly complex royalty structure, as set forth in the Licensing Agreement. The Licensing Agreement also permits 19 to audit Sony's books and records to determine whether its calculation of royalty payments was consistent with this royalty structure. (LA ¶ 17.4.)

Pursuant to this provision, 19 performed an audit of Sony's books and records. (Am. Compl. ¶ 20.) Sony has purportedly refused to allow 19 access to all necessary books and records (id. ¶ 30), but based on those books and records 19 has audited, it claims that Sony has systematically miscalculated royalty payments (id. ¶¶ 24–25). 19 alleges that these miscalculations breached numerous provisions of the Licensing Agreement, detailed below, as well as the implied duty of good faith and fair dealing, such that 19 was significantly underpaid. (Id. ¶¶ 32–150.)

---

[2] Any differences in the Licensing Agreements are irrelevant to the Court's disposition of Sony's motion to dismiss.

[3] Although 19 did not annex any of the Licensing Agreements to its Amended Complaint, they are so integral to the Amended Complaint that their consideration for the purposes of Sony's motion to dismiss is proper here. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

It is these allegations that form the basis of 19's Amended Complaint, which Sony now moves to dismiss.

## LEGAL STANDARD

### I.    Motion to Dismiss

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and be "plausible on its face," Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### II.   Breach of Contract

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).[4]  At least initially, however, the construction of a contract is "a matter of law for the court to decide." K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (quotation omitted).  Where a claim for breach turns on an ambiguous contractual provision, the "claim may not be dismissed for failure to state a claim." Wurtsbaugh v. Banc of Am. Sec. LLC, No. 05 Civ. 6220 (DLC), 2006 WL 1683416, at *5 (S.D.N.Y. June 20, 2006).  But where a claim for breach turns on an unambiguous contractual provision, a Court must

---

[4] Federal courts exercising diversity jurisdiction pursuant to 28 U.S.C. § 1332 apply state substantive law. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996).  Here, the choice of law question is resolved by reference to the Licensing Agreement, which contains a clear choice of law provision selecting New York law.  (LA ¶ 28.1.)  In their briefing, the parties also assume that New York law applies, which is itself sufficient to determine the choice of law.  See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000).  The Court will thus apply New York's substantive contract law for the purpose of deciding the motion to dismiss.

"give effect to the contract as written," K. Bell & Assocs., Inc., 97 F.3d at 637 (quotation omitted), and dismissal pursuant to a motion under Fed. R. Civ. P. 12(b)(6) is proper, Wurtsbaugh, 2006 WL 1683416, at *5.

## III. Breach of the Implied Duty of Good Faith and Fair Dealing

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002). This covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995) (quotation omitted). In addition, it "encompass[es] any promises which a reasonable person in the position of the promisee would be justified in understanding were included." 773 N.E.2d at 500–01 (quotation omitted).

The implied covenant "does no more" than this, however; "it works only to ensure that a party with whom discretion is vested does not act arbitrarily or irrationally." 663 N.E.2d at 296. "For this to occur, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407–08 (2d Cir. 2006) certified question accepted, 857 N.E.2d 528 (N.Y. 2006) and certified question answered, 864 N.E.2d 1272 (N.Y. 2007). The covenant, however, "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." Id. at 408 (quotation omitted).

Indeed, "New York law is clear that the implied covenant cannot be used to create independent obligations beyond the contract." ARI & Co. v. Regent Int'l Corp., 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003). Nor does "New York law . . . recognize a separate cause of action for breach of the implied covenant . . . when it is based on the same facts as the breach of contract

4

claim." Goldblatt v. Englander Comm'cns, L.L.C., No. 06 Civ. 3208 (RWS), 2007 WL 148699, at *5 (S.D.N.Y. Jan. 22, 2007). Where the two claims depend on the same facts, the breach of the implied covenant of good faith and fair dealing claim must be dismissed. See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 861 F. Supp. 2d 344, 365 (S.D.N.Y. 2012). So, too, where "the relief sought in claiming a breach of the implied covenant of good faith is intrinsically tied to the damages allegedly resulting from the breach of contract." Goldblatt, 2007 WL 148699, at *5.

