Richard S. Busch (SB 5613)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone: (615) 259-3456
Facsimile: (615) 726-541

Kenneth E. Gordon (KG 5703)
GORDON, GORDON & SCHNAPP, P.C.
437 Madison Avenue, 39th Floor
New York, New York 10022
Telephone: (212) 355-3200
Facsimile: (212) 355-3292

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 19 RECORDINGS LIMITED<br><br>    Plaintiff,<br>v.<br><br>SONY MUSIC ENTERTAINMENT,<br><br>    Defendant. | Case No. 14-CV-I056 (RA)(GWG)<br><br>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF 19 ENTERTAINMENT'S MOTION TO AMEND<br><br><u>DEMAND FOR JURY TRIAL</u> |

1

Plaintiff 19 Recordings Limited ("19"), by and through its counsel, hereby submits its Motion to Amend its First Amended Complaint to add a claim that Defendant Sony Music Entertainment ("Sony") breached its duty of good faith and fair dealing by agreeing with Spotify (a Company in which Sony owns an interest) to be paid a below industry standard royalty rate for streaming income in exchange for a share of advertising and other forms of revenue, which Sony does not have to share with 19, its artists, and every other artist in Sony's roster. This self dealing has no relation to the value that Sony's catalog offers to Spotify, which is entirely attributable to Spotify's right to exploit master recordings owned or controlled by Sony, and this payment structure was created in bad faith. These actions, as explained herein, rob 19 and its artists (indeed all artists), to their rightful share of royalties under the Recording Agreements, constitute a violation of Sony's duty of good faith and fair dealing, and must be cured.

## I. Background Facts

19's affiliated company brought *American Idol*, to the United States in 2002. DE 18 at ¶ 6. As part of the *American Idol* competition, 19 signed certain contestants to exclusive recording agreements and, as described below, entered into virtually identical licensing agreements with Sony with respect to the *American Idol* winner and certain other finalists, allowing Sony to reap millions of dollars in profits by exploiting their respective works. *Id.* at ¶¶ 6, 16.

Prior to the selection of the first *American Idol* winner, in September of 2002, 19 entered into a master agreement (the "Master Recording Agreement") with Ronagold Limited granting Ronagold the right to designate the RCA Record Label, a unit of BMG Music and the predecessor-in-interest of Sony, as the "exclusive record label" for all American Idol finalists during the first nine seasons[1] of American Idol. *Id.* at ¶ 16. Attached thereto was the template agreement 19 was required to use in licensing Sony the rights to future acts "picked up" each season by Sony, and thus was the master "form" for the series of exclusive licensing agreements thereafter entered into by 19 and Sony for each of the Artists (individually and collectively

---

[1] The original agreement with Ronagold was for four seasons of the *American Idol* series, but was subsequently extended.

2

referred to, as each may have been amended, the "Recording Agreement," and the "Recording Agreements," respectively).[2] *Id.* Through the Recording Agreements, 19 granted Sony the exclusive right to manufacture, advertise, promote, distribute, sell, and otherwise exploit, and to license such rights to others, the individual recordings of the Artists in all configurations throughout the world. *Id.*

In consideration of 19's performance under the Recording Agreements, Sony agreed to account to and pay 19 under a certain royalty structure set forth in detail therein. *Id.* at 19. In order to ensure Sony correctly accounted to and paid 19 under the Recording Agreements, Paragraph 17.4 of each Recording Agreement gave 19 the explicit right to inspect Sony's books and records through an audit procedure. *Id.* Specifically, Sony agreed to allow 19 to "inspect examine and otherwise audit [Sony's] books and records for the purposes of determining the accuracy of [Sony's] statements to [19]." *Id.*

