Richard S. Busch (SB 5613)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone: (615) 259-3456
Facsimile: (615) 726-541

Kenneth E. Gordon (KG 5703)
GORDON, GORDON & SCHNAPP, P.C.
437 Madison Avenue, 39th Floor
New York, New York 10022
Telephone: (212) 355-3200
Facsimile: (212) 355-3292

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **19 RECORDINGS LIMITED**<br><br>     **Plaintiff,**<br>**v.**<br><br>**SONY MUSIC ENTERTAINMENT,**<br><br>     **Defendant.** | **Case No. 14-CV-I056 (RA)(GWG)**<br><br>**REPLY IN SUPPORT OF PLAINTIFF 19 RECORDING'S MOTION TO AMEND**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff 19 Recordings Limited ("19"), by and through its counsel, hereby submits its Reply in Support of its Motion to Amend its First Amended Complaint to add a claim that Defendant Sony Music Entertainment ("Sony") breached its duty of good faith and fair dealing by contracting with music streaming company Spotify, a company owned in part by Sony,[1] and the other major record labels, to be paid a below industry standard royalty rate for streaming income. 19's Proposed Amended Compl. at ¶¶ 33-52. As asserted in the proposed Amended Complaint, Sony entered into this self-dealing arrangement to increase Spotify's value by lowering Spotify's financial obligations well below the market rate for the right to stream music. Further, the colluded structure of the deal allowed Sony to take streaming revenue allocable and attributable to specific master recordings, and, in bad faith, re-characterize that revenue as advertising-related payments not attributable to any specific master recording.

Sony has not denied that it engaged in this unconscionable conduct, but instead sets forth three reasons that allegedly warrant denial of 19's motion: (1) "the parties anticipated that [Sony] may exploit the recordings in certain ways that would benefit [Sony], but that may not result in revenue for 19 . . ." and "19 cannot claim that the parties intended that [Sony] would not receive consideration on a general or label basis (such as in the form of an advertising credit), rather than on a basis tied to the use of a particular sound recording, because 19 expressly agreed that it 'shall not be entitled to a share of income received by or credited to [Sony] on a general or label basis" (Sony mem. at 14); (2) "19 does not allege any facts that give rise to an inference of control . . . [as a]llegations of minority stock ownership is insufficient as a matter of law to establish such control" (Sony mem. at 15); and (3) "19's objective is plain: to use the proposed Second Amended Complaint as cover to obtain the very discovery that Judge Abrams previously disallowed." (Sony mem. at 10). None of these three points are factually or legally correct or provide any basis for the Court to deny 19's Motion to Amend.

---

[1] As set forth below, the other major record labels also have a minority ownership interest in Spotify. Proposed Amended Compl. at ¶ 44.

First, while it is true that 19 and Sony envisioned that Sony may receive revenue not tied to a recording that would not need to be shared with artists, it was in no way contemplated by the parties that Sony would be able to agree to a fictitiously low royalty rate with a company that it owned in part, and agree to divert that money to other forms of income so that it could contend that it is general advertising income not attributable to a specific master recording. Sony's actions are far outside the spectrum of the parties' understanding, and in fact have the effect of significantly injuring 19's position to receive the fruits of the agreement. Sony acted in bad faith and breached its duty of good faith and fair dealing in at least two ways: (1) Sony agreed to receive a royalty rate well below industry standard with a company it (and the other major record labels) own in order to enrich itself by increasing Spotify's value; and (2) Sony colluded with Spotify to structure the deal so that Sony could resell advertising on Spotify and not share those proceeds with artists, producers, and other content creators.

Second, contrary to Sony's assertions, Sony does not have to have a majority ownership in Spotify in order to engage in self-dealing. Each of the major record labels owns a stake in Spotify, and, individually and collectively, that ownership in Spotify allows each of the labels to exert unique and significant influence over Spotify, since the Spotify business would not be viable if any of the major record labels did not provide the music for streaming. (Proposed Amended Compl. At ¶ 44). The facts outlined above show Sony's specific and harmful self-dealing.

