KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201

TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907

www.kingballow.com

Direct Dial: (615) 726-5422
Fax: (888) 688-0482
Email: rbusch@kingballow.com

October 28, 2015

**Via ECF**
Honorable Gabriel W. Gorenstein
United States Magistrate Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:   *19 Recordings Limited v. Sony Music Entertainment*
               Case No. 14 Civ. 1056

Dear Judge Gorenstein:

      We represent 19 Recordings Limited ("19"), plaintiff in this case. This letter is submitted in response to the letter motion of defendant Sony Music Entertainment ("SME") dated October 23, 2015, to compel production of documents and Your Honor's Order of October 23, 2015, setting the matter for hearing on October 29, 2015.

### SME's Motion to Compel Production

      SME raises five issues: (1) It believes 19's production is incomplete, as many of the types of documents 19 said it would produce were not included in 19's document production. (2) It objects to 19's production of documents in non-searchable PDF format rather than as TIFFs with associated metadata and searchable text. (3) It contends that 19's agreement to produce certain types of agreements between 19 and the artists whose recordings are at issue in this royalty dispute is insufficient. It also seeks documents concerning the negotiation and drafting of those agreements. (4) 19 objected to producing copies of SME's royalty statements on grounds that SME already had those documents. SME claims that is not a sufficient basis to

withhold production and presses its request. (5) SME contends it should be able to obtain documents "sufficient to show the direct or indirect interests of any person or entity in any revenues received by Plaintiff," RFP 41, a request to which 19 has maintained its objection.

### 19's Response

**(1) Completeness of the Production** – 19 made its initial document production of more than 5,000 pages in early July. SME did not express any concerns about the adequacy of the production until October 14, 2015, when it requested a conference with 19's counsel to discuss the issues now before the Court (as well as others that were resolved). As was made clear at the conference, 19 is aware of its ongoing discovery obligations and is taking steps to ensure that it complies with them.

SME complains that 19 appears to have produced only documents that were in the possession of its lawyers or auditors. At the meet-and-confer 19's counsel were uncertain as to whether the initial production included documents obtained from a search of the client's files but represented that they would be making an additional production, which would include such documents. 19's counsel were unable to give a firm date or format for the production because they were still gathering information, but they offered to provide more details within a week's time. Notably, the parties were in the middle of cross-motions for judgment on the pleadings and 19's Reply was submitted to the Court on Monday. SME's counsel found this offer insufficient.

While 19's search for responsive documents continues, SME's assumption that there must be documents responsive to each request merely because 19 undertook to provide all responsive documents "that have been located after reasonably diligent search" is incorrect. 19 did not represent that such documents existed, only that if found they would be produced.

In addition, the majority of the requests seek documents concerning allegations in the complaint and amended complaint, such as the request in RFP 23 for "[a]ll documents concerning 19's allegation in ¶ 70 of the Amended Complaint that SME has incorrectly 'calculate[d] royalties for the domestic "Now Series"' or the request in RFP 34 for "[a]ll documents concerning 19's allegation in ¶ 116 of the Amended Complaint that '[a]ll of the synchronization income was not reported by [SME] in its accountings to 19.'" The documents supporting these allegations are in most instances to be found not in 19's files but in the documents gathered and relied on by the auditors, on whose findings the allegations in the complaint are based. Therefore, what SME received in 19's initial production will in many instances be all that 19 has relating to those allegations.

This is not to say that 19's production is complete. It is not, and 19 is working to prepare a supplementary production. Unfortunately, because SME felt it necessary to file this motion and would not accommodate counsel's request for one additional week to provide more detail on the nature and scope of what remains to be done, we have no choice but to burden the Court with these details.

One of the problems 19 faces is that the potentially responsive documents go back as far as 14 years. In 2002, 19 and its related entities were based in the United Kingdom. Most of its personnel and records were maintained there. In addition, at that time, electronic storage of information was not as common as today. Subsequently, in 2010, 19 closed its offices and transitioned its administrative functions from the UK to the United States, and many company records were put in storage. 19 has identified more than 50 storage boxes that might contain responsive documents. We are still trying to determine if there is any way to narrow the focus to a smaller number of boxes and to determine the cost of retrieval, processing, and review of those documents.

There is also a substantial amount of electronic data to be identified and reviewed for responsiveness. In fact, since its initial July production, 19 has been working with its IT department to gain access to archived email boxes. The archived email boxes were on an old server that did not have a PST export capability. 19 needed to add new storage to a new server with export capability, then move mailboxes from one server to another, and then export the documents.

After initial culling, there are still approximately 550 GB of data, which equates to roughly 2 million items to be reviewed. 19 is continuing to work on determining the accessibility of additional electronic files. Processing of these files and documents is complicated by the fact that many of the people involved in the transactions at issue are attorneys, so limiting a privilege review to the documents on which the name of at least one attorney appears does little to reduce the burden. In an effort to speed up the process, 19 is willing to make a rolling production rather than await completion of the entire document review. We expect that the first installment can be ready in two weeks.

