```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
19 RECORDINGS LIMITED,                      :
                                            :      OPINION AND ORDER
                Plaintiff,                  :      14 Civ. 1056 (RA) (GWG)
                                            :
        -v.-                                :
                                            :
SONY MUSIC ENTERTAINMENT,                   :
                                            :
                Defendant.                  :
---------------------------------------------------------------X
```

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

In this suit by 19 Recordings ("19") against Sony Music Entertainment ("Sony"), 19 moves to amend the existing complaint to include claims for breach of the implied covenant of good faith and fair dealing.[1] For the reasons stated below, the plaintiff's motion is denied.

## I. BACKGROUND

Because the resolution of the motion to amend turns on whether the proposed Second Amended Complaint states a claim for relief, we assume its allegations are true and draw all reasonable inferences in 19's favor. See, e.g., Steginsky v. Xcelera Inc., 741 F.3d 365, 368 (2d Cir. 2014) (citation omitted). As is true for motions to dismiss for failure to state a claim, we have also considered documents that are annexed to or incorporated by reference in the proposed

---

[1] See Plaintiff 19 Recordings Limited Motion to Amend, filed June 24, 2015 (Docket # 64); Memorandum of Law in Support of Plaintiff 19 Entertainment's Motion to Amend, filed June 24, 2015 (Docket # 65) ("P. Mem.") (unredacted version filed under seal as Docket # 148); Defendant Sony Music Entertainment's Opposition to Plaintiff's Motion for Leave to Amend, filed July 8, 2015 (Docket # 72) ("D. Opp."); Declaration of Douglas S. Curran, filed July 8, 2015 (Docket # 73); Reply in Support of Plaintiff 19 Recording's [sic] Motion to Amend, filed July 13, 2015 (Docket # 77) ("Reply"); Letter from Jonathan M. Sperling, dated Feb. 8, 2016 (Docket # 137) ("D. Ltr.") (unredacted version filed under seal as Docket # 145); Letter from Richard S. Busch, dated Feb. 18, 2016 (Docket # 138) (filed under seal as Docket # 146); Letter from Jonathan M. Sperling, dated Feb. 19, 2016 (Docket # 139).

complaint, as described further below. See, e.g., Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).[2] We focus on the allegations relating to the claim for relief that is the subject of the motion to amend.

The proposed amended complaint alleges that 19 entered into individual recording agreements with several singers who appeared on the American Idol television series. See [Proposed] Second Amended Complaint, appended as Exhibit A to P. Mem. ("SAC"), ¶¶ 6-15. These recording agreements "assigned to 19 the rights necessary for 19 to enter into" licensing agreements with third parties. Id. ¶ 15. Based on its control of individual artists' recordings, 19 entered into a series of licensing agreements with Sony, id., an example of which is contained in the record, see Licensing Agreement, appended as Exhibit B to Declaration of Christopher Y.L. Yeung, filed June 19, 2014 (Docket # 20) (the "Licensing Agreement" or "LA").[3] Under the Licensing Agreement, Sony paid 19 "pursuant to a highly complex royalty structure." 19 Recordings, Ltd. v. Sony Music Entm't, 97 F. Supp. 3d 433, 437 (S.D.N.Y. 2015). In pertinent part, the provisions on royalties direct Sony to make payments to 19 based on the exploitation of "albums" and "records." See, e.g., LA ¶ 7.1. The Licensing Agreement provides, however, that 19 "shall not be entitled to a share of income received by or credited to [Sony] on a general or label basis." LA ¶ 7.17. It also provides that Sony's right to license the songs subject to the agreement "may be exercised . . . in any . . . manner . . . as shall be determined . . . by [Sony] in its sole and absolute discretion." Id. ¶ 12.3.

---

[2] We thus have not considered materials supplied during the briefing on the motion to amend that are not referenced in the complaint. See, e.g., Declaration of Theodore Cohen, appended as Ex. B to P. Mem.; Contract, appended as Ex. 2 to D. Ltr..

[3] "The RCA Records Label, a Unit of BMG Music," was 19's original counterparty for the Licensing Agreement. LA at 2. Sony succeeded RCA's interest in the LA. See SAC ¶ 16.

Sony subsequently contracted with third party streaming providers, who made the artists' recordings available over the Internet. SAC ¶¶ 36, 39. One of these providers was Spotify. Id. ¶ 42; see January 18, 2011 Agreement between Sony Music Entertainment and Spotify USA Inc., appended as Exhibit C to P. Mem. ("Spotify Contract"). Spotify allows end users to access Sony's music catalog, including songs by artists associated with 19. SAC ¶ 45.

19 alleges that Sony "structured its agreement with the streaming service, Spotify, in a manner designed to rob 19, its artists, and other artists of royalties." Id. ¶ 42. The SAC relies heavily on the allegation that Sony "owns an equity interest in Spotify" that 19 alleges is "in excess of five percent," id. ¶ 44, and that Sony made an arrangement with Spotify in the Spotify Contract that could "only" be obtained by "self dealing," id. ¶ 48.

19 alleges that the royalty rate in the Spotify Contract is "substantially below industry standard." SAC ¶ 45. Sony's "per stream" rate with Spotify is alleged to be substantially below what is paid by Spotify's competitors. Id. ¶ 46.[4] This lower rate is alleged to "increase[] the value of Sony's ownership in Spotify at the expense of 19." P. Mem. at 4. The lower rate allegedly

> allows Sony to structure its agreement with Spotify to receive income which is purportedly unconnected to the exploitation of sound recordings so that Sony does not have to share that revenue with 19, the artists involved in this action, or other artists, and therefore further enriches Sony in the process.

SAC ¶ 47.

The complaint alleges that the agreement "moves consideration" from exploitation of 19's catalog to "other forms of income." Id. ¶ 48. The only example given in the complaint is

---

[4] The complaint offers two different percentages, id., both of which have been deemed confidential, and thus we do not state them here.

3

the allegation that the Spotify Contract gives advertising rights to Sony, which Sony can resell. Id. ¶ 49. The SAC alleges that payments to Sony that are unrelated to the exploitation of 19's catalog reflect "a scheme to enrich Sony while robbing 19 . . . of the fruits of [its] agreement[] with Sony." Id. ¶ 50. This portion of the complaint concludes with the allegation that Sony has "us[ed] its ability to self deal in a manner which rob[s]" 19 of the "benefit of [its] bargain[]." Id. ¶ 53.

## II. LAW GOVERNING MOTIONS TO AMEND

Fed. R. Civ. P. 15(a)(2) provides that leave to amend should be "freely give[n] . . . when justice so requires." While the decision to grant leave to amend a pleading is within the discretion of the Court, the Court must have "good reason" to deny leave to amend. See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 55 (2d Cir. 1995) (citing S.S. Silberblatt, Inc. v. East Harlem Pilot Block Bldg. 1 Hous. Dev. Fund Co., 608 F.2d 28, 42 (2d Cir. 1979)). Leave to amend may be denied where there has been "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citing Dougherty v. N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002)). Rule 12(b)(6) provides that a party may move to dismiss an opposing party's pleading that "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). As we have already noted, such a motion requires a court to accept as true all of the allegations contained in a complaint. However, that principle does not apply to legal conclusions. See

4

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citation, internal quotation marks, and brackets omitted). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678 (citation omitted), and thus a court's first task is to disregard any conclusory statements in a complaint, id. at 680.

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." Id. at 678 (citation and internal quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion."). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "'show[n] that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (internal punctuation omitted).

III. DISCUSSION

Sony argues, inter alia, that 19's new claim is futile. Accordingly, we turn to the question of whether it could survive a motion to dismiss.

5

A.  Law Governing the Implied Covenant of Good Faith and Fair Dealing

The parties' briefs cite nearly exclusively to New York case law and thus we apply the law of New York to plaintiff's claims.  See, e.g., Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law") (citation and internal punctuation omitted); see also Licensing Agreement ¶ 28.1 (choice-of-law clause selecting New York).  One case helpfully summarized New York law on the implied covenant of good faith and fair dealing as follows:

> Under New York law, "a covenant of good faith and fair dealing in the course of contract performance" is "[i]mplicit in all contracts." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (citing Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co., 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972)).  The implied covenant of good faith and fair dealing obligates a promisor to fulfill "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract.  Id. (quoting Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978)) (internal quotation marks omitted).  Specifically, implied in every contract is a promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Id. (quoting Kirke La Shelle Co. v. Armstrong Co., 263 N.Y. 79, 87, 188 N.E. 163 (1933)) (internal quotation marks omitted); see also LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc., 725 F.3d 184, 195 (2d Cir. 2013) ("The implied covenant of good faith and fair dealing bars a party from taking actions 'so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties.'" (quoting Bank of China v. Chan, 937 F.2d 780, 789 (2d Cir. 1991))).  That said, the implied covenant arises "only in connection with the rights or obligations set forth in the terms of the contract," Paul v. Bank of Am. Corp., No. 09–CV–1932 (ENV)(JMA), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011); see also Corazzini v. Litton Loan Servicing LLP, No. 1:09–CV–0199 (LEK/RFT), 2010 WL 1132683, at *7 (N.D.N.Y. Mar. 23, 2010) ("[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983))), and "cannot create duties that negate explicit rights under a contract," LJL 33rd St. Assocs., 725 F.3d at 195.

In re LIBOR-Based Fin. Instruments Antitrust Litig., 962 F. Supp. 2d 606, 631-32 (S.D.N.Y. 2013).

Additionally, "the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." M/A COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (citing Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co., 30 N.Y.2d 34, 46 (1972)) (internal quotation marks omitted); accord Ferguson v. Lion Holding, Inc., 478 F. Supp. 2d 455, 479, reconsideration denied, 2007 WL 2265579 (S.D.N.Y. 2007).  Nonetheless, "even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement." Richbell Info. Servs. v. Jupiter Partners, L.P., 309 A.D. 2d 288, 302 (1st Dep't 2003) (citation omitted).  Thus, while the doctrine may not be used to "create new duties that negate [a party's] explicit rights under a contract," it may be used to "seek imposition of an entirely proper duty to eschew . . . bad-faith targeted malevolence in the guise of business dealings." Id.; accord Serdarevic v. Centex Homes, LLC, 760 F. Supp. 2d 322, 333 (S.D.N.Y. 2010).

B. Prior Motions to Dismiss

Sony had previously moved to dismiss certain claims in the prior complaint alleging breach of the implied covenant of good faith and fair dealing.  Judge Abrams resolved these claims in a March 17, 2015, decision in this matter, see 19 Recordings, 97 F. Supp. 3d 433; in an oral decision on May 1, 2015, granting Sony's motion for reconsideration, see Transcript of May 1, 2015 proceeding, filed May 19, 2015 (Docket # 56) ("Tr."); and in a decision denying 19's motion for reconsideration, see Order, filed Sept. 4, 2015 (Docket # 85) ("Sept. 4 Order").  In these decisions, Judge Abrams dismissed two of 19's theories asserting a breach of the implied

covenant of good faith and fair dealing.

First, Judge Abrams dismissed 19's claim that Sony breached the implied duty of good faith and fair dealing by "improperly allowing [digital service providers] to sell disaggregated tracks to 19's pecuniary disadvantage." 97 F. Supp. 3d at 441. Judge Abrams noted that the Licensing Agreement does not "restrict or even address Sony's discretion to sell disaggregated tracks." Id. The court stated:

> [T]he Licensing Agreement expressly grants Sony the "unlimited right" to "manufacture Records ... by any method(s) now or hereafter known embodying any portion(s) or all of the Material recorded." (LA ¶ 12.3.).
>
> Because Sony is expressly granted such an "unlimited right" under the Licensing Agreement, finding in 19's favor [on whether it has stated a claim for breach of the implied covenant of good faith and fair dealing] would not merely impose reasonable limits on Sony's use of its discretion, but would abrogate an express contractual provision, impermissibly "create independent obligations beyond the contract," ARI & Co., 273 F. Supp. 2d at 523, and "undermine [Sony's] general right to act on its own interest," M/A–COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (quotation omitted).

Id. (first and third alterations in original).

Judge Abrams also dismissed a claim related to a portion of the Licensing Agreement that provided that if Sony's contract with a streaming provider categorized the exploitation of a recording as "transmissions" or "broadcasts," 19 would receive 50% of Sony's receipts under that contract as royalties. Id. (internal quotation marks omitted). The Licensing Agreement provides that if, however, the contract with the streaming provider categorized the exploitation as "distribution or sales," 19 received a much lower rate. Id. 19 claimed that Sony breached the implied covenant by purposefully "drafting or editing the third-party agreements to mischaracterize the nature of the relevant exploitation." Id. 19 alleged that Sony purposefully, in breach of its implied duty, used the lower-rate "distribution" language when the higher-rate

"broadcast" language should have applied.  Id. at 443.  While Judge Abrams initially denied Sony's motion addressed to this claim, id., she ultimately granted Sony's motion for reconsideration on this point, Tr. 4-5.  She concluded that the "Licensing Agreement allows [Sony] to enter into a variety of different types of agreements with streaming providers — and the royalty treatment these agreements receive, for better or worse, depends on how these agreements describe the exploitation."  Id. at 5.  She noted that Sony's "discretion is thus not limited by how the exploitation entailed in these agreements might fairly be described, but how it is actually described."  Sept. 4 Order at 3-4.  On the question of whether Sony's exercise of the discretion afforded to it violated the covenant of good faith and fair dealing, Judge Abrams ruled that 19's allegation that the categorizations arose because they were "purposefully drafted or edited by [Sony] in a manner which mischaracterizes the services' exploitations," was too conclusory to allow a finding of bad faith.  See id. at 4-5 (citation omitted) (brackets in original); accord Tr. 5, 7.

    C.  Analysis

The claim against Sony regarding the Spotify Contract is described in 14 paragraphs of the SAC.  SAC ¶¶ 42-54, 173.  As we have already described, 19 alleges that Sony breached its implied duty of good faith and fair dealing by using its position as partial owner of Spotify to harm 19 by agreeing to lower than market value royalty rates.  SAC ¶¶ 44, 48, 53.  This allegation, however, does little to show any breach of the implied covenant of good faith and fair dealing because it is not supported by facts in the complaint that show its plausibility.  The "self-dealing" argument rests on 19's allegation that Sony owned "in excess of five percent" of Spotify.  Id. ¶ 44.  The precise ownership stake is not alleged, but we will not assume it to be any more than six percent — a fact ultimately conceded in plaintiff's brief.  See P. Mem. at 4 n.3.

9

Such a low stake in Spotify does not allow a reasonable inference of "self-dealing" between Sony and Spotify. See generally In re China Valves Tech. Sec. Litig., 979 F. Supp. 2d 395, 414 (S.D.N.Y. 2013) (allegation of 34% ownership failed to state a claim of control); In re Global Crossing Sec. Litig., Ltd., 2005 WL 1907005, at *1, 13 (S.D.N.Y. Aug. 8, 2005) (same for alleged 15.8% ownership interest); In re Deutsche Telekom AG Sec. Litig., 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (same for alleged 22% ownership interest).[5]

More significantly, no self-dealing can be inferred regardless of Sony's position in Spotify because there is no allegation that the total compensation package Sony received from Spotify under the Spotify Contract is anything other than a fair market value. Thus, the fact that the royalty rate is below a market royalty rate does not demonstrate that the contract did not provide appropriate value in return for the rights Sony allowed to be exploited by Spotify.

The cases that 19 cites on the topic of self-dealing do not rescue their argument as they are completely unrelated to the allegations here. Instead they involved arbitrary schemes that were lacking in commercial reasonableness. For example, Gray & Assocs., LLC v. Speltz & Weis LLC, 22 Misc. 3d 1124(A), 2009 WL 416138 (Sup. Ct. 2009), involved, inter alia, allegations of unnecessary overbilling, secret conflicts of interest hidden from a client, and repeated misrepresentations to a corporate board. Id. at *1-3.

The complaint also attacks — seemingly regardless of the existence of "self-dealing" — the compensation package Sony obtained from Spotify on the ground that the royalties portion is

---

[5] While 19 also argues that Sony "control[s]" Spotify through its ownership of the intellectual property Spotify needs to survive, id. at 7-8 (citing S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1473 (2d Cir. 1996)), 19 does not support this argument with allegations from the SAC. 19 cites SAC ¶ 44 for support, id. at 7, but this paragraph says nothing about intellectual property.

paid at a rate that is lower than would be achieved in a fair market. See SAC ¶¶ 46-47. The claim is that this lower rate "allows Sony to structure its agreement with Spotify to receive income which is purportedly unconnected to the exploitation of sound recordings." Id. ¶ 47. The complaint gives only one example of how the agreement is improperly structured: through the use of advertising credits. Id. ¶ 49. 19 says that Sony obtains substantial revenue from the Spotify Contract in the form of credits for advertising, which Sony is free to sell to others, "without having the cost of paying royalties." Id. ¶ 50. It alleges that such a structure is not a "legitimate business model." Id. ¶ 51. To permit Sony to exploit 19's recordings in this manner, 19 argues, would violate the implied covenant of good faith and fair dealing because accepting such low compensation for royalties deprives 19 "of what it ultimately sought from the contractual arrangement." P. Mem. at 9 (citing Gray & Assocs., 2009 WL 416138, at *10) (internal quotation marks omitted). In other words, 19 seeks to show that Sony acted to deprive 19 of the "fruit or benefit of its bargain." Id. (citing Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc., 97 A.D.3d 781, 784 (2d Dep't 2012) (citation and internal quotation marks omitted).

To determine whether 19 has plausibly alleged a breach of the implied covenant of good faith and fair dealing, we begin by examining the Licensing Agreement. The Licensing Agreement contains a number of royalty provisions that govern the sale of records, electronic sales of records, and distribution of recordings via the Internet, such as through streaming services. Licensing Agreement ¶¶ 7.1, 7.7, 7.16. The Licensing Agreement does not provide for specific royalty rates to be paid by Sony to 19 with respect to recordings of the 19 artists. Instead, the requirement to pay 19 royalties is based on a "Royalty Base Price," see Recording Agreement ¶¶ 1.33, 7.1, 7.7, 7.16 (incorporating in part ¶ 7.7), which is ultimately calculated based on the "actual price . . . charged" by Sony for the recordings, id. ¶¶ 1.13, 1.33.

The claim at issue does not allege that Sony has not transmitted to 19 the appropriate portion of the royalty Sony receives from Spotify.  Rather, 19 asserts that the Licensing Agreement implicitly limits Sony's ability to exploit 19's recordings in instances where the exploitation does not involve a royalty payment that would ultimately benefit 19.  19 does not specify the contours of its proposed limitation.  Essentially, the only non-conclusory fact pled with respect to Sony's bad faith is that the royalty portion is substantially below the market rate for such royalties.  SAC ¶¶ 46-47.  This allegation, however, is not sufficient to plausibly show that Sony acted in bad faith.

First, the Licensing Agreement itself speaks to Sony's power to act with respect to the exploitation of recordings.  It vests not merely wide discretion in Sony but "absolute" discretion.  See Licensing Agreement ¶ 12.3 (Sony's right to license the songs "may be exercised . . . in any . . . manner . . . as shall be determined . . . by [Sony] in its sole and absolute discretion.") (emphasis added).  Additionally, the Licensing Agreement not only does not prevent Sony from licensing the recordings to others in a manner that permits non-royalty payments, it also specifically contemplates that Sony could seek non-royalty-based payments arising from the exploitation of the recordings.  As noted, paragraph 7.17 provides that any royalty payments made under the Licensing Agreement represent the "full and final compensation" due to 19 and that 19 is not "entitled to a share of income received by or credited to [Sony] on a general or label basis."  It is uncontested that "general or label" provision refers to revenue that is "not tied to the sale of a particular sound recording."  D. Opp. at 4; see also Reply at 5.

Paragraph 7.17 makes clear that the "fruit or benefit" of the bargain obtained by 19 in the Licensing Agreement cannot be characterized as the payment of 100% of the full market value of the potential royalties that Sony could extract from a licensee.  To do so now would require

ignoring the language of the Licensing Agreement that permits exploitation on a "general or label" basis and instead creating a new right that is inconsistent with the existing rights under that agreement — a result not countenanced by the case law treating the implied covenant of good faith and fair dealing. See Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 335 (1987) (implied covenant will not impose an obligation "which would be inconsistent with other terms of the contractual relationship"); accord In re LIBOR-Based Fin. Instruments Antitrust Litig., 962 F. Supp. 2d at 632.

We also accept Sony's argument, see, e.g., D. Ltr. at 9-11, that the complaint as written does not allege any facts that plausibly show that the royalty rates for the specific usages identified in the Spotify Contract are significantly below the royalty rates for similar usages. The allegations on this point, SAC ¶ 46, are entirely lacking any detail that would allow for a comparison of the rates under the Spotify Contract and the rates in the market.

While, as plaintiffs note, a "sale at below market value" may be relevant to determining whether a party has breached a claim for breach of the duty of good faith and fair dealing," see P. Mem. at 10; Reply at 7 (citing, inter alia, Coco Invs., LLC v. Zamir Manager River Terrace, LLC, 26 Misc. 3d. 1231(A), 2010 WL 761237 (Sup. Ct. 2010); New York Cent. R. Co. v. New York, New Haven & Hartford R. Co., 13 A.D.2d 309, 329 (1st Dep't 1961)), there is no allegation that the total compensation received by Sony from the Spotify deal is below fair market value. And, as we have already noted, the allegation regarding the royalty rate by itself being below fair market value is lacking in detail that would allow a finding of bad faith.

The plaintiff's briefs, see P. Mem. at 8, Reply at 5, cite Legend Autorama, Ltd. v. Audi of Am., Inc., 32 Misc.3d 1216(A), 2011 WL 2811461 (Sup. Ct. 2011) ("Autorama I"), aff'd in part, rev'd in part, 100 A.D.3d 714 (2d Dep't 2012) ("Autorama II"), for the proposition that

"encompassed within the implied obligation of each promisor to exercise good faith are any promises that a reasonable person in the position of the promisee would be justified in understanding were included." Autorama I, 2011 WL 2811461, at *5. The underlying complaint in Autorama I, like the complaint in Gray & Assocs., contained detailed allegations describing a scheme without "any rational business justification . . . not supported by [defendant's] own market studies . . . opposed by [defendant] executives responsible for the [relevant] market," and "motivated by [defendant's] desire to force one of its existing dealers . . . out of business." Autorama I, 2011 WL 2811461, at *2. On appeal, the Appellate Division affirmed that, where a party has some discretion to exercise a right, they may not do so in bad faith. Autorama II, 100 A.D.3d at 716. As discussed above, such detailed allegations of bad faith do not exist here.[6]

In the end, because the allegations of the complaint show only that Sony was "acting in [its] own self-interest consistent with [its] rights under [the] contract," the complaint does not show a breach of the covenant of good faith and fair dealing. DeBlasio v. Merrill Lynch & Co., Inc., 2009 WL 2242605, at *38 (S.D.N.Y. July 27, 2009) (citation omitted); accord Ray Legal Consulting Grp. v. DiJoseph, 37 F. Supp. 3d 704, 726 (S.D.N.Y. 2014) (claim dismissed where there were no allegations that the defendant engaged either in "malevolent conduct []or a purposeful scheme designed to deprive" plaintiff of revenue). Arguably, 19 makes arguments that are consistent with Sony engaging in conduct that violates the implied covenant. But where a pleading alleges facts that are "merely consistent with the conclusion that the defendant

---

[6] Another case cited by 19, F.B.T. Prods., LLC v. Aftermath Records, Case No. Civ. 07-3313 PSG (MANx) (C.D. Cal. June 27, 2012), appended as Exhibit A to Reply, contains no substantive discussion whatsoever of New York law (or the law of any other state) regarding the implied covenant of good faith and self dealing.

violated the law," but does not "actively and plausibly suggest that conclusion," the complaint cannot survive a motion to dismiss. Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007).

Because the filing of the proposed complaint would be futile, the motion to amend is denied.[7]

IV. CONCLUSION

For the foregoing reasons, plaintiff's motion to amend (Docket # 64) is denied.

Dated: November 19, 2015
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[7] In light of this conclusion, it is not necessary to reach defendant's alternative argument that the motion reflects bad faith. See D. Opp at 16-17.

15