**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

19 RECORDINGS LIMITED,

                    Plaintiff,

    v.                                      14-CV-1056 (RA) (GWG)

SONY MUSIC ENTERTAINMENT,         ECF CASE

                    Defendant.

-----------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF SONY MUSIC ENTERTAINMENT'S**
**MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018

*Attorneys for Defendant*
*Sony Music Entertainment*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .............................................................................................................. 2

LEGAL STANDARD ....................................................................................................... 4

ARGUMENT ................................................................................................................. 6

I.      SME Is Entitled To Judgment With Respect to Revenue from Streaming
        Agreements With Spotify, AOL Music Now, Microsoft, Rhapsody, and Napster. ........... 6

        A.      The "Exploitation" Under ¶ 7.16 Is the Streaming Service. ................................ 6

        B.      SME's Agreements with Third-Party Streaming Providers Characterize
                the Provision of the Streaming Services as "Distributions" and "Sales." .............. 8

                1.      Spotify ............................................................................................ 8

                2.      AOL Music Now ............................................................................. 14

                3.      Microsoft ........................................................................................ 15

                4.      Napster ........................................................................................... 17

                5.      Rhapsody ........................................................................................ 18

CONCLUSION ............................................................................................................. 23

TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Am. Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994)................................................................................8

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)..............................................................................5

*Holloway v. King*,
   361 F. Supp. 2d 351 (S.D.N.Y. 2005)..............................................................5

*Int'l Audiotext Network v. Am. Tel. & Tel. Co.*,
   62 F.3d 69 (2d Cir. 1995) .................................................................................5

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
   886 F. Supp. 1120 (S.D.N.Y. 1995)..................................................................8

*Jewish People for the Betterment of Westhampton Beach v. Vill. of Westhampton Beach*, 778 F.3d 390 (2d Cir. 2015)......................................................................5

*Republic of Ecuador v. ChevronTexaco Corp.*,
   376 F. Supp. 2d 334 (S.D.N.Y. 2005)..............................................................5

*Storms v. United States*,
   2015 WL 1196592 (E.D.N.Y. March 16, 2015) ...............................................7

*Veterans in Positive Action, Inc. v. Dep't of Veterans Affairs*,
   2013 WL 5597186 (S.D.N.Y. Sept. 30, 2013)..................................................7

*Wright v. Monroe Cmty. Hosp.*,
   493 F. App'x 233 (2d Cir. 2012) ..................................................................4, 5

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)..........................................................................................4

Fed. R. Civ. P. 12(c) ...........................................................................................4, 5

## PRELIMINARY STATEMENT

Plaintiff 19 Recordings Limited ("19") claims that defendant Sony Music Entertainment ("SME"[1]) breached the parties' agreements by underpaying royalties in connection with the exploitation of sound recordings by third-party streaming providers.[2]  In its March 17, 2015 Opinion and Order, this Court ruled that the parties' agreements require SME to pay royalties at the rate claimed by 19 only when SME's contract with a given streaming provider characterizes the exploitation exclusively as a "broadcast" or "transmission," and not also as a "distribution" or "sale."[3]

Because resolution of 19's claim thus "depend[s] on how Sony's agreements with third-party streaming agreements characterize this exploitation, and not how it might fairly be described by 19,"[4] the Court and the parties resolved at the May 1, 2015 status conference that SME would produce those agreements and then move promptly for judgment on 19's breach-of-contract claim regarding streaming royalties.[5]  SME has since produced nearly 300 individual agreements and amendments with streaming providers, comprising over 6,300 pages.

SME now moves for judgment in its favor on 19's claim as applied to revenue from five key streaming providers that are responsible for a substantial majority of the streaming revenue at issue.  SME's agreements with each of these providers characterizes the provider's exploitation as a distribution or sale, and 19's claim as to royalties on revenue from these providers therefore fails.

---

[1]      As used herein, SME refers to Sony Music Entertainment and its affiliates and predecessors in interest.

[2]      Am. Compl., ¶¶ 32–41.

[3]      March 17, 2015 Opinion and Order ("Op."), Dkt. 32, at 10.

[4]      *Id.*

[5]      May 1, 2015 Hearing Tr. at 4:18–24, 42:24–44:8.

BACKGROUND

Paragraph 7.16 of the parties' agreement sets forth the royalty rates applicable to revenue SME receives from licensing to third parties the right to exploit sound recordings via streaming services.  It states:

> [I]n relation to [SME's] Receipts arising from the exploitation of Audio Material by means of an Internet Radio Service or any other kind of streaming service not specifically provided for above, in the event that the license or other agreement pursuant to which such moneys are received by Company describes or characterises the exploitation as "broadcast" or "transmission" Company shall . . . credit [19's] royalty balance hereunder with fifty per cent (50%) thereof, but where the licence or other agreement does not so describe the exploitation as indicated above or describes or characterises the exploitation as "distribution" or "sales" then such monies shall be treated in accordance with the [lower rate set forth in the] provisions of sub-clause 7.7 above.[6]

In plain English, ¶ 7.16 provides that 19 is entitled to a 50% royalty only if SME's agreement with the streaming provider characterizes the provider's "exploitation of Audio Material by means of . . . [a] streaming service" *solely* as a "broadcast" or "transmission."  If the agreement characterizes the exploitation as a "distribution" or "sale"—regardless of whether it also characterizes it as a "broadcast" or "transmission"—SME is obligated to pay the lower royalty rate set forth in ¶ 7.7.

The Amended Complaint alleged that SME had wrongly accounted to plaintiff for streaming royalties at the lower rate.[7]  19 did not contend that the streaming agreements at issue did not, in fact, describe the exploitation as a "distribution" or "sale."  Instead, despite the plain language of ¶ 7.16, 19 claimed that the parties intended that SME would pay the higher 50% royalty rate any time that "the exploitation between the DSP and the end user consisted of

---

[6]        19/SME Agmt., Dkt. 15-2, ¶ 7.16.

[7]        Am. Compl. ¶ 36.

'streaming services,'" because "[s]uch exploitation can only be fairly described as 'transmissions' or 'broadcasts.'"[8]  19 contended that the terms "distribution" and "sale" could only apply to permanent downloads, not streaming services.[9]

In its March 17 Opinion & Order, the Court rejected 19's position.[10]  The Court held that royalties under ¶ 7.16 "depend on how Sony's agreements with third-party streaming services characterize this exploitation, and not how it might fairly be described by 19."[11]  "Where the third-party agreements describe the exploitation exclusively as broadcasts or transmissions, 19 is to get 50% of Sony's receipts; where they do not, or where they describe the exploitation as distribution or sales, 19 is to get a far lower rate, set forth in paragraph 7.7."[12]  The Court clarified that "[t]he lower rate also applies where the third-party agreements characterize the exploitation as both a broadcast (or transmission) and as a distribution (or sale)."[13]  Thus, if these agreements "*do* characterize the exploitation as distribution or sales . . . then 19's claims must fail, as [the claims] are contrary to the plain meaning of paragraph 7.16."[14]

Based on this ruling, the Court stated that "19's claim of breach thus turns . . . on the language of Sony's agreements with third-party streaming services:   Do these agreements describe the exploitation solely as a broadcast or transmission, or do they also describe it as a download or sale?"[15]  The Court indicated that "[t]his is a narrow issue and one that should prove

---

[8]      *Id*. ¶ 35

[9]      *Id.* ¶ 35.

[10]     Op. at 10.

[11]     *Id.*

[12]     *Id.*

[13]     *Id.*

[14]     *Id.* at 11 (emphasis in original).

[15]     *Id.*

relatively easy to resolve."[16]   The Court therefore ordered 19 to indicate by letter whether, based on the redacted agreements between SME and streaming providers that 19 had received, its claim was foreclosed by the Court's interpretation of ¶ 7.16.

On March 31, 2015, 19 submitted a letter in which it asserted, *inter alia*, that it could not determine whether its claim was foreclosed based on the materials it had received.   Accordingly, at the May 1 Status Conference, the Court ordered SME to produce agreements with third-party streaming providers "in which the description of the exploitation is unredacted."[17]   The Court and the parties resolved that SME would produce those agreements within a few weeks, and then move for judgment on 19's claims.[18]

SME now moves for judgment in its favor on 19's streaming claim as applied to revenue from five streaming providers.   As set forth below, SME's agreements with each of these providers plainly describe the streaming service's exploitation of the sound recordings licensed from SME as a "distribution" or "sale."   SME therefore is entitled to judgment in its favor on 19's claim as to revenue from these providers.

### LEGAL STANDARD

SME moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).   "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."[19] A defendant is

---

[16]    *Id.*

[17]    May 1, 2015 Hearing Tr. at 4.

[18]    *Id.* 42–44.

[19]    *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 234 (2d Cir. 2012).

therefore entitled to judgment as a matter of law unless the complaint in question "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[20]

"On a motion to dismiss"—and thus on a Rule 12(c) motion—"'even where a document is not incorporated by reference' into the complaint, 'the court may nevertheless consider [the document] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint'."[21]   The Second Circuit has held that this is true even where the plaintiff alleges the content of the document only on information and belief.[22]

Here, 19's streaming claim is based entirely on allegations regarding the content of SME's agreements with streaming providers.  Specifically, it alleges that "Sony has entered into agreements with a variety of streaming services. . . . Such exploitation can only be fairly described as 'transmissions' or 'broadcasts,' and, upon information and belief, are so described in the licenses or other agreements between Sony and the streaming services."[23]   The Amended Complaint thus "relies heavily on the terms and effect" of the various streaming agreements,

---

[20]     *Id.* (quotations and citations omitted).

[21]     *Holloway v. King*, 361 F. Supp. 351, 353 n.5 (S.D.N.Y. 2005) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *aff'd* 161 F. App'x 122, 124 (2d Cir. 2005)).

[22]     *See Jewish People for the Betterment of Westhampton Beach v. Vill. of Westhampton Beach*, 778 F.3d 390, 393 n.1 (2d Cir. 2015) (finding that agreement was "integral" to the complaint and could therefore be considered on Rule 12(b)(6) motion, where complaint "referenced" the terms of the agreement only "[u]pon information and belief" (citing Compl. ¶ 42, Dkt. 1, 12-cv-3760 (E.D.N.Y. July 30, 2012), 2012 WL 3096755)); *see also Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("Although the amended complaint in this case does not incorporate the [agreement between defendant and a third party], it relies heavily upon its terms and effect; therefore, the Agreement is 'integral' to the complaint and we consider its terms . . . ."); *cf. Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 376 n.19 (S.D.N.Y. 2005) (considering agreement not incorporated by reference or relied on "to any significant degree" because both parties acknowledged its contents and to exclude "it from consideration [in deciding the 12(b)(6) motion]. . . would be a pointless exercise in formalism").

[23]     Am. Compl. ¶ 36.

such that they are integral to the complaint.  As a result, this Court can properly consider them under Rule 12(c).

**ARGUMENT**

**I.     SME Is Entitled To Judgment With Respect to Revenue from Streaming Agreements With Spotify, AOL Music Now, Microsoft, Rhapsody, and Napster.**

SME's agreements with each of these five key streaming providers characterizes the provider's exploitation as a "distribution" or "sale."  Under the Court's prior construction of the agreements between 19 and SME, SME therefore is entitled to judgment on 19's claim with respect to revenue from these providers.

**A.     The "Exploitation" Under ¶ 7.16 Is the Streaming Service.**

Pursuant to ¶ 7.16 as construed by this Court, SME's royalty obligation with respect to revenue "arising from the exploitation of Audio Material by means of . . . [a] streaming service"[24] depends on the characterization of that exploitation in SME's agreements with third-party streaming providers.

The Amended Complaint alleges that this "exploitation" consists of the "streaming service," as distinguished from sales of permanent downloads:

> [I]t was the specific intent of the parties that 19 and the Artists would receive [the higher royalty] *when the exploitation between the DSP and the end user consisted of "streaming services,"* which 19 and Sony understood were referred to in the DSP agreements as a "broadcast" or a "transmission" to an end user, but, on the other hand, would receive the lower [rate] when the exploitation between the DSP and ends users were "permanent downloads", which the parties understood were referred to in those agreements as a "distribution" or "sale."[25]

---

[24]     19/SME Agmt. ¶ 7.16

[25]     Am. Compl. ¶ 35 (emphasis added).

6

It further alleges that "the 'exploitation' referenced [in ¶ 7.16] is *the transaction between the streaming provider and the end user*," as distinguished from "the transaction between Sony and the streaming provider."[26]

In its March 31 letter to the Court, 19 sought to avoid the dispositive effect of the Court's March 17 Opinion and Order by seeking to constructively amend these allegations of its complaint. In that letter, 19 for the first time contended that (i) within the "transaction" between the streaming provider and the end user, the "subscription service" is distinct from the "actual stream itself," and that (ii) the "exploitation" referenced in ¶ 7.16 concerns only the latter.[27]

This is an entirely new theory that is not pled in, and is contrary to, the Amended Complaint. The Amended Complaint alleges that the relevant exploitation is the "streaming service"; 19 now contends that the relevant exploitation is *not* "the service," but is instead some arbitrarily limited component of the service.

19's claim, however, is defined by what it pled in its complaint, not what it writes in a letter.[28] And, in any event, 19's unpled new theory is at odds with the plain meaning of the words "exploitation . . . by means of . . . [a] streaming service."[29] A subscription-based streaming service, for example, makes money from its license to use SME's sound recordings by selling subscriptions that offer access to streams of those recordings. That commercial transaction, no less than the delivery of a particular stream, is clearly an "exploitation" by the

---

[26]     *Id.* ¶ 33 (emphasis added).

[27]     March 31, 2015 Ltr. at 2–3.

[28]     *Cf. Storms v. United States*, 2015 WL 1196592, at *17 (E.D.N.Y. March 16, 2015) ("Plaintiffs cannot amend their pleadings through their motion papers in an effort to circumvent dismissal"); *Veterans in Positive Action, Inc. v. Dep't of Veterans Affairs*, 2013 WL 5597186, at *2 (S.D.N.Y. Sept. 30, 2013) ("[P]laintiffs may not use an opposition brief to amend their complaint").

[29]     19/SME Agmt. ¶ 7.16.

streaming service of the rights granted by SME, as it generates revenue for the service, even if it does not generate revenue for SME.[30]

Thus, SME is entitled to judgment so long as its agreements with third-party providers characterize the "streaming service" as a distribution or sale.

### B.  SME's Agreements with Third-Party Streaming Providers Characterize the Provision of the Streaming Services as "Distributions" and "Sales."

SME moves for judgment with respect to 19's claims for streaming royalties relating to revenue attributable to the following providers: (1) Spotify, (2) AOL Music Now, (3) Microsoft, (4) Napster, and (5) Rhapsody.  Together, these providers account for a substantial majority of both domestic and foreign streaming revenue, and SME's agreements with each plainly characterize streaming as a distribution or sale.  19's claims with respect to these providers must be rejected.

### 1.  Spotify

SME's agreements with Spotify AB ("Spotify Global"), Spotify Limited ("Spotify International"), and Spotify USA Inc. ("Spotify USA") (collectively "Spotify") repeatedly and consistently characterize Spotify's exploitation of the SME sound recordings as a distribution. Thus, notwithstanding occasional references to transmissions, SME is entitled to judgment in its favor on 19's claims regarding these providers.

As an initial matter, SME's agreements with the Spotify entities are each titled either "Digital Audio <u>Distribution</u> Agreement" or "Digital Audio/Video <u>Distribution</u> Agreement." Thus, the agreements characterize their entire subject matter as "distribution."[31]

---

[30]    *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) (holding that a "commercial exploitation" of copyrighted material occurs when a party "directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material"); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 886 F. Supp. 1120, 1130 (S.D.N.Y. 1995) (same).

Pursuant to these contracts, SME grants Spotify the non-exclusive right to exploit SME sound recordings by making those recordings available to consumers through the Spotify service.[32]   In their opening paragraphs, the agreements describe the nature of that service as a "digital <u>distribution</u> service":

> This letter agreement . . . will constitute the entire agreement between [SME] and [Spotify] regarding, inter alia, the exploitation of audio recordings embodying the performances of various musical recording artists *via [Spotify's] online and mobile digital <u>distribution</u> service*, as owned, controlled and operated by [Spotify]."[33]

Each of the SME/Spotify agreements thus plainly characterizes Spotify's exploitation of the sound recordings controlled by SME as a "distribution", such that 19's claim as to revenue from Spotify fails.   While not necessary to resolution of the motion, each of the Spotify agreements is teeming with additional distribution  language, as set forth below.

### a)      Spotify Global

The Spotify Global agreement includes a series of interrelated definitions that describe the manner in which the streaming service will exploit the SME recordings.  The agreement first states that the "Approved <u>Distribution</u> Method" of the SME audio recordings is "the technical method by which Authorized Materials shall be accessible by End Users via Approved Interfaces via each of the Services," and expressly states that "Streams" are one such approved method of distribution.[34]  It then defines the "Subscription Service"—that is, the core of Spotify's revenue

---

[31]      *See* Exs. 1–4.   "Ex." refers to the exhibits attached to the Declaration of Stephanie Brooks, dated June 24, 2015.

[32]      Ex. 1 at Ex. A ¶ 7; Ex. 2 at Ex. A ¶ 7; Ex. 3 at Ex. A ¶ 7; Ex. 4 at Ex. A ¶ 7.

[33]      Ex. 1 at 1 (emphasis added); *see also* Ex. 2 at 1; Ex. 3 at 1; Ex. 4 at 1.  For convenience, each quoted reference to "sale" or "distribution" in this memorandum is underlined.  SME has supplied this emphasis in each such instance, unless otherwise indicated.

[34]      Ex. 1 at Ex. A ¶ 1.

generation—as a service that "offer[s] End Users within the Territory unlimited on-demand and pre-programmed advertising-free access to Authorized Audio Recordings in the relevant Approved Format via an Approved <u>Distribution</u> Method."[35]   Regarding the referenced "Authorized Audio Recordings," the agreement states that such recordings are "[a]udio tracks, as delivered by [SME] to [Spotify Global,] . . . which [SME] has rights for exploitation via the Approved <u>Distribution</u> Methods."[36]

Other provisions are to similar effect, as the agreement repeatedly refers to Spotify's exploitation of the SME recordings as "distributions."  For instance, with regard to new releases, the agreement requires that SME must provide Spotify Global "a general release date indicating the day upon which such item is authorized for <u>distribution</u> via the . . . Subscription Service."[37] The contract also requires Spotify Global to bear "[a]ll costs associated with hosting, streaming, billing, accounting and reporting in respect of <u>distribution</u> of the Authorized Materials," and to "be solely responsible for creating, maintaining and hosting, marketing and <u>distributing</u> the Services."[38]

Finally, the agreement contains an entire section titled "Authorized <u>Distribution</u>," which sets forth the terms of and limitations on Spotify Global's right to distribute SME-owned sound recordings by way of the Spotify streaming service.[39]  The use of the term "distribution" in the title of this primary section—like in the title of the agreement itself—characterizes the entire nature of the streaming service as a "distribution."  Core aspects of the operations of the Spotify

---

[35]      *Id.*

[36]      *Id.* ¶ 6(a).

[37]      *Id.* ¶ 7(f).

[38]      *Id.* ¶ 8(a)(2).

[39]      *Id.* ¶ 9.

service fall within the scope of these "Authorized <u>Distribution</u>" provisions, including, among others: (i) Spotify's right "to facilitate access to and use of the Services by End Users,"[40]; (ii) the manner in which Spotify is authorized to provide "Streams of Authorized Materials,"[41]; and (iii) authorization for Spotify to coordinate with third-party "Authorized <u>Distributors</u>" to disseminate SME content.[42]   By any measure, the SME/Spotify Global agreement characterizes and describes the streaming exploitation of the SME recordings as a distribution.

**b)**      **<u>Spotify International</u>**

SME's two agreements with Spotify International—executed in 2008 and 2010, respectively—are each titled "Digital Audio/Video <u>Distribution</u> Agreement" and similarly describe Spotify's exploitation as a method of "distribution."[43]   Among other provisions, the 2008 agreement likewise contains an "Authorized <u>Distribution</u>" section, which sets forth the terms of Spotify International's streaming rights.[44]   In this agreement, the "Authorized <u>Distribution</u>" section also contains a subsection titled "<u>Distribution</u> Method – Online Streaming Only," which states:

> [T]he Label Materials shall be made available to End Users via Authorised Applications solely as follows: (i) as "single-play", on-demand streamed performances, (ii) as part of a sequence of streamed performances forming part of "playlists" (including playlists comprising search results) permitting unlimited backwards and forwards skips, and/or (iii) as part of a sequence of streamed performances delivered as part of artist-related or

---

[40]      *Id.* ¶ 9(a)(1).

[41]      *Id.* ¶ 9(a)(3).

[42]      *Id.* ¶ 9(b).

[43]      Ex. 2 at 1; Ex. 3 at 1.

[44]      Ex. 2 at Ex. A ¶ 9(a)–(b).

11

thematic "radios" programmed by [Spotify] permitting unlimited backwards and forwards skips.[45]

By referring to "streamed performances" as the *exclusive* "[d]istribution [m]ethod" permitted under the agreement, the agreement expressly characterizes the delivery of a stream as a distribution.

Like the Spotify Global agreement, the 2008 Spotify International agreement also contains provisions regarding: (i) SME's obligation to provide a "Street Date" for each newly released recording, before which Spotify "shall not make the corresponding Stream . . . available for distribution,"[46] and (ii) Spotify International's obligation to bear all costs associated with the "distribution of the Label Materials" via the Spotify service,[47] among numerous other provisions characterizing streaming as a distribution.

SME and Spotify International negotiated a new "Digital Audio/Video Distribution Agreement" in 2011, which likewise expressly describes Spotify's exploitation of SME recordings as a "distribution service."[48]  This agreement contains many of the same provisions as the 2008 agreement, including (i) a statement in the opening paragraph that the agreement concerns "the exploitation of audio recordings . . . via [Spotify's] online and mobile digital distribution service,"[49]; (ii) a provision stating that the term "Distribution Method" refers to "the authorised method for distribution of Label Materials via each of the Services,"[50]; (iii) a provision regarding SME's obligation to provide Spotify with a "general release date indicating

---

[45]    *Id.* ¶ 9(c).

[46]    *Id.* at Ex. A ¶ 7(f).

[47]    *Id.* ¶ 8(a)(ii).

[48]    Ex. 3 at 1.

[49]    *Id.*

[50]    *Id.* at Ex. A ¶ 1.

the day upon which [a newly released SME recording] is authorized for <u>distribution</u> via the . . . Subscription Service,"[51]; (iv) a provision regarding Spotify International's obligation to bear all costs associated with the "<u>distribution</u> of the Label Materials" via the Spotify service[52]; and (v) a section setting forth the requirements for the "Authorized <u>Distribution</u>" of the streaming content, which states that, *inter alia*, the authorized "<u>Distribution</u> Method" consists exclusively of making recordings "available to End Users" as "streamed performances."[53]   This agreement therefore also plainly falls within the scope of the distribution and sales provision of ¶ 7.16.

### c)   <u>Spotify USA</u>

Finally, SME's agreement with Spotify USA likewise describes Spotify's permitted exploitation using the term "distribution" from the outset, as the agreement itself is titled "Digital Audio/Video <u>Distribution</u> Agreement."[54]   Like the other Spotify contracts, this agreement grants Spotify the right to exploit SME's sound recordings via the Spotify streaming service, which it describes as a "<u>distribution</u> service."[55]   Beyond the title itself, the SME/Spotify USA contract is brimming with additional characterizations of the streaming exploitation as a "distribution."

For instance, the agreement contains, (i) a statement in the opening paragraph that the agreement pertains to "the exploitation of audio recordings . . . via [Spotify's] online and mobile digital <u>distribution</u> service"[56]; (ii) a provision stating that the term "<u>Distribution</u> Method" refers to "the authorised method for <u>distribution</u> of Label Materials via each of the Services"—that is,

---

[51]     *Id.* at Ex. A ¶ 7(f).

[52]     *Id.* ¶ 8(a)(ii).

[53]     *Id.* ¶ 9(a)–(c).

[54]     Ex. 4 at 1.

[55]     *Id.*

[56]     *Id.*

via the streaming services[57]; (iii) a provision regarding SME's obligation to provide Spotify with a "general release date indicating the day upon which [a newly released SME recording] is authorized for <u>distribution</u> via the . . . Subscription Service"[58]; (iv) a provision regarding Spotify USA's obligation to bear all costs associated with the "<u>distribution</u> of the Label Materials" via the Spotify service[59]; and (v) a section setting forth the requirements for the "Authorized <u>Distribution</u>" of the streaming content, which states that, *inter alia*, the authorized "<u>Distribution</u> Method" consists exclusively of making recordings "available to End Users" as "streamed performances."[60]

*     *     *

SME's agreements with the Spotify entities repeatedly characterize Spotify's exploitation of SME's recordings as a "distribution."  SME therefore is entitled to judgment in its favor on 19's claim regarding this provider.

### 2.    *AOL Music Now*

Under SME's agreement with AOL Music Now LLC ("AOL"), AOL has the non-exclusive right to exploit SME sound recordings by allowing consumers to access those recordings through the AOL subscription service in exchange for a recurring fee.[61]   This agreement nowhere characterizes AOL's authorized streaming exploitation as either a "broadcast" or "transmission."[62]   This Court already has held that "[i]f the third-party licensing

---

[57]    *Id.* at Ex. A ¶ 1.

[58]    *Id.* at Ex. A ¶ 7(f).

[59]    *Id.* ¶ 8(a)(ii).

[60]    *Id.* ¶ 9(a)–(c).

[61]    Ex. 5 at Ex. A ¶ I(1).

[62]    *See* Ex. 5, ¶ I.  This agreement's terms (attached as Exhibit A to the Confidential Memorandum of Understanding) are divided into two main sections.  Paragraph I (pages 6–16) (continued…)

14

agreements do not characterize the exploitation as transmissions or broadcasts—regardless of how it could 'fairly' be described—this exploitation is subject to the lower rate."[63]  19's claim as to revenue from AOL Music Now therefore fails.

In addition, while not necessary to resolution of the motion, the SME/AOL agreement characterizes AOL's permitted exploitation of the recordings through its subscription service as a "distribution" or "sale."   Most significantly, the agreement defines AOL's "Subscription Service" as an "offering" through which AOL "makes [SME] sound recordings available for distribution . . . via the PC Web Platform in [the] form of . . . on-demand streams."[64]  The agreement thus expressly describes the delivery of streams to consumers as a "distribution."

The agreement also characterizes AOL's exploitation as a "sale."  For instance, in a later amendment, the parties describe the SME/AOL agreement as one for "the sale of permanent downloads, conditional downloads and on-demand streams."[65]

### 3.   Microsoft

SME and Microsoft Corporation ("Microsoft") entered into two agreements granting Microsoft the right to include SME recordings in its streaming service—one in 2007 and another in 2012.[66]  Although the 2012 contract defines the term "stream" as a "digital transmission,"[67]

---

concerns the Subscription Service Offering, which includes "on-demand streams."  *Id.* ¶ I(1)(a). Paragraph II (pages 16–21) addresses AOL's Permanent Download Service Offering.  Although the agreement refers to the "transmission" of streamed thirty-second promotional sound clips as part of AOL's Permanent Download Service, the portion of the agreement concerning the Subscription Service Offering—that is, the streaming service—contains no such language.  *Id.* ¶ II(1)(c); *see generally* Ex. 5, Ex. A.

[63]    Op. at 10.

[64]    Ex. 5 at Ex. A, ¶ I(1)(a).

[65]    Ex. 6 at 1.

[66]    *See* Ex. 7, ¶ 3.01(a); Ex. 10, ¶ 3.01(a).

[67]    Ex. 10, ¶ 1.01.

both the 2007 and 2012 agreements repeatedly characterize Microsoft's exploitation of the recordings through its streaming service as distributions and sales.

As an initial matter, the parties themselves describe the subject matter of the 2007 agreement—that is, the streaming service—in subsequent side letters and amendments as "<u>sales</u> of conditional downloads and on-demand streams embodying [SME] Materials via [Microsoft's] subscription music service."[68]   And the 2007 agreement itself states that Microsoft "shall unilaterally establish its own retail prices to End Users with respect to the <u>sale</u> of subscriptions to the Subscription Service."[69]   The agreement also defines "Subscription Service" to include "On Demand Streams," and provides that Microsoft is "solely responsible"  for "<u>distributing</u> the Subscription Service."[70]   Thus, the agreement characterizes Microsoft's exploitation of the sound recordings via the Service as both a sale and a distribution.

The 2012 agreement likewise characterizes the streaming service as a method of "distribution," as it similarly assigns to Microsoft the responsibility for "<u>distributing</u> the applicable offering of the Service" to end users.[71]   And under this agreement, SME grants Microsoft the "power and authority to . . . <u>distribute</u> and/or otherwise make available the SME Materials via each offering of the Service."[72]   In exchange for SME's grant of rights, Microsoft must, among other things, "maintain accurate and complete records and books of account solely

---

[68]      *E.g.*, Exs. 8 and 9.

[69]      Ex. 7, ¶ 1 (defining "Subscription Service" to include "On Demand Streams"); *id.*, ¶ 6.03D.

[70]      *Id.*, ¶ 4.01(a).

[71]      Ex. 10, ¶ 4.01(a).

[72]      *Id.*, ¶ 3.01(a)(4).

related to <u>sales and distributions</u> of On-Demand Streams . . . ."[73]  Thus, here too, even delivery of the streams themselves is characterized as a sale.

SME therefore is entitled to judgment in its favor on 19's claim as to revenue SME receives from Microsoft.

### 4.    *Napster*

SME's agreements with Napster, LLC and its predecessor companies (collectively, "Napster") permit Napster to "integrate" and "<u>distribute</u>" SME recordings via its subscription streaming service.[74]  Although the SME/Napster agreements, like the 2012 Microsoft agreement, include the word "transmission" in the definition of the term "Stream," the agreements also contain numerous references to the streaming exploitation as a sale and distribution.

For starters, the agreements themselves are titled "Content <u>Distribution</u> and Integration Agreement" and "Amended and Restated Content Integration and <u>Distribution</u> Agreement."[75]  The agreements thus characterize their entire subject matter as a "distribution."   The first paragraph then describes Napster as a company that "produces, markets, <u>distributes</u> and exploits recorded music."[76]

The agreements also grant Napster the right to exploit the recordings by designating third parties to "<u>distribute</u> the Service" on its behalf, which third parties are referred to as

---

[73]    *Id.*, ¶ 7.02.

[74]    Exs. 11 & 12.

[75]    Exs. 11 & 12.

[76]    Ex. 12 at 1; *see also* Ex. 11 at 1 ("Company and Company's Corporate Affiliates develop, produce, market, <u>distribute</u> and otherwise exploit recorded music . . . .").

"Distribution Agents."[77]   And the representations and warranties section states that "[Napster] will not directly or indirectly sell" content "[e]xcept for the sales of the Service to End Users."[78]

These prominent provisions, among others, plainly describe Napster's exploitation of SME recordings as a distribution and a sale.  19's claim should be dismissed.

### 5.   *Rhapsody*

SME's agreements with Rhapsody International, Inc. and its predecessor in interest RealNetworks, Inc. (collectively, "Rhapsody") grant Rhapsody the non-exclusive right to exploit SME sound recordings by making those recordings available to consumers through the Rhapsody streaming service.[79]   Like some of the other agreements, the SME/Rhapsody contracts include the word "transmission" in their definition of the term "Stream,"[80] but the agreements are also replete with characterizations of Rhapsody's permitted exploitation of the recordings as distributions and sales.   As a result, 19's breach-of-contract claim with respect to revenue generated pursuant to these agreements must be dismissed.

The plain language of the SME/Rhapsody agreements characterizes the Rhapsody streaming service as a method for the sale and distribution of sound recordings.  For instance, the 2005 agreement expressly states that its intended purpose is to enable Rhapsody to "sell Downloads and Streams of [SME] Authorized Recordings to consumers via the Service," and it therefore authorizes Rhapsody to serve as SME's "agent in connection with the sale of Downloads and Streams of [SME] Authorized Recordings to consumers via the Service."[81]   That

---

[77]     Ex. 11, ¶ 1.17.

[78]     *Id.*, ¶ 9(o).

[79]     Ex. 13, ¶ 3.01(a); Ex. 16, ¶ 3.01(a); Ex. 19, ¶ 3.01(a).

[80]     *E.g.*, Ex. 16 at ¶ 1.68.

[81]     Ex. 13 at 1.

agreement then uses distribution and sales language to describe the exploitation rights granted to Rhapsody, as the contract gives Rhapsody the "right to integrate the [SME] Materials into the Service and to <u>distribute</u> those [SME] Materials in accordance with the terms" of the agreement.[82]  It also permits Rhapsody to enter agreements with third-party agents that "facilitate the <u>sale</u> of subscriptions to End Users" of the streaming service.[83]

SME and Rhapsody also used sales language to address limitations on revenue generated by the exploitation of the SME recordings.  In particular, ¶ 16.12 states:

> [Rhapsody] recognizes that the *<u>sale</u> of subscriptions for access to on-demand Streams* of recorded music content, is speculative and that [SME] makes no warranties, representations or guarantees with respect to *the number of Streams, if any, which <u>will be sold</u>* hereunder or otherwise.[84]

This provision likewise plainly states that streams are "sold" through the Rhapsody service.

These descriptions of the streaming exploitation as a sale and distribution are confirmed in later amendments to the agreement.  For instance, a 2006 amendment describes the 2005 agreement as an "Agreement pursuant to which, among other things, [Rhapsody] <u>distributes</u> [SME] Authorized Recordings via the Service."[85]  And another 2006 amendment describes the 2005 agreement as an "Agreement pursuant to which, inter alia, [Rhapsody] is authorized to act as [SME's] agent in connection with the <u>sale</u> of Downloads and Streams of the [SME] Authorized Recordings to consumers via the Service."[86]   The 2005 agreement thus unquestionably falls within the distribution and sales provisions of ¶ 7.16.

---

[82]     *Id.* ¶ 3.01(a).

[83]     *Id.* ¶ 8.01.

[84]     *Id.* ¶ 16.12 (emphasis added).

[85]     Ex. 14 at 1.

[86]     Ex. 15 at 1.

The parties' 2010 agreement similarly characterizes Rhapsody's exploitation of the SME recordings as distributions and sales.  For instance, this agreement contains the same limiting language as the 2005 agreement, referring to the "<u>sale</u> of subscriptions for access to on-demand Streams" and "the number of Streams, if any, which will be <u>sold</u>" through the streaming service.[87]

The 2010 agreement also uses distribution and sales characterizations in connection with provisions governing revenue generated pursuant to the streaming service.  For instance, the contract defines "Subscription Fees" as "all monies payable . . . in consideration of access by End Users . . . to the Service."[88]  That definition then states that such Subscription Fees "shall not include" certain "retail mark-up[s]" on the "<u>sale</u> of access to the Service" by "Syndication Partners."[89]  A "Syndication Partner" is a third-party that Rhapsody "desires to permit to <u>distribute</u> the Service."[90]

The parties also included a provision addressing foreign revenue generated by the streaming service, which describes Rhapsody's exploitation as a "sale or distribution":

> [t]o the extent that any amounts payable hereunder are required to be converted from a currency other than United States Dollars to United States Dollars *in connection with a <u>sale</u> or <u>distribution</u> in any given calendar month*, then such conversion shall be made at the exchange rate for such other currency published in the Wall Street Journal on the last business day of such calendar month.[91]

This provision thus contemplates that any commercial benefit generated by the streaming exploitation is the result of a "sale" or "distribution" of the SME recordings.

---

[87]     Ex. 16, ¶ 16.12.

[88]     *Id.*, ¶ 6.04(b)(7).

[89]     *Id.*

[90]     *Id.*, ¶ 8.01(a).

[91]     Ex. 17, ¶ (I)(F)(x) (emphasis added).

The agreement also provides a description of streaming agreements generally, characterizing exploitations under all such agreements as methods of "distribution." Specifically, the term "Similar Service"—that is, all services that are of the same type as the Rhapsody service—are defined as "distribution" services:

> [A] music subscription service that (i) is accessible via the internet or the Wireless Medium to end user customers in the Territory, (ii) has a functionality, general scope of titles offered, and grant of rights substantially similar to that set forth in this Content Integration Agreement, (iii) charges the end user customer directly or indirectly a periodic recurring fee as a condition precedent to access thereto, and (iv) *offers the* __distribution__ *of On Demand Streams and Conditional Downloads authorized by SME on a similar business model to that hereunder.*[92]

Several additional provisions likewise include language describing Rhapsody's exploitation as a distribution. For instance, the agreement imposes certain security requirements on Rhapsody, in part requiring Rhapsody to "immediately notify SME" if it becomes aware of "a breach of security with respect to [Rhapsody] Servers or any other aspect of [Rhapsody's] server-side __distribution__ platform."[93]   The agreement likewise requires Rhapsody to notify SME of any change in taxes imposed in connection with Rhapsody's "__distribution__ of the SME Materials" via a mobile-phone offering known as the "Vivo Offering."  The agreement states:

> In the event the amount of mandatory taxes, levies, and/or charges owed to a Brazilian taxing authority *with respect to the* __distribution__ *of the SME Materials via the Vivo Offering* is reduced at any point during the Vivo Discount Term for any reason, including by reason of Vivo tax benefits/credit, then [Rhapsody] shall give SME written notice of the amount of the reduction within five (5) business days . . . .[94]

---

[92]    Ex. 16, ¶ 1.60 (emphasis added).

[93]    *Id.* ¶ 5.01(b).

[94]    Ex. 18, ¶ VII(A) (emphasis added).

The provision contains a similar notification requirement if the tax obligation in connection with "the <u>distribution</u> of the SME materials" increases.[95]  And, indeed, the parties twice refer to the SME/Rhapsody contract itself as a "Content <u>Distribution</u> Agreement."[96]

The parties then entered a subsequent agreement in 2014, which is largely similar to the 2010 agreement.[97]  The 2014 agreement contains the same references to distributions and sales in the following analogous provisions, among others: ¶ 1 (definition of "Similar Service" referring to "the <u>distribution</u> of On Demand Streams"); ¶ 13.12 (provision referring to the "<u>sale</u> of subscriptions for access to Streams" and to the "number of Streams . . . which will be <u>sold</u>"); ¶ 6.17(a) (provision referring to fees owed in connection with a "<u>sale</u> or <u>distribution</u>" through the streaming service); ¶ 5.01(b) (security requirements referring to Rhapsody's "<u>distribution</u> platform"); Exhibit H-1 ¶ (VI)(A) (tax-related provision concerning the "<u>distribution</u> of the SME Materials").  SME is therefore likewise entitled to judgment on 19's claim with respect to revenue generated pursuant to the 2014 SME/Rhapsody agreement.

These and other similar provisions demonstrate that although the SME/Rhapsody agreements do contain certain provisions containing the word transmission, they are also replete with characterizations of the streaming service as sales and distributions.  Under the Court's construction of ¶ 7.16, 19's claims must therefore be dismissed.

---

[95]     *Id.*

[96]     *Id.* ¶¶ 9.02(a) & 9.03).

[97]     Ex. 19.

## CONCLUSION

SME's agreements with each of the third-party providers identified above plainly and unequivocally characterize the streaming exploitation as a sale or distribution.  Thus, as this Court has already ruled, under ¶ 7.16 of 19's and SME's agreement, 19 is not entitled to a 50% royalty rate on streaming revenue generated by these providers.  SME therefore requests that this Court enter judgment in SME's favor on 19's breach-of-contract claim with respect to these providers.

Dated:  June 26, 2015

Respectfully submitted,

Jonathan M. Sperling
Douglas S. Curran
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
jsperling@cov.com
dcurran@cov.com

*Attorneys for Defendant*
*Sony Music Entertainment*