### DISCUSSION

In this action, 19 alleges that Sony's improper calculation of royalty payments breached multiple provisions of the Licensing Agreement. Sony responds that 19 is simply seeking to rewrite its agreement with Sony in order to claim millions of dollars in royalties to which it is not entitled. (Def.'s Mem. 1.) Sony does not appear to contest the existence of the Licensing Agreement or the adequacy of 19's performance under this Agreement. Thus, 19's claims can survive only if a finding of breach is not precluded by the plain, unambiguous language of the Licensing Agreement. 19 also brings multiple claims for breach of the implied duty of good faith and fair dealing.

The Court addresses each disputed contractual provision, in turn, below, beginning with 19's breach of contract claims, followed by any related good faith and fair dealing claims.

### I.   19's Claim that Sony Improperly Calculated Royalty Escalations

19 alleges that Sony breached the Licensing Agreement by failing to aggregate sales of single track downloads into so-called "track equivalent albums" for purposes of calculating royalty escalations due based on "Album" sales under paragraph 7.1 of the Licensing Agreement. (Am. Compl. ¶¶ 77–90.) In a related claim, it also argues that Sony breached the implied duty of good faith and fair dealing by "unilaterally allow[ing] iTunes and other DSPs [digital service providers]

5

to 'disaggregate' every album into individual song downloads . . . so they could . . . reap enormous financial benefits, without passing those benefits to Artists." (Id. ¶ 82.)

### *19's Breach of Contract Claim*

Paragraph 7.1 does two principal things. First, it sets forth royalty rates for three types of Records ("Albums," "Records other than Albums released during the First Contract Period," and "Records other than Albums released during subsequent Contract Periods"). (LA ¶ 7.1.) Second, it provides for the escalation of Album royalty rates pursuant to the following clause (the "Escalation Clause"):

> PROVIDED THAT on an Album by Album basis, in the event that the number of Records Sold during the Term of any Recording Commitment Album throughout the world exceeds one million (1,000,000), then the royalty rate in respect of Records Sold of such Album in excess of one million (1,000,000) shall increase by one percent (1%) in every territory.
>
> For the purposes of the foregoing escalation, reference to Records Sold shall be deemed to refer to Records Sold at full price through normal retail outlets only, and also Records Sold embodying Electronic Sales at full price made in territories in which electronic sales have at the relevant date achieved a market penetration by reference to official published industry statistics, of fifteen per cent (15%) or more.

(Id.)

The parties interpret the Escalation Clause differently. 19 reads it to require a one percent increase in royalty rates for albums sold where "Records Sold of a particular Recording Commitment Album achieve[] worldwide sales of 1,000,000 units." (Am. Compl. ¶ 81–90.) 19 argues that the electronic sale of a certain number of tracks from a Recording Commitment Album should "count as the equivalent of the sale of one album"—what 19 refers to as "track equivalent albums" or "TEAs." (Id.) Sony, it contends, has wrongfully failed to count these TEAs toward the million sale threshold that triggers an escalation in royalty payments. (Id.) Sony disagrees,

arguing that the plain language of the Licensing Agreement precludes this interpretation, and that only traditional sales—physical or electronic—of full Recording Commitment Albums should count toward the million sale escalation threshold.  (Def.'s Mem. 5, 12–15.)

As an initial matter, paragraph 1.1 defines an Album as "a Record containing not less than twelve . . . nor more than twenty-five . . . different Tracks and totaling no fewer than forty-five . . . . minutes of playing time," while paragraph 1.27 defines a Record as "a reproduction of Audio Material in any form now or later developed."  Paragraph 1.30, further, defines a Recording Commitment Album as "an Album forming part of" 19's commitment to deliver one full Album of Audio Material to Sony during each contract period.  Thus, as Sony correctly notes, the sale of multiple individual tracks does not constitute the sale of an Album, nor the sale of a Recording Commitment Album.  (Def.'s Mem. 12–13.)  The plain language of the Licensing Agreement forecloses this possibility.

This distinction, however, does little to clarify the meaning of the somewhat obtuse Escalation Clause, which links the one percent escalation in royalties to "the number of Records Sold during the Term of any Recording Commitment Album throughout the world."  (LA ¶ 7.1.) Thus, the central question is what "Records Sold . . . of [a] Recording Commitment Album" means, and, for the purposes of this motion, whether this meaning is readily discerned from the plain language of the Licensing Agreement.

The Court agrees with Sony that "Records Sold . . . of [a] Recording Commitment Album" plainly refers to sales *of* Recording Commitment Albums, and not sales of individual tracks *from* those Albums.  (See Def.'s Mem. 13–14.)  The Escalation Clause itself provides that it is to apply on an "Album by Album basis" and sets forth a clear distinction between Albums and Records other than Albums—a distinction found throughout the Licensing Agreement.  19, moreover, has

7

not pointed to a single contractual provision that aggregates individual track downloads into Albums, for any purpose.

That the Escalation Clause refers to "Records Sold embodying Electronic Sales," does not prove otherwise, as 19 contends. (Pl.'s Opp. 21.) This language merely clarifies that Electronic Sales of Recording Commitment Albums—and not just physical sales—also count toward escalation in some instances. (Def.'s Mem. 14.) Thus, while 19 is correct that "Electronic Sales" is defined to include all sorts of Records, including individual tracks (LA ¶ 1.15), the Escalation Clause is only concerned with certain types of Electronic Sales: sales of full Recording Commitment Albums.

The Court is also not swayed by 19's allegation that Sony routinely paid 19 the Album royalty trade on individual track downloads, and that this practice should bear on how the Court construes the Escalation Clause. (See Pl.'s Opp. 24.) As an initial matter, this allegation constitutes parol evidence, which is not admissible without a finding that the contract is ambiguous. See Schron v. Troutman Sanders LLP, 986 N.E.2d 430, 433 (N.Y. 2013) ("Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract."). Furthermore, although the parties disagree about the extent to which the Licensing Agreement contemplates the seismic changes in the music industry since the advent of iTunes and other digital service providers ("DSPs") in the early 2000s (compare Pl.'s Opp. 10 n.13 with Def.'s Mem. 15), Sony may well have decided it was only fair to pay 19 a higher royalty rate on the download of individual tracks as sales of full Albums declined. Even assuming this were so, however, the Licensing Agreement would not then compel Sony to aggregate the sale of individual track downloads for the purposes of triggering the Escalation Clause. One course of conduct does not necessitate the other.

8

For these reasons, the Court finds that the plain language of the Escalation Clause precludes 19's interpretation as a matter of law. Sony's motion to dismiss is granted as to this claim.

### *19's Implied Duty of Good Faith and Fair Dealing Claim*

Sony's motion is also granted as to the claim that Sony breached the implied duty of good faith and fair dealing by improperly allowing DSPs to sell disaggregated tracks to 19's pecuniary disadvantage. (Am. Compl. ¶ 82.) Nowhere does the Licensing Agreement restrict or even address Sony's discretion to sell disaggregated tracks. Indeed, the Licensing Agreement expressly grants Sony the "unlimited right" to "manufacture Records . . . by any method(s) now or hereafter known embodying any portion(s) or all of the Material recorded." (LA ¶ 12.3.)

Because Sony is expressly granted such an "unlimited right" under the Licensing Agreement, finding in 19's favor would not merely impose reasonable limits on Sony's use of its discretion, but would abrogate an express contractual provision, impermissibly "create independent obligations beyond the contract," ARI & Co., 273 F. Supp. 2d at 523, and "undermine [Sony's] general right to act on its own interest," M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (quotation omitted).

## II.   19's Claim that Sony Underpaid Streaming Royalties

### *19's Breach of Contract Claim*

19 alleges that Sony underpaid royalties on records licensed to third-party streaming services. (Am. Compl. ¶¶ 32–41.) The treatment of third-party streaming services for royalty purposes is set forth in paragraph 7.16 of the Licensing Agreement. Paragraph 7.16 distinguishes between two types of third-party agreements: first, those that "describe[] or characterise[] the exploitation as 'broadcast' or 'transmission,'" and second, those that either do "not so describe the exploitation [in this way] or describe[] or characterise[] the exploitation as 'distribution' or

9

'sales.'" Where the third-party agreements describe the exploitation exclusively as broadcasts or transmissions, 19 is to get 50% of Sony's receipts; where they do not, or where they describe the exploitation as distribution or sales, 19 is to get a far lower rate, set forth in paragraph 7.7. (LA ¶ 7.16).

Despite this clear distinction, 19 argues that *all* third-party streaming services "can only be fairly described as 'transmissions' or 'broadcasts,'" such that it is always entitled to the higher royalty rate. (Am. Compl. ¶ 36.) The Court disagrees.

Pursuant to the plain language of paragraph 7.16, royalty payments for "the exploitation of Audio Material by means of an Internet Radio Service or any other kind of streaming service" depend on how Sony's agreements with third-party streaming services characterize this exploitation, and not how it might fairly be described by 19. If the third-party licensing agreements do not characterize the exploitation as transmissions or broadcasts—regardless of how it could "fairly" be described—this exploitation is subject to the lower rate.[5]  The lower rate also applies where the third-party agreements characterize the exploitation as both a broadcast (or transmission) *and* as a distribution (or sale).  As paragraph 7.16 plainly states, the lower rate applies where a third-party agreement "does not so describe the exploitation as [broadcasts or transmissions] *or* describes . . . the exploitation as 'distribution' or 'sales.'" To read paragraph 7.16 as 19 suggests would eliminate this critical "or" from the Licensing Agreement.

19 also alleges that, upon information and belief, Sony's actual agreements with third-party streaming services describe the exploitation as transmissions or broadcasts, and that Sony

_____

[5] The Court also agrees with Sony that paragraph 7.16 cannot apply to sales of permanent digital downloads. (Def.'s Mem. 16–17.) Although paragraph 7.16 refers to paragraph 7.7 and treats some forms of exploitation by third-party streaming services as though they were electronic downloads, it does not itself cover such downloads. It only covers those streaming services "not specifically provided for above." Paragraph 7.7, which covers electronic downloads, is "above" paragraph 7.16.

misclassified income from these agreements in its accountings to 19. (Am. Compl. ¶ 36.) In other words, 19 appears to claim that Sony's third-party agreements describe the exploitation solely as broadcasts or transmissions, but Sony is paying out royalties at the lower distribution or sales rate. 19's claim of breach thus turns not on the plain language of the Licensing Agreements, but on the language of Sony's agreements with third-party streaming services: Do these agreements describe the exploitation solely as a broadcast or transmission, or do they also describe it as a download or sale?

This is a narrow issue and one that should prove relatively easy to resolve. Indeed, 19 appears to admit that the redacted third-party agreements it has received from Sony *do* characterize the exploitation as distribution or sales, speculating only that the redacted portions of these agreements also characterize the licensed exploitation as broadcasts or transmission. (Id. ¶ 37.) If this is so, then 19's claims must fail, as they are contrary to the plain meaning of paragraph 7.16. If not, then 19 has raised an issue of fact that can only be determined by reference to materials outside of the pleadings. Because the Court must accept 19's factual allegations as true at this early stage of the proceedings, however, dismissal before 19 can confirm whether it is alleging that the agreements describe the exploitation *solely* as broadcasts or transmissions, or as broadcasts and transmissions *in addition to* distributions or sales, would be improper.

Sony's motion to dismiss is thus denied as to this breach of contract claim, but 19 shall indicate by letter within two weeks of this Opinion whether its claim is foreclosed by the Court's findings as to the plain meaning of paragraph 7.16. If so, the Court will dismiss this claim at that time.

### 19's Breach of the Implied Duty of Good Faith and Fair Dealing Claim

Sony's motion to dismiss is also denied as to 19's related claim for breach of the implied covenant. 19 claims in part that Sony breached the implied covenant by "purposefully" drafting or editing the third-party agreements to mischaracterize the nature of the relevant exploitation, and that it did so "wrongfully and in bad faith" to "avoid its full obligation to 19 and destroy a significant part of the fruits of the Recording Agreement." (Pl.'s Opp. 5.)  19 is not contending, as Sony argues, that that "the mere fact of [Sony's] entry into such agreements" breaches the implied covenant. (Def.'s Reply 6.)  Nor is 19 arguing that "describing *any* third-party streaming agreement as a 'sales' or 'distribution' agreement necessarily constitutes bad faith." (Id. (emphasis in original).)  Instead, 19 is arguing that the "ephemeral nature of [the] exploitation" by the third-party streaming providers with which Sony has actually entered into agreements can reasonably only be characterized as broadcasts and transmissions, and that Sony's characterizations otherwise constitute bad faith. (Pl.'s Opp. 4–5.)

19's claim that Sony purposefully mischaracterized the nature of the exploitation in its licenses with third-party streaming providers thus depends on a different set of facts than its analogous breach of contract claim.  The royalties 19 receives from its third-party licensing agreements depend on Sony's characterization of the subject exploitation, as discussed, and the Licensing Agreement impliedly grants Sony the discretion to characterize the exploitation.  But this says little about how Sony has actually wielded this discretion, and in particular, whether it has wielded this discretion in bad faith.

Finding that there are limits on this discretion—*e.g.*, that such characterization may not be arbitrary—would not "create independent obligations beyond the contract," ARI & Co., 273 F. Supp. 2d at 523, or "undermine [Sony's] general right to act on its own interest," M/A-COM Sec.

Corp., 904 F.2d at 136.  It would only honor what anyone entering into the Licensing Agreement would anticipate: that Sony's characterization of its licenses with third-party streaming providers would not be arbitrary or capricious, but instead tied to what "broadcast," "transmission," "distribution," or "sale" might reasonably mean.  Because 19 has sufficiently alleged that Sony's characterization is arbitrary and in bad faith, its claim can survive Sony's motion to dismiss.

**III.   19's Claim that Sony Improperly Deducted Television and Radio Advertising Costs for Compilation Albums**

19 alleges that Sony "improperly reduced the royalty rate owed [it] for television advertised sales for Compilation Albums." (Am. Compl. ¶ 120.)  In particular, 19 alleges that paragraph 7.5.1, which permits Sony to deduct, within set limits, television advertising costs from royalties otherwise owed 19, does not apply to Compilation Albums.  (Id. ¶¶ 120–128.)  The paragraph provides for such deductions only "[i]n respect of Records Sold," and 19 argues that "Records Sold" does not encompass Compilation Albums.  (LA ¶ 7.5.1.)

In making this argument, 19 employs the following syllogism: First, a Record Sold is a "Record[] shipped or otherwise distributed for sale." (LA ¶ 1.32.)  A Record, in turn, is defined, in part, as "a reproduction of Audio Material in any form." (LA ¶ 1.27.)  Audio Material, however, is limited to "audio only Recording(s) of Artist's Performance(s) made pursuant to [each individual Licensing] Agreement." (LA ¶ 1.4.)  Therefore, because paragraph 7.5.1 is limited "[i]n respect of Records Sold," it can solely encompass "Masters performed by a <u>single</u> Artist and not to Albums comprised of individual Tracks from <u>multiple</u> artists, which is what Compilation Albums are." (Am. Compl. ¶ 123 (emphasis in original).)

This argument must be rejected.  First, the Licensing Agreement expressly defines a Compilation Album as "a multi-artist compilation album . . . embodying . . . Audio Material." (LA ¶ 1.9.)  Compilation Albums are thus also Records and, when distributed for sale, Records Sold.

There is no language in the contract—at least none to which 19 has pointed—requiring that a Record consist exclusively of Audio Material of a single Artist.  After all, if a Record is "a reproduction of Audio Material *in any form*," (LA ¶ 1.27 (emphasis added)), why could one of those forms not include a Compilation Album, which consists of both Audio Material and material from other artists not subject to the Licensing Agreement at all?  Indeed, paragraph 7.11 of the Licensing Agreement specifically envisions royalty payments for joint performance Records, where a 19 "Artist performs . . . jointly with any artist(s) in favour of whom [Sony] or its licensees is obliged to accrue royalties."

Second, as both 19 and Sony acknowledge, paragraph 7.4.2, which sets royalty rates for particular categories of Records Sold, expressly lists Compilation Albums as a type of Records sold.  (See Am. Compl. ¶ 124; Def.'s Mem. 18.)  The Court agrees with Sony that the inclusion of Compilation Albums in paragraph 7.4.2 persuasively demonstrates that, throughout the Licensing Agreement, Compilation Albums are to be considered Records Sold.

The Court also agrees that 19 cannot argue, on the one hand, that Records Sold includes Compilation Albums for the purpose of calculating royalties, while arguing, on the other hand, that Records Sold does not include Compilation Albums for the purpose of Sony deducting its advertising costs.[6]  19 either gets no royalties on Compilation Albums at all, or it gets royalties— but then must also cover some of Sony's advertising costs for such Albums.  It cannot have it both ways.

---

[6] Because the Court finds that the plain language of the text precludes 19's interpretation, the Court is not swayed by 19's extra-textual argument that it would be "inequitable and unprecedented to charge 19, who is receiving only a small pro-rata percentage of the total royalties due," with 50% of the advertising costs of an entire Compilation Album, as paragraph 7.5.1 requires.  (Am. Compl. ¶ 125.)

For the reasons stated, 19's argument that paragraph 7.5.1 does not encompass Compilation Albums fails.  Sony's motion to dismiss this claim is granted.

## IV.  19's Claim that Sony Failed to Report Receipts from its Settlements with DSPs

19 alleges that Sony "under-reported or failed to report net receipts from settlements with certain DSPs," (Am. Compl. ¶ 97), as is required pursuant to paragraph 20.1 of the Licensing Agreement (Am. Compl. ¶ 98).  19's interpretation of this paragraph is in error.

Paragraph 20.1 sets forth two potential ways for Sony to combat the unauthorized manufacture or sale of records.  First, at "the request and expense" of Sony, 19 is required to cooperate in "preventing . . . the unauthorised manufacture or sale and/or distribution of Records and Audio Visual Devices."  (LA ¶ 20.1.)  Second, where necessary, Sony can "institute . . . legal proceedings in the name of [19] and/or Artists as [Sony] may deem suitable."  (Id.)  19's consent is required to initiate these proceedings, but Sony is "entitled to deduct [its] costs incurred" from any recovery, with "one half of any excess recovery" credited to 19's "royalty balance." (Id.)  Nothing in Paragraph 20.1, however, limits the rule set forth in paragraph 7.17 that 19 is not "entitled to a share of income received by or credited to [Sony] on a general or label basis."

19's allegation that Sony's lawsuits against certain DSPs have "resulted in payments or awards that are clearly attributable to Artists' Masters" fails to state a claim for breach of contract. (Am. Compl. ¶ 99.)  19 is only entitled to its share of excess recovery where such suits were brought in 19's name, which would have required 19's express consent.  Otherwise, Sony remains free to bring suits "on a general or label basis" (LA ¶ 7.17)—and to retain the full amount of any settlements such suits yield.  Because 19 has not alleged that Sony failed to report settlement receipts from suits actually brought in its name and not just attributable to its Artists, 19 has not sufficiently alleged a breach of this provision.  Sony's motion to dismiss this claim is granted.

15

**V. 19's Claim that Sony Improperly Deducted Foreign Television and Radio Advertising Expenses from 19's Royalties**

19 argues that Sony has improperly deducted foreign television and radio advertising expenses from 19's royalties by misconstruing the limits paragraph 7.5.2(c) sets on these expenses. (Am. Compl. ¶¶ 42–53.)

Paragraph 7.5.2 outlines the royalties due based on Sony's television and radio advertising expenditures in defined countries. Subparagraphs (a) and (b) of paragraph 7.5.2, which concern television and radio advertising in the United States, set expenditure thresholds of $150,000 and $75,000, respectively. (LA ¶ 7.5.2.) Broadly speaking, if Sony's spending on television and radio advertising exceeds these thresholds, then Sony is permitted to deduct 50% of its advertising costs from 19's royalties on sales of the Album in support of which Sony advertised. (Id.)

By their plain terms, both subparagraphs apply on an Album-by-Album basis. (See, e.g., LA ¶ 7.5.2(a) ("[I]f the TV spend . . . in the USA for each such Album . . . .").) In other words, all of the different television advertising campaigns that Sony runs in support of any one Album— *e.g.*, a television buy in the New York City market, and another in Los Angeles—get added together, and where this sum exceeds $150,000, Sony gets to withhold 19's royalties on the album until 50% of its costs have been recouped. (Id.) Where this sum exceeds $600,000, however, 19's consent is required before Sony can undertake such an expenditure. (Id.)

Subparagraph (c), meanwhile, applies outside of the United States to a defined list of foreign countries included in a table to the subparagraph. Broadly speaking, subparagraph (c) also permits Sony to withhold royalty payments until it has recouped 50% of its television and advertising costs in these foreign countries, as long as its expenditures fall between minimum and maximum "spends" set forth in the accompanying table. Any advertising expenditures in excess of these limits require 19's consent. (LA ¶ 7.5.2(c).) Subparagraph (c), however, does not include

16

the language in subparagraphs (a) and (b) indicating that the minimum and maximum "spends" apply on an Album-by-Album basis.

Sony argues that this difference in language is meaningful, and that the limits set forth in subparagraph (c) apply only on a campaign-by-campaign basis. (Def.'s Mem. 21–22.) Pursuant to Sony's reading, the subparagraph would work as follows: Suppose Sony is supporting sales of an Album in Canada, and conducts two separate television advertising campaigns—*e.g.* a $150,000 television buy in Toronto and another $150,000 buy in Vancouver. Subparagraph (c), unlike subparagraphs (a) and (b), does not add these two campaigns together to determine whether Sony's total in-country spending is: 1) less than the minimum spend, in which case Sony is unable to recoup its costs; 2) between the minimum or maximum spend, in which case Sony gets to recoup 50% of its costs; or 3) in excess of the maximum spend such that 19's approval would be required. Instead, according to Sony, these determinations are made under subparagraph (c) by looking at each campaign in its own right. Because the hypothetical spend in Vancouver falls between the minimum and maximum television spends for Canada, it does not first require 19's approval— even though the total cost of the combined campaigns, Toronto plus Vancouver, would exceed the $200,000 maximum Canadian spend set forth in the accompanying table.

19 disagrees. It argues that Sony's reading would lead to an "absurd" result: the "ability to conduct an unlimited number of TV and/or radio advertising campaigns in a given country for a particular Album without ever seeking 19's prior approval so long as each individual campaign, however limited," fell within the minimum and maximum limits of subparagraph (c). (Am. Compl. ¶ 48 (emphasis in original).)

Here, the Court agrees with Sony that subparagraph (c) does not contain the same, express "Album-by-Album" language as subparagraphs (a) and (b). The Court, however, cannot conclude

17

that subparagraph (c) does not contain other language that unambiguously limits spending on an Album-by-Album basis. The provision is simply too opaque to allow the Court to readily determine—at least without reference to extrinsic evidence, supplemental briefing, or both—its precise meaning. Sony argues that subparagraph (c), "like the default provision in ¶ 7.5.1 . . . [,] unambiguously provides for [Sony's] deduction of television and radio advertising expenditures on a per campaign basis." (Def.'s Mem. 21–22.) But paragraph 7.5.1 does not use the same language as subparagraph (c), nor is it nearly as syntactically complex. For instance, paragraph 7.5.1 does not use the phrase, "retained by Company on the Album the subject of the TV/radio advertising campaign," the precise meaning of which, in the context of this subparagraph, is particularly unclear. (LA ¶ 7.5.2(c).) Nor does paragraph 7.5.1 shuttle as frequently—or as confusingly—between the singular and the plural ("spend/spends" and "campaign/campaigns") as does paragraph 7.5.2.

Thus, while the Court is not swayed by 19's interpretation of subparagraph (c), nor can it embrace Sony's argument that subparagraph (c) "unambiguously appl[ies] on a per-campaign" basis. (Def.'s Mem. 22.) In sum, subparagraph (c) is simply too ambiguous to warrant dismissal at this stage. Sony's motion to dismiss this claim is thus denied.

## VI. 19's Claim that Sony Breach the Implied Duty of Good Faith and Fair Dealing by Underreporting Record Club Income

Finally, 19 alleges that Sony is underreporting income on which it would otherwise be required to pay royalties by improperly structuring its agreements with third-party record clubs. (Id. ¶¶ 106–109.) In particular, 19 alleges that Sony allows Record Clubs to use 19's "Masters at an amount less than fair market value," but then receives so-called "trademark payments" from the Record Clubs to make up for this underpayment. (Id. ¶ 107.) In other words, 19 claims that Sony gets the full fair market value on the Records it permits Record Clubs to use, but only classifies

18

part of this amount as income on which it is required to pay royalties. As a result, 19 contends that it has been underpaid, and that Sony's purposeful structuring of its agreements with Record Clubs to avoid royalty payments breaches the implied covenant of good faith and fair dealing. (Id. ¶ 109.)

Sony's motion is denied as to this claim. Although Sony argues that 19 lacks the basis on which to plead such a claim on information and belief (Def.'s Mem. 25), the partial audit 19 has conducted of Sony's books and records provides a sufficient factual basis for an "inference of culpability," at least at this stage of the proceedings. Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). These allegations, moreover, depend on a set of facts distinct from those on which 19's analogous breach of contract claim depend. Even if Sony is complying with the letter of the Licensing Agreement as to its relationships with record clubs, this says little about whether its compliance stems from Sony's bad-faith structuring of its record club agreements, as 19 alleges.

## VII.    Other Claims

Although styled as a motion to dismiss 19's Amended Complaint, Sony seeks only partial dismissal, and has not challenged several of 19's allegations. (See Def.'s Mem. 2 (seeking dismissal only of the "claims addressed below").) Those allegations are: the improper deduction of excess charges from royalties (Am. Compl. ¶¶ 54–64); incorrect royalty payments on joint venture Compilation Albums (id. ¶¶ 65–71); the failure to properly account for foreign sales in calculating escalations (id. ¶¶ 91–93); the failure to count all Albums sold through normal retail channels in calculating escalations (id. ¶¶ 94–96); the failure to correctly account for income from record clubs (id. ¶¶ 101–109); the improper charging of taxes (id. ¶¶ 110–114); the under and non-reporting of synchronization and other royalties (id. ¶¶ 115–119); wrongful attempts to take a deduction under the new technology provision (id. ¶ 141); the failure to allow a full and fair audit

19

(id. ¶¶ 142–145); the failure to correctly pay for Kelly Clarkson masters used in connection with Glaceau (id. ¶¶ 146–147); and recovery of 19's accounting fees (id. ¶¶ 148–150).  Within two weeks of this Opinion, Sony shall notify the Court whether it intends to file a responsive pleading as to these remaining claims, and, if not, why the failure to answer these allegations should not be considered an admission of those facts pursuant to Fed. R. Civ. P. 8(b)(6).

In addition, Sony initially sought to dismiss any claims for royalties for Carrie Underwood and Kellie Pickler from 2006, arguing that any such claims were barred by applicable contractual contestability provisions. (Def.'s Mem. 22–23.)  In its opposition papers, however, 19 indicated that it was not raising any such claims. (Pl.'s Opp. 3 n.5.)  Thus, as to these claims, Sony's motion is denied as moot.

## CONCLUSION

For the reasons stated above, Sony's motion to dismiss is denied in part and granted in part. The Clerk of Court is requested to close the motion pending at Dkt. 19.

As multiple claims remain in this action, a status conference in this matter is scheduled for Tuesday, May 1, 2015 at 11:00 a.m.  No later than April 24, 2015, the parties shall jointly submit to the Court a revised case management plan and scheduling order, as well as a joint letter updating the Court as to the status of any discovery.  A template for the case management plan and scheduling order is available at http://nysd.uscourts.gov/judge/Abrams.

In addition, no later than two weeks from the date of this opinion, 19 must submit its letter regarding the viability of its claim that Sony underpaid streaming royalties and Sony must submit its letter as to whether it intends to answer, or otherwise respond to, those claims for which it did not seek dismissal.

SO ORDERED.

Dated:     March 17, 2015
           New York, New York

                                         Ronnie Abrams
                                         United States District Judge