19 conducted audits of Sony's books and records (collectively the "Audits") for certain of the Recording Agreements. *Id.* at 20-22. The Audits revealed, for the first time, a wide array of underpayments by Sony, including systematically incorrect calculations, which resulted in significant underpayments. However, 19 was unable to determine the full extent of its claims because Sony refused to provide certain books and records to 19's auditors, including its agreements with streaming providers. *Id.* at ¶ 30. This failure to provide the relevant books and records was itself of a breach of the Recording Agreements. *Id.*

Subsequent to the May 1, 2015 Case Management Conference in this matter, Sony produced to 19 certain agreements between Sony and third party streaming providers. While Sony redacted some financial information in those agreements, the non-redacted portions of the agreements shed light on the nature of Sony's relationships with its third party streaming providers. Additionally, on or about May 19, 2015, an unredacted version of Sony's agreement

---

[2] The first such Recording Agreement has an effective date of September 4, 2002 for the recordings of Kelly Clarkson (the paragraph references herein, unless otherwise specified, refer to paragraph numbers in this first Recording Agreement; the subsequent Recording Agreements contain the same or substantially the same language discussed herein, but in some limited instances may have different paragraph numbering). *Id.* at 16.

with the streaming provider Spotify was obtained by several media outlets. The subsequent news stories regarding the terms of that agreement gave further clarity to Sony's relationship with Spotify.

As set forth in the proposed Second Amended Complaint, Sony is a part owner of Spotify.[3] Ex. A at ¶ 44; *see also* Declaration of Ted Cohen attached hereto as Exhibit B. Thus, when Sony was negotiating with Spotify, Sony was, in fact, negotiating not at arm's length, but with a company it owned. Instead of entering an agreement negotiated at arm's length, Sony used its influence and ownership in Spotify to craft an agreement which increased the value of Sony's ownership of Spotify, and allowed Sony to receive income that it claims is not subject to its royalty obligations to its royalty participants, while also artificially lowering the royalties paid by Spotify to Sony so as to decrease Sony's royalty obligations. As indicated in the Declaration of Ted Cohen, attached hereto, each of the major record labels in fact own an interest in Spotify. Ex. B. While we have not seen the agreements between those other record labels and Spotify, on information and belief, those other labels have in most likelihood engaged in the same self-dealing as Sony with respect to the diversion of payments to them, and the below market streaming royalty rates payable to artists in their Spotify agreements. Together, and individually, the labels have a significant power to exert control over Spotify, and dictate how revenue will be paid.

Put another way, Sony agreed with a company it owns in part, to be paid a royalty rate that is substantially below the fair market value so that it can receive other compensation instead that it does not have to share with 19 and its artists. Ex. A at ¶¶ 45-46. Upon information and belief, that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *Id.* at ¶ 46; Ex. B.

---

[3] 19 is without the ability to determine the exact percentage of Sony's ownership, however, media reports claim that Sony owns between five and six percent of Spotify.

4

Sony had multiple reasons for negotiating such a below market royalty rate. First, as an owner of Spotify, negotiating a lower royalty rate with Spotify increased the value of Sony's equity in Spotify. Ex. A at ¶ 47. This action is textbook self dealing. Second, because of its ability to negotiate with itself, Sony was able to structure the financial terms of its agreement with Spotify in a manner that resulted in Spotify paying the equivalent of a near fair market value to Sony, but in a format that allowed Sony to only have to share a portion of that money with its artists - the royalty rate that was substantially below the fair market value of the right to exploit Sony's catalog. *Id.* at ¶¶ 46-47. Sony accomplished this by moving the consideration for access to its catalog away from the actual exploitation of the catalog to other forms of income. *Id.* at ¶ 48. For instance, Sony's agreement with Spotify ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at ¶ 49. Thus, Sony is able to collect up to ▮▮▮ under the terms of its agreement with Spotify and then claim that none of the income is attributable to the exploitation of a master recording, and thus not subject to the payment of royalties to Sony's recording artists and other royalty participants, such as 19. *Id.* at ¶¶ 49-50. By structuring the agreement in this way, Sony is able to take in ▮▮▮▮▮▮▮▮▮ in revenue without having the cost of paying royalties to the content creators who created the master recordings which allowed Sony to enter into its agreement with Spotify. *Id.* at ¶ 50. None of the streaming agreements negotiated at arm's length provide for such a structure. *Id.* at ¶ 51.

Thus, Sony used its ability to self deal in a manner which robbed 19, the artists involved in this action, and other artists of the benefit of their bargains by allowing for the exploitation of those artists and producers' master recordings without proper compensation. The structure agreed upon by Sony and Spotify has no relation to the actual purpose of the agreement between Sony and Spotify. *Id.* at ¶¶ 47, 50. Spotify's intention in entering the agreement with Sony was to gain the right to exploit master recordings owned or controlled by Sony. *Id.* However, instead of paying fair market value for that right, Spotify paid only a fraction of a reasonable royalty. *Id.* at ¶ 46. Spotify subsequently gave Sony ▮▮▮▮▮▮▮▮▮▮▮ without gaining any rights to the master recordings it wanted to exploit. *Id.* at ¶¶ 49-50. Such a structure does not reflect terms

that could ever be negotiated at arm's length, but instead evidences that Sony manipulated its ability to self deal in order to purposefully move payments away from being attributable to the exploitation of its master recordings so as to avoid its royalty obligations. This frustrated the purpose of the Recording Agreements by depriving 19 of the consideration it sought, the payment of royalties for the exploitation of master recordings it caused to be created. *Id.* at ¶ 53.

Based on these facts, Sony has breached its duty of good faith and fair dealing to 19 and deprived 19 of royalties properly due it. Sony then attempted to cover up that wrongdoing by failing to provide the relevant streaming agreements during the course of the audit and by producing agreements with redacted financial information during this litigation. *See e.g.* Spotify Agreement at 17-19; 29-31 attached hereto as Exhibit C; DE 18 at ¶ 30. 19 should be allowed to amend its First Amended Complaint in order to assert these claims, which it has only just been able to discover, and recover income which Sony has purposefully hidden from 19. Indeed, this motion is being filed within weeks of receiving this information, and at what amounts to the beginning of discvery.

## II.   Standard of Review

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir. 1990 In discussing the exercise of Rule 15 discretion, the United States Supreme Court has stated that, in the absence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment, the leave sought should be given. *Foman v. Davis,* 371 U.S. 178, 182 (1962). "Mere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981) (citations omitted). Where a party did not know of a potential claim, the period of delay at issue only begins once of the party becomes aware of its claim. *Bridgeport Music, Inc. v. Universal Music Grp., Inc.,* 248 F.R.D. 408, 414 (S.D.N.Y. 2008).

### III.  19 Should Be Allowed to Amend to Raise Claims Which Could Have Only Become Known in Recent Weeks

19's Motion to Amend is timely as 19 is bringing its Motion within weeks after it first had access to the facts allowing it to make the allegations contained in its proposed Second Amended Complaint, and at the beginning of discovery in this case.

On or about May 19, 2015, a copy of the streaming agreement between Spotify and Sony became available to some members of the press.[4] Numerous press outlets then reported on the terms of that agreement including the terms set forth above. *See e.g.* Ex. D. On May 22, 26, and June 2, 2015 Sony made certain of its streaming agreements available to 19 based on this Court's Order. Since that time, 19's counsel has been reviewing the approximately 6,374 pages of documents produced.

Prior to being able to review these documents, 19 had no way of knowing that Sony had negotiated with itself in a manner that violates Sony's duty of good faith and fair dealing. Sony's agreement with Spotify has been a closely guarded secret. In fact, as pleaded in 19's First Amended Complaint, Sony refused to produce that agreement during 19's examination of Sony's books and records even though that agreement directly related to the manner in which Sony had accounted to and paid 19. As set forth above, these newly discovered facts set forth a claim that could not have previously been brought.

Courts routinely allow the amending of a Complaint under circumstances where a party learns of additional facts which state a claim. In fact, courts have permitted amendments where the time between a moving party's discovery of the relevant facts and the filing of the motion to amend was much longer. *See, e.g., Securities and Exchange Commission v. PCI Telecommunications, Inc.*, 207 F.R.D. 32, 34–35 (S.D.N.Y. 2002) (plaintiff obtained discovery supporting amendment four months before motion); *Green v. Wolf Corp.*, 50 F.R.D. 220, 223 (S.D.N.Y.1970) (plaintiff aware of facts asserted in amended complaint from outset of case).

---

[4] It appears that agreement was leaked without Sony's permission and in violation of the terms of the agreement itself.

7

Allowing leave to amend in this case, is especially appropriate as discovery is only in its infancy. The Case Management Conference did not occur until May 1, 2015 and discovery is set to remain open until April 8, 2016. DE 50. 19 has acted diligently in pursuing its claims and should be granted leave to amend to assert a claim of which it is only now in possession of the information necessary to articulate that claim.

### IV. Sony Breached Its Duty of Good Faith and Fair Dealing by Purposefully Driving Down the Royalty Rates Payable by Spotify While Simultaneously Creating a Windfall for Itself

Sony's actions, described in detail above, are a breach of its duty of good faith and fair dealing. Sony had discretion to license the Masters under the Recording Agreement. Sony even had the discretion to license the Masters to companies it owned or controlled. However, Sony did not have the right to license the Masters at rates which are only a pittance of the fair market value of the Masters while simultaneously enriching itself by accepting ███████████ under an agreement with a company that it owns while claiming that income is separate from income resulting from the exploitation of its master recordings.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2002). The implied covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* The duty of good faith and fair dealing encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995); *see also Legend Autorama, Ltd. v. Audi of Am., Inc.*, 934 N.Y.S. 2d 34, 11-13 (N.Y. Sup. Ct. 2011). Parties to a contract may not exercise discretion in a way which would somehow prevent an opposing party from receiving the value it bargained for. *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank*, 680 F. Supp. 2d 625, 631-

32 (S.D.N.Y. 2010); *see also AFBT-II, LLC v. Country Vill. on Mooney Pond, Inc.*, 759 N.Y.S.2d 149, 151 (N.Y. Sup. Ct. App. Div. 2003).

As described in detail in the proposed Second Amended Complaint, Sony could use its own judgment in order to enter into streaming agreements. What Sony could not do was enter into agreements with streaming services and purposefully self deal by agreeing to artificially low royalty rates in exchange for accepting other consideration that provided value to Sony while robbing 19 of the royalties rightfully due to it. Indeed, could Sony have agreed to be paid nothing in royalties, have all of its money from Spotify be paid in advertising revenue, and then claimed that it did not have any royalty obligations at all to 19 or the artists who have made Sony a fortune? The answer is no. This is no different, except Sony apparently believed that by at least agreeing to some royalty rate, albeit well below industry standard, it could avoid being caught by cloaking its agreements with incredible secrecy and refusing to provide the agreements to its artists even in the audit process. Sony's scheme, however, has now been found out, and their greed exposed.

Depriving a party "of what it ultimately sought from the parties' contractual arrangement" cannot be allowed. *Gray & Assoc., LLC v. Speltz & Weis LLC*, 22 Misc. 3d 1124(A) (N.Y. Sup. Ct. 2009). Thus, under New York law, even if a party is not in breach of its express contractual obligations, it "may be in breach of the implied duty of good faith and fair dealing when it exercises a contractual right as part of a scheme . . . to deprive the other party of the fruit or benefit of its bargain." *Elmhurst Dairy v. Bartlett Dairy*, 2012 N.Y. App. Div. LEXIS 5659, at *7-8 (N.Y. Sup. Ct. App. Div. July 25, 2012) (quoting *Marion Scott Real Estate, Inc. v. Rochdale Vil., Inc.*, 23 Misc.3d 1129(A) (N.Y. Sup. Ct. 2009)).

A "commonly recognized hallmark[] of bad faith . . . [is] self-dealing." *Mickle v. Christie's Inc.*, 207 F. Supp. 2d 237, 252 (S.D.N.Y. 2002). Here, not only has Sony engaged in self dealing, as it owns an interest in Spotify, but Sony has engaged in self dealing in a way that purposefully frustrates the terms of the Recording Agreements while enriching Sony in a manner that is untied to the purpose of the streaming agreement. Sony's action in allowing access to its

9

catalog at below market value supports a claim for breach of the duty of good faith and fair dealing when it is coupled with Sony's action in enriching itself through an agreement that would never be contemplated by parties acting at arm's length. *See Coco Investments, LLC v. Zamir Manager River Terrace, LLC*, 907 N.Y.S 2d 99 (N.Y. Sup. Ct. 2010) (sale at below market value supports a claim for breach of the duty of good faith and fair dealing; *New York Cent. R. Co. v. New York, New Haven, & Hartford R. Co.*, 216 N.Y.S. 2d 928, 945-46 (N.Y. Sup. Ct. 1961). In this case, Sony's bad faith goes beyond self dealing and encompasses Sony's actions in manipulating its agreements to avoid royalty obligations to 19 and others.

Under New York law, the covenant of good faith and fair dealing requires "that parties not 'frustrate the contracts into which they have entered.'" *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 315 (S.D.N.Y. 2003) (quoting *Grad v. Roberts*, 14 N.Y.2d 70, 75, 248 N.Y.S.2d 633, 198 N.E.2d 26 (1964)). Sony's bad faith actions have frustrated the purpose of the Recording Agreements by robbing 19 of the consideration it sought, the payment of royalties for the exploitation of master recordings it caused to be created.

Such an allegation of bad faith in regard to depriving a party "of what it ultimately sought from the parties' contractual arrangement" states a claim for breach of the duty of good faith and fair dealing and 19 should be able to amend its Complaint to set forth that claim. *Gray & Assoc., LLC*, 22 Misc. 3d at 28-29.

## Conclusion

As the United States Supreme Court has noted, a plaintiff should have a chance to test its claims on the merits. *Foman*, 371 U.S. at 182. In this instance, 19 has timely raised a claim which arises out of facts that Sony had previously hidden from 19. Those facts support a claim "which may be a proper subject of relief," and therefore 19 should be allowed to amend its First Amendment Complaint. *Middle Atl. Utilities Co. v. S.M.W. Dev. Corp.*, 392 F.2d 380, 384 (2d Cir. 1968). As such, 19 prays this Court will allow 19 to amend its First Amended Complaint to assert claims related to Sony's bad faith actions with respect to its agreement with Spotify.

10

Dated: June 15, 2015                    Respectfully submitted,

                                        By:    /s/Richard S. Busch

                                        Richard S. Busch (SB 5613)
                                        KING & BALLOW
                                        315 Union Street, Suite 1100
                                        Nashville, Tennessee 37201
                                        Telephone: (615) 259-3456
                                        Facsimile: (615) 726-541

                                        Kenneth E. Gordon (KG 5703)
                                        GORDON, GORDON & SCHNAPP, P.C.
                                        437 Madison Avenue, 39th Floor
                                        New York, New York 10022
                                        Telephone: (212) 355-3200
                                        Facsimile: (212) 355-3292

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of June 2015, the preceding document was filed with the CM/ECF system which served the document on:

Jonathan M. Sperling, Esq.
Christopher Yeung, Esq.
Douglas R. Curran, Esq.
COVINGTON & BURLING LLP
620 Eighth Avenue
The New York Times Building
New York, New York 10018

/s/Richard S. Busch