Finally, this is not a "fishing expedition" as Sony repeatedly claims. 19 has not only pled the facts outlined above to support its claim, but it attached to its original Motion the Declaration of an expert witness, Theodore Cohen, who states specifically that the royalty rates in the Spotify agreement are dramatically below industry standards. 19, therefore, supports its allegations of bad faith with specific facts, and has further pled more particular and detailed facts than generally could be expected at the pleading stage.[2] Based on these assertions and the

---

[2] Sony exhausts the term "fishing expedition" in an attempt to adopt the Court's use of the term during the May 1 hearing to this Motion to Amend and 19's new claim. While 19 respectfully submits that the Court

detailed arguments laid out below, 19 respectfully requests that the Court grant its Motion to Amend the Complaint.

## ARGUMENT

### I. Sony Does Not Have Discretion under the Recording Agreements to Self-Deal in a Manner that is Commercially Unreasonable

Sony first claims that it has the right to structure its agreement with Spotify in any manner that "it sees fit" (Sony mem. at 10). The law simply does not permit this. If Sony were able to structure its Spotify agreements in any manner, it would not be a breach of Sony's duty of good faith and fair to 19 and its Artists for Sony to agree to forego all streaming royalties in favor of the right to generate revenue through the resale of advertising, or any other form of compensation that completely avoided Sony's obligation to make payments to 19 and its Artists. Sony asserts that New York law does not prohibit Sony from taking revenue that 19 rightfully expected to participate in, and divert that money as it "sees fit." Not only is this contrary to New York law, but it is also a position rejected by another federal court in a similar case in granting a motion to amend a Complaint to add a claim for breach of the duty of good faith and fair dealing. In that case, like here, the defendant record label made the outrageous claim that it could, if it so chose, structure a contractual arrangement to divert money to itself in a way that deprived artists of receiving any royalties, much less a fair percentage of the royalties expected under the recording agreement. As explained below, the court in that case unceremoniously rejected the defendant label's position, and this Court should, respectfully, reach the same result here.

---

erred in dismissing 19's original claim (which is the subject of a pending motion for reconsideration or, in the alternative, for interlocutory appeal), as highlighted herein, the facts underlying this claim are far different than the original claim. In that instance, the Court concluded that 19 gave Sony the unfettered discretion to call "the exploitation" in paragraph 7.16 of the Recording Agreement either a broadcast, transmission, sale, or distribution, so Sony could do that no matter how the stream is actually delivered to the end user. Here, 19 certainly never gave Sony the right to allow its recordings to be streamed by streaming services without paying any royalty at all, or a royalty well below industry standard, so that Sony could increase the value of its equity stake in Spotify, while recouping that money through revenue that it claims does not have to be shared with 19 and its artists. As explained more fully herein, it is these actions that constitute the bad faith, support the claim, and distinguish it from 19's first alternative claim for breach of the duty of good faith and fair dealing.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2002). The implied covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* The duty of good faith and fair dealing encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995); *see also Legend Autorama, Ltd. v. Audi of Am., Inc.*, 934 N.Y.S. 2d 34, 11-13 (N.Y. Sup. Ct. 2011). Parties to a contract may not exercise discretion in a way which would somehow prevent an opposing party from receiving the value it bargained for. *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank*, 680 F. Supp. 2d 625, 631-32 (S.D.N.Y. 2010); *see also AFBT-II, LLC v. Country Vill. on Mooney Pond, Inc.*, 759 N.Y.S.2d 149, 151 (N.Y. Sup. Ct. App. Div. 2003).

19 does not dispute that Sony need not share income that is rightfully and in good faith received on a "general or label basis" as set forth in paragraph 7.17 of the Recording Agreements. DE 20-2. Sony has the right to enter agreements which pay it on a general or label basis without having any additional royalty obligation to 19.[3] The Recording Agreements do not, however, give Sony discretion to enter agreements under which it specifically licenses the right to exploit the Masters to a third party and then artificially transfers the income attributable to those exploitations of specific Masters to some form of non-attributable revenue in order to enrich itself and deprive 19 of royalties.

New York law is clear, depriving a party "of what it ultimately sought from the parties' contractual arrangement" cannot be allowed. *Gray & Assoc., LLC v. Speltz & Weis LLC*, 22 Misc. 3d 1124(A) (N.Y. Sup. Ct. 2009). Thus, under New York law, even if a party is not in

---

[3] For instance, Sony might enter an agreement allowing a retailer to use Sony's trademarks to advertise if it sells or licenses Sony's entire catalog. Such an agreement would result in income that was not attributable to a master recording, but was instead received on a general or label basis.

5

breach of its express contractual obligations, it "may be in breach of the implied duty of good faith and fair dealing when it exercises a contractual right as part of a scheme . . . to deprive the other party of the fruit or benefit of its bargain." *Elmhurst Dairy v. Bartlett Dairy*, 2012 N.Y. App. Div. LEXIS 5659, at *7-8 (N.Y. Sup. Ct. App. Div. July 25, 2012) (quoting *Marion Scott Real Estate, Inc. v. Rochdale Vil., Inc.*, 23 Misc.3d 1129(A) (N.Y. Sup. Ct. 2009)). 19's allegations support a finding that Sony has done just that.

Indeed, as mentioned above, in a similar case, another federal court granted a motion to amend where a record label, Aftermath Records, a division of UMG Recordings, Inc., ("Aftermath"), made a similar argument to Sony's argument here. *See F.B.T. Prods. v. Aftermath Records,* Case No. Civ. 07-3313 PSG (MANx) (C.D. Cal. June 27, 2012) attached as Exhibit A. In that case, Aftermath asserted that its recording agreement with artist Eminem only required it to share licensing revenue specifically received by it, freeing Aftermath to allow its foreign affiliates, under its inter-company licensing agreement, to keep an unreasonably large percentage of foreign licensing money. *Id*. at 5. Like Sony here, Aftermath contended that it had the full and unfettered discretion to allow its foreign affiliates to keep all of the foreign licensing revenue as it saw fit. *Id*. at 7. The court rejected Aftermath's argument, and granted F.B.T.'s motion to amend its Complaint to add a claim that UMG's actions with its foreign affiliate supported a claim for a breach of the duty of good faith and fair dealing because it deprived F.B.T. of royalties it had the right to expect would be shared with it. *Id*. at 8. The same is true here, and 19 should be allowed to amend its First Amended Complaint.

## II. Sony Engaged In Self-Dealing

While self-dealing is not required to establish a breach of the duty of good faith and fair dealing, a "commonly recognized hallmark[] of bad faith . . . [is] self-dealing." *Mickle v. Christie's Inc.*, 207 F. Supp. 2d 237, 252 (S.D.N.Y. 2002). Here, Sony's conduct shows self-dealing in at least two ways: (1) its actions increase the value of Spotify and therefore its own value due to its ownership of Spotify; and (2) Sony purposefully diverted money that it is required to share with artists, producers, and others to a category of revenue that it claims it does

not have to share, thereby frustrating the purpose of the Recording Agreements while unfairly and in bad faith enriching itself. Sony's agreement with Spotify never would have been contemplated by parties acting at arm's length and therefore breaches the duty of good faith and fair dealing irrespective of self-dealing. *See Coco Investments, LLC v. Zamir Manager River Terrace, LLC*, 907 N.Y.S. 2d 99 (N.Y. Sup. Ct. 2010) (sale at below market value supports a claim for breach of the duty of good faith and fair dealing); *New York Cent. R. Co. v. New York, New Haven, & Hartford R. Co.*, 216 N.Y.S. 2d 928, 945-46 (N.Y. Sup. Ct. 1961).

Sony attempts to side step this issue by claiming that it has not engaged in self-dealing because it does not "control" Spotify. Sony cites to a number of cases in which courts held that minority stock holder did not "control" a corporation under the Securities Act. *See e.g. In re Alstom SA Sec. Lit.*, 406 F. Supp. 2d 433, 489 (S.D.N.Y. 2005). Of course, each of the cases cited by Sony details the proof required under the Securities Act and are inapplicable to the instant facts. Further, Sony's first citation shows that the standard under the Securities Act is broader than Sony alleges. Under the Securities Act, a person has "control" if they have "the power to direct or cause the direction of the management and policies of a person, **whether through the ownership of voting securities, by contract, or otherwise**." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (emphasis added). As that decision recognizes, control is not just affected through ownership, but can be demonstrated in other ways. There is no precedent supplied by Sony that supports Sony's allegation that a majority stake in a company is the only ground on which to prove self-dealing.

19 has alleged that Sony's ownership stake, in conjunction with the ownership stakes of the other two major record labels, gives Sony influence beyond that typically afforded a minority shareholder. See Proposed Amended Compl. at ¶ 44. Sony, along with its two competitors, all technically "minority" shareholders in Spotify, control almost one hundred percent of the intellectual property rights that Spotify needs to exist. In other words, Sony's significant control in the marketplace gives Sony far greater influence over Spotify's policies than its "minority" stake would otherwise suggest. This unique influence, coupled with the

partial ownership of Spotify, gives Sony and the other labels the ability to self-deal in a manner that is unlawful and in bad faith as Sony has done here.

**III.    19's Allegations are Supported by Specific Facts**

In latching onto a comment made by this Court in regard to a separate breach of the duty of good faith and fair dealing claim, Sony repeatedly asserts that 19 is on a "fishing expedition" and seeks to amend its Complaint to obtain discovery that this Court previously disallowed.  This is untrue.  As discussed fully herein, now that 19 has finally seen the Spotify and other streaming agreements – despite Sony's best attempts to avoid producing these documents – 19 has pleaded specific facts supporting its current claim for breach of the duty of good faith and fair dealing. Moreover, in further support of its claim, 19 submitted with its original motion the Declaration of an industry expert.  Sony cannot use the term "fishing expedition" to avoid liability for bad faith, corporate greed, and diversion of millions of dollars of income that Sony has wrongfully kept at the expense of the parties who created the content on which Sony's business is built.

## **Conclusion**

19's allegation that Sony deprived 19  "of what it ultimately sought from the parties' contractual arrangement" supports a claim for the breach of the duty of good faith and fair dealing, and 19 should be able to amend its Complaint to set forth that claim. *Gray & Assoc., LLC v. Speltz & Weiss LLC*, 22 Misc. 3d 1124 (N.Y. Sup. Ct. 2009).  As the United States Supreme Court has noted, a plaintiff should have a chance to test its claims on the merits. *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The facts alleged more than support a claim "which may be a proper subject of relief," and therefore 19 should be allowed to amend its First Amendment Complaint. *Middle Atl. Utilities Co. v. S.M.W. Dev. Corp.*, 392 F.2d 380, 384 (2d Cir. 1968).  19 respectfully requests that this Court allow 19 to amend its First Amended Complaint to assert the claim related to Sony's bad faith actions.

Dated: July 13, 2015                                               Respectfully submitted,

                                                                   By:     /s/ Richard S. Busch

Richard S. Busch (SB 5613)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone: (615) 259-3456
Facsimile: (615) 726-541

Kenneth E. Gordon (KG 5703)
GORDON, GORDON & SCHNAPP, P.C.
437 Madison Avenue, 39th Floor
New York, New York 10022
Telephone: (212) 355-3200
Facsimile: (212) 355-3292

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 13th day of July 2015, the preceding document was served via U.S. Mail and E-mail on:

Jonathan M. Sperling, Esq.
Christopher Yeung, Esq.
Douglas R. Curran, Esq.
COVINGTON & BURLING LLP
620 Eighth Avenue
The New York Times Building
New York, New York 10018


/s/Richard S. Busch