**(2) Production Format** – SME specified that the documents should be produced in TIFF format with searchable text and metadata included. 19's initial document production was in the form of non-searchable PDFs. There are two issues here – availability and cost. Most of the documents that were produced in PDF format were maintained in that form. Those documents will not have associated metadata. Even for documents that were created in a different format, it would not be feasible to locate all of the original documents (assuming they still exist) and reproduce them in native format (such as Word or Excel), along with the original metadata. Moreover, the PDFs, even if not searchable initially, can be processed for optical character recognition and made searchable relatively easily. This is something SME has undoubtedly already done for the initial production.

Metadata is rarely needed for the ordinary contract dispute, and if it does become relevant, it is likely to be limited to a small, readily identifiable subset of the documents. If SME can identify particular documents for which it needs metadata, and explain why the metadata relating to those documents contains information relevant to the issues in this case, 19 is willing to see if an earlier version of the document, containing metadata, exists and could be produced. But to go through that exercise for all of the previously produced documents would be wasteful and unnecessary.

Going forward, the issue is cost. Even a native-format PDF can be produced as a TIFF image (though it will have no associated metadata). SME presumably wants the documents in this format for convenience, because it is using document review software that either prefers or requires documents to be uploaded as TIFFs with associated load files. But it costs something on the order of four cents per page to do that conversion. So if all of the documents in the 550 GB of data mentioned earlier were being produced, the cost of producing them as TIFFs with load files would be $80,000 even if each of the items were only a single page. 19 is willing to do this on the understanding that this is a cost that should be borne by SME, as the conversion to TIFFs is solely for its convenience. In its response to the document requests, 19 did make a general objection to burdensomeness, which includes the costs associated with producing the documents in SME's preferred format.

**(3) Artist Agreements** – RFP 8 asked for documents "concerning the negotiation and drafting of any template that served as the basis of any agreement between 19 and any of the 'Artists,' . . . ." 19 objected to this request on several grounds but agreed to produce "all agreements actually executed between Artists and 19." SME finds this inadequate and claims it is entitled to documents relating to 19's negotiations with the individual Artists.

SME is not entitled to these documents. First, RFP 8 only asks for documents relating to the negotiation and drafting of a *template* that served as the basis for 19's agreements with the Artists, not for documents relating to the negotiation and drafting of the signed agreements *that resulted from* the use of any such template. The difference is subtle but important. SME is now asking for something that is not within the scope of its request. Moreover, this case is about how to construe and apply the agreement between 19 and SME and the extent to which SME has breached that agreement. Agreements between 19 and the artists whose recordings it licensed to SME are at one remove from the agreement at issue here and have no bearing on the scope of SME's obligations to 19; documents relating to the negotiation of those agreements have an even more attenuated relationship to the issues before the Court. They are simply not relevant.

In addition, the terms of 19's artist agreements are highly proprietary and would provide SME insight into 19's financial position. Accordingly, even for the artist agreements 19 has agreed to produce, because of the extremely sensitive nature of the information in those documents, 19 intends to redact the advances and royalty figures and designate them as Attorneys Eyes Only under the protective order.

**(4) Royalty Statements** – RFP 10 seeks the royalty statements SME sent to 19. 19 objected that SME already had these documents. SME does not deny this, but insists it is still entitled to have them produced so it can "see what [the parties to the contract] have done." Motion to Compel at 5 (quoting from *N.Y. Marine & Gen. Ins. Co. v. LaFarge N. Am., Inc.*, 599 F.3d 102, 119 (2d Cir. 2010)). It is hard to see how these documents fulfill that objective, as the only thing the royalty statements show is what SME has done; they are SME's unilateral product and reveal nothing about 19's response. More importantly, 19 accesses royalty statements on SME's web portal. When statements become available, SME notifies 19, and 19 is able to log onto the portal to review the statements. No one in 19's finance department has a practice of

printing out and maintaining complete sets of royalty statements in the ordinary course. Thus, 19 would not in any event have a complete set, and there is no evidentiary significance that 19 may have some statements but not others.

19 considered trying to download all of the royalty statements from SME's web portal so they could be produced back to SME for purposes of this case, but the information posted on SME's portal says that the royalty statements are no longer made available after three years. If SME has purged these documents and no longer retains copies (which would be surprising in light of SME's obligation not to purge documents relevant to an ongoing litigation), 19 is willing to produce as many of the missing royalty statements as can be located in its files.

**(5) True Parties in Interest** – RFP 41 sought documents sufficient to show "the direct or indirect interests of any person or entity in any revenues received by Plaintiff." It appears from SME's motion that it is looking for evidence that 19 has assigned its interest in the 19/Sony agreement or the lawsuit. Because that has not happened, there are no responsive documents. If SME seeks anything beyond this, 19 continues to object on the basis of relevance.

### Conclusion

SME's motion for an order requiring 19 to produce documents in seven days should be denied, and the parties should be directed to continue the normal course of discovery that was interrupted by this unnecessary motion. 19 should be required to produce documents going forward in SME's preferred format only if SME agrees to bear the costs. SME's request for additional relief relating to RFPs 8, 10, and 41 is not well taken and should be denied.

Respectfully submitted,

*/s/ Richard S. Busch*

Richard S. Busch

Cc: Jonathan Sperling, Esq.
Christopher Yeung, Esq.
Douglas Curran, Esq.