USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/28/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

19 RECORDINGS LIMITED,

                    Plaintiff,

        -v-

SONY MUSIC ENTERTAINMENT,

                    Defendant.

---

No. 14-CV-1056 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

In this action, Plaintiff 19 Recordings Limited, a record company which has entered into exclusive recording agreements with contestants on the popular television show *American Idol*, alleges that Defendant Sony Music Entertainment underpaid 19 royalties on recordings licensed to third-party streaming services in breach of various licensing agreements between the parties. In its March 17, 2015 Opinion and Order, this Court interpreted paragraph 7.16 of these licensing agreements to say that the royalty rates for the exploitation of those recordings were dependent on how Sony's agreements with the third-party streaming services described or characterized that exploitation—as a broadcast or transmission, distribution or sale, neither, or both. Believing this to be a narrow issue, the Court predicted—prematurely, as it turns out—that how these agreements in fact describe or characterize the exploitation would be relatively easy to resolve. That has proven not to be the case. Having now reviewed over forty of Sony's agreements with third-party streaming services that were not previously before the Court, it has become clear that paragraph 7.16 is ambiguous as applied to the majority of these contracts. With the few exceptions discussed below, the parties' motions for judgment on the pleadings on this breach of contract claim are therefore denied.

1

## BACKGROUND

### I.    Facts

The Court will recite the facts as relevant to these motions, but otherwise assumes

familiarity with the background facts as set forth in the Court's March 17, 2015 Opinion and Order.

19, a recording company that represents certain *American Idol* finalists and winners, entered into

a series of licensing agreements with Sony (collectively, the "Licensing Agreement" or "LA").[1]

The Licensing Agreement granted Sony the exclusive right to distribute and otherwise exploit

specified recordings, and in exchange, Sony agreed to pay 19 royalties. Am. Compl. ¶¶ 16–17;

*see also* LA Exs. B–I ¶ 12.1.1(a), ECF No. 15.[2] As relevant to the parties' claims, paragraph 7.16

of the Licensing Agreement addresses royalty payments arising from Sony's agreements with

third-party streaming services, and provides, in relevant part, as follows:

> For the avoidance of doubt, in relation to [Sony's] Receipts arising from the
> exploitation of Audio Material by means of an Internet Radio Service or any other
> kind of streaming service not specifically provided for above, in the event that the
> license or other agreement pursuant to which such moneys are received by [Sony]
> describes or characterises the exploitation as "broadcast" or "transmission" [Sony]
> shall (subject to the provisions of clause 7.17 below) credit [19's] royalty balance
> hereunder with fifty percent (50% thereof), but where the license or other agreement
> does not so describe the exploitation as indicated above or describes or characterises
> the exploitation as "distribution" or "sales" then such monies shall be treated in
> accordance with the provisions of sub-clause 7.7 above.

LA ¶ 7.16.

19 alleges that Sony breached paragraph 7.16 of the Licensing Agreement by failing to

account for and pay 19 required royalties for recordings licensed to these third-party streaming

---

[1] Any differences in the eight licensing agreements are irrelevant to the parties' cross-motions for judgment on the pleadings; therefore, the Court will collectively refer to them as the "Licensing Agreement."

[2] As 19's Amended Complaint "relies heavily on the terms and effects" of the Licensing Agreement, the Court considers it integral to the Amended Complaint and may properly consider it for the purposes of these motions. *See Daniels ex rel. v. Comm'r of Social Sec.*, 456 F. App'x 40, 41 (2d Cir. Jan. 19, 2012); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

services. *Id.* ¶ 32–36. Specifically, 19 asserts that Sony paid it royalties at the lower royalty rate provided for in sub-clause 7.7—which applies when Sony's agreements with streaming services describe or characterize "the exploitation" (i) as "distribution" or "sales," (ii) as both "distribution" (or "sales") and "transmission" (or "broadcast"), or (iii) as none of the above—when, in fact, Sony's agreements with the streaming services describe or characterize "the exploitation" as a "broadcast" or "transmission," entitling 19 to a higher royalty payment. *Id.* ¶ 36.

## II.   Procedural History

On April 25, 2014, Sony moved to dismiss 19's breach of contract claim, arguing that "[p]aragraph 7.16 unambiguously provides that royalties to 19 will be calculated pursuant to the ¶ 7.7 rate if the underlying license or agreement describes or characterizes the transaction between [Sony] and the streaming service provider as anything other than a 'broadcast' or 'transmission', or also describes it as a 'distribution' or 'sale' (*i.e.*, even if the agreement also characterizes it as a 'broadcast' or 'transmission.')." Def.'s Mem. Mot. Dismiss 16, ECF No. 24. Sony thus contended that 19's breach of contract claim should be dismissed "to the extent that the underlying agreement describes or characterizes the transaction as a 'distribution' or 'sale,' even if the agreement also characterizes it as a 'broadcast' or 'transmission.'" Def.'s Reply Mot. Dismiss 5 n.4 (internal citation omitted), ECF No. 30.

In its March 17 Opinion, the Court interpreted paragraph 7.16 to mean that, "[w]here the third-party agreements describe the exploitation exclusively as broadcasts or transmissions, 19 is to get 50% of Sony's receipts; where they do not, or where they describe the exploitation as distribution or sales, 19 is to get a far lower rate, as set forth in paragraph 7.7." March 17, 2015 Op. 10. The Court also held that "where the third-party agreements characterize the exploitation as *both* a broadcast (or transmission) *and* as a distribution (or sale)," the lower rate also applies.

3

*Id.* (first emphasis added). However, accepting as true 19's factual allegations that Sony's contracts with streaming services describe the relevant "exploitation" as transmissions or broadcasts, Am. Compl. ¶ 36, the Court did not dismiss the claim, but instead ordered 19 to advise it upon review of the relevant agreements whether its claim was foreclosed. *Id.* 11.

By March 31, 2015 letter, 19 indicated that it could not determine how exploitation was characterized in these agreements based on the redacted versions Sony had produced. Yeung Decl. Ex. 1, Pl.'s March 31, 2015 Letter (filed under seal). Specifically, 19 argued that Sony had cherry-picked portions of the agreements, which had references to distribution and sales, but the excerpts did not address "exploitation" as 19 interpreted it to mean in paragraph 7.16 of the Licensing Agreement. *Id.* During a May 1, 2015 conference, the Court held that 19's breach of contract claim could go forward based on 19's assertions that it could not make a determination based on the available portions of the agreement. May 1, 2015 Tr. 4, ECF No. 56. The Court also ordered Sony to produce the agreements in unredacted form, at least as to the provisions that addressed exploitation. *Id.*

Now before the Court are the parties' cross-motions for judgment on the pleadings on 19's claim that Sony mischaracterized how its agreements with streaming services describe "the exploitation of Audio Material," and, in doing so, underpaid 19.[3] On March 22, 2016, the Court held a conference in which it partially addressed the motion, holding that "the exploitation of Audio Material" as it is used in paragraph 7.16 of the Licensing Agreement, refers only to the delivery of Audio Material to the end user, e.g., the stream, and does not refer to the sale of the subscription services. March 22, 2016 Tr. 8, ECF No. 164.

---

[3] In the Licensing Agreement, "Audio Material" is defined as "any audio only Recording(s) of Artist's Performance(s) made pursuant to this Agreement." LA ¶ 1.4.

4

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)). "Thus, we will accept all factual allegations in the complaint as true and draw all reasonable inferences in [plaintiffs'] favor," *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (alteration in original), "unless contradicted by more specific allegations or documentary evidence," *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal citations omitted). "To survive a Rule 12(c) motion, [plaintiffs'] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hayden*, 594 F.3d at 160 (alteration in original).

"On a 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" *L-7 Designs, Inc*, 647 F.3d at 422 (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)). The Court may also consider documents that "are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). Here, 19's breach of contract claim turns on how "the exploitation" is "so described in the licenses or other agreements between Sony and streaming services," Am. Compl. ¶ 36; therefore, the streaming agreements the parties have attached to their respective motions are integral to the Amended Complaint and may be considered for the purposes of this motion. *See Chambers*, 282 F.3d at 153. Moreover, even though the Amended Complaint's allegations regarding these agreements are based "upon information and belief," Am. Com ¶ 36,

5

there is no danger that 19 lacks notice of the contents of these agreements, as Sony has since produced them to 19. Finally, neither party objects to the consideration of these documents—in fact, both parties advocate for their consideration—so there is no danger of prejudice. *See, e.g.*, *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 n.4 (2d Cir. 1998) ("[N]ot only is [plaintiff's] contract integral to her complaint and a document of which she has notice, but she has not objected to its inclusion in the record on appeal."); *McCormack v. IBM*, No. 14-CV-3242 (KMK), 2015 WL 6866300, at *8 (S.D.N.Y. Nov. 9, 2015).

## DISCUSSION

"Whether a contract is ambiguous . . . is a 'threshold question of law to be determined by the court.'" *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005)). "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (alteration in original) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)). "[A]mbiguity exists," on the other hand, "where the terms of a contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 173 (2d Cir. 2004) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters of Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)). "When interpreting a contract [under New York law], the 'intention of the parties should control, and the best evidence of intent is the contract itself.'"

6

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (alteration in original) (quoting *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010)).[4]  "Nonetheless 'where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered.'"  *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 56 (2d Cir. 2012) (quoting *JA Apparel*, 568 F.3d at 397).  In the context of a motion for judgment on the pleadings, "if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data" to grant the motion, *id.* (quoting *Eternity Glob. Master Fund*, 375 F.3d at 178).

Previously, this Court held that "the exploitation of Audio Material," as that phrase is used in paragraph 7.16 of the Licensing Agreement, does not include the sale of subscription services, but refers only to delivery of music to the end user.  Sony argues that, even under that definition of "exploitation," 19 is entitled only to the lower royalty rate because virtually all of Sony's agreements with streaming services characterize the delivery of the Audio Material as a "distribution" or "sales" (even where it is also characterized as a "transmission" or "broadcast").[5]  On this theory, Sony moves for judgment on 19's breach of contract claim as applied to its revenue from five streaming services: (1) Spotify, which includes Sony's agreements with Spotify AB ("Spotify Global"), Spotify Limited ("Spotify International"), and Spotify USA Inc. ("Spotify USA") (collectively "Spotify"); (2) AOL Music Now LLC ("AOL"); (3) Microsoft Corporation

---

[4] Federal courts exercising diversity jurisdiction apply state substantive law. *See In re Fosamax Prods. Liability Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013).  As New York law "recognize[s] the right of contracting parties to agree to choice of law," *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994), and as the Licensing Agreement provides that it shall be governed by New York law, LA ¶ 28, the Court will apply New York law.

[5] As discussed above, *see supra* pp. 3–4, the Court previously held that "[t]he lower rate also applies where third-party agreements characterize the exploitation as both a broadcast (or transmission) *and* a distribution (or sale)."  March 17, 2015 Op. 10.  This interpretation follows from the placement of the word "or" in paragraph 7.1. Specifically, paragraph 7.16 provides that the lower royalty rate applies where a third-party agreement "does not so describe the exploitation as ['broadcast' or 'transmission'] *or* describes . . . the exploitation as 'distribution' or 'sales.'"  *See id.* (quoting ¶ 7.16).

7

("Microsoft"); (4) Napster LLC and its predecessor companies (collectively "Napster"); and (5) Rhapsody International, Inc. and its predecessor in interest RealNetworks, Inc. (collectively "Rhapsody"). 19, in turn, contends that the agreements exclusively describe or characterize the delivery of Audio Material to the end user as a "broadcast" or "transmission," and that Sony's citation to "a handful of isolated and random uses of the words 'distribution' and 'sale'" does not amount to a description or characterization of "the exploitation." Pl.'s Reply 1. 19 accordingly moves for judgment on its breach of contract claim as applied to the five key streaming services, as well as Sony's agreements with twenty other streaming services. As paragraph 7.16 is amenable to more than one reasonable interpretation as applied to the majority of the streaming contracts at issue here, it is ambiguous as applied to those agreements. *See Eternity Global Master Fund Ltd.*, 375 F.3d at 178 ("[A] contract may be ambiguous when applied to one set of facts but not another." (alteration in original)) (quoting *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003)).

The ambiguity here lies primarily in what it means to "*describe or characterize* the exploitation of Audio Material" as a "broadcast," "transmission," "distribution," or "sales." LA ¶ 7.16 (emphasis added). Sony argues for an expansive interpretation of these terms, urging the Court to construe, for example, the labeling of an entire agreement as a "distribution agreement" as a characterization of the exploitation at issue in the agreement. Def.'s Mem. 8. 19, in turn, urges a narrower construction, arguing, in essence, that because "describe" and "characterize" are synonymous with define, the Court should find the exploitation to be described or characterized only when "the exploitation" is *defined* as a "transmission," "broadcast," "distribution," or "sales." Pl.'s Reply 3. Ultimately, because the meaning of the words "describe or characterize" is so

8

imprecise that it could plausibly embrace both interpretations, the Court concludes that paragraph 7.16 is ambiguous.

This ambiguity becomes apparent when one tries to apply paragraph 7.16 to Sony's agreements with the streaming services. Take, for example, Sony's July 1, 2013 Digital Audio Distribution Agreement with Spotify Global. Sony Ex. 1.[6]  19 argues that "the exploitation" is exclusively characterized as a transmission because "Stream" is explicitly defined as "each instance in which any portion of a recording is delivered by means of digital audio *transmission* which digital audio *transmission* is substantially contemporaneous with the performance of the recording embodied therein . . . ." *Id.* Ex. A § 1.  The Court agrees with 19 that, under this definition, "Stream" is unequivocally characterized as a "transmission."  But what complicates the analysis is the number of instances in which the word "distribution" also appears in the contract, which raises the question whether these too constitute descriptions or characterizations under paragraph 7.16.  Sony points out, for example, that the agreement is entitled a "Digital Audio Distribution Agreement," and argues that it thus "characterize[s] the entire subject matter as a 'distribution.'" Sony Mem. 8.[7]  It is not clear from paragraph 7.16, however, whether the use of one of the key words in the title of an agreement, in and of itself, amounts to a description or characterization of "the exploitation," i.e., the delivery of the music to the end user.

It is similarly unclear whether, when the word "distribution" appears in section headings, it amounts to a characterization or description when some, but not all, of the provisions of that section refer to "exploitation."  Sony, for example, points out that the Spotify Global agreement

---

[6] "Sony Ex." refers to the exhibits attached to the June 24, 2015 Declaration of Stephanie Brooks.

[7] *See also* Sony Ex. 2 ("Spotify: Digital Audio/Video Distribution Agreement"); Sony Ex. 3 ("Digital Audio/Video Distribution Agreement"); Sony Ex. 4 ("Digital Audio/Video Distribution Agreement"); Sony Ex. 11 ("Amended and Restated Content Integration and Distribution Agreement"); Sony Ex. 12 ("Content Distribution and Integration Agreement").

contains a section labeled "Authorized Distribution," Sony Ex. 1 Ex. A § 9, and argues that "[t]he use of the term 'distribution' in the title of this primary section . . . characterizes the entire nature of the streaming service as a 'distribution.'" Def.'s Mem. 10.[8]  As a preliminary matter, this heading may or may not refer to "the exploitation," as the Court has defined it.  The section does include a provision that explains how "Streams of Authorized Materials" may be transferred to the end user. *See* Sony Ex. 1 Ex. A § 9(a)(3) ("Streams of Authorized Materials . . . . using an Approved Interface may be initiated by End Users either (i) directly via such Approved Interface or (ii) indirectly via any Company-branded widget/frame . . . .).  But the "Authorized Distribution" section also includes provisions that do not refer to "the exploitation," including a provision setting forth parameters for Spotify Global's distribution of the Spotify subscription service. *See id*. Ex. A § 9(a)(1) ("Access to the Subscription Service may be (i) retailed to potential End Users by Company directly, or (ii) resold to potential End Users by third parties . . . .").  Moreover, the provision on "Streams of Authorized Materials" is under the subheading, "Authorized Platform," and as it would be difficult to credibly argue that the "Streams" are characterized as a platform, it calls into question whether the section heading necessarily "describes or characterizes" every provision in it.  Moreover, even assuming that "Authorized Distribution" does refer to the "Streams of Authorized Materials," it is again not clear whether this would amount to a description or characterization as those terms are used in paragraph 7.16.

The other instances of "distribution" or "sales" that Sony cites in these agreements raise similar questions.  Can a description/characterization take place in the prefatory, non-binding clauses of the contract?[9]  *See Structured Capital Sols., LLC v. Commerzbank AG*, --- F. Supp. 3d

---

[8] *See also* Sony Ex. 2 Ex. A § 9; Sony Ex. 3 Ex. A § 9; Sony Ex. 4 Ex. A § 9.

[9] *See, e.g.*, Sony Ex. 13 at 1 ("[Sony] would like to, *inter alia*, sell Downloads and Streams of [Sony] Authorized Recordings to consumer via the Service," and Rhapsody "desires to act as [Sony's] agent in connection with the sale of Downloads and Streams of the [Sony] Authorized Recordings to consumers via the service."); Sony

----, No. 15-CV-0905 (JSR), 2016 WL 1554679, at *6 (S.D.N.Y. Apr. 17, 2016) ("New York law holds that a 'whereas' clause . . . 'cannot be used to modify or create substantive rights not found in the contract's operative clauses.'") (quoting *RSL Commc'ns, PLC v. Bildirici*, 2010 WL 846551, at *4 (S.D.N.Y. Mar. 5, 2010)). Does the fact that Spotify is described as a "distribution service" amount to a characterization of "the exploitation"?[10]   Should one take into account where in the contract the purported description or characterization takes place? In other words, where the key words appear in provisions where one would not expect such a description/characterization—like provisions covering the date the streaming service is authorized to release music,[11] assumption of costs,[12] financial audits,[13] the conversion of foreign proceeds,[14] and the currency for payments of service fees in Brazil[15]—does the location bear on whether it amounts to a description or characterization of "the exploitation of Audio Material"? Paragraph 7.16 leaves these questions unanswered.

---

Ex. 14 at 1 ("Whereas, [Rhapsody] and [Sony] entered into the Agreement pursuant to which . . . [Rhapsody] distributes [Sony] Authorized Recordings via the Service."); Sony Ex. 15 at 1 ("Whereas [Rhapsody] and [Sony] are parties to the Agreement pursuant to which, *inter alia*, [Rhapsody] is authorized to act as [Sony's] agent in connection with the sale of Downloads and Streams of the [Sony] Authorized Recordings to consumers via the Service.").

[10] *See, e.g.*, Sony Ex. 1 at 1; Sony Ex. 2 at 1; Sony Ex. 3 at 1; Sony Ex. 4 at 1.

[11] *See, e.g.*, Sony Ex. 1 Ex. A § 7(f) (Sony and Spotify Global "shall provide . . . a general release date indicating the day upon which such item is authorized for distribution via the Ad Supported Service . . . . ); Sony Ex. 2 Ex. A § 7(f) ("[Spotify International] shall not make the corresponding Stream . . . hereunder available for distribution in the Territory earlier than such Street Date."); Sony Ex. 3 Ex. A § 7(f) ("[Sony] shall provide . . . a general release date indicating the day upon which such item is authorized for distribution via the Ad Supported Service . . . . ); Sony Ex. 4 Ex. A § 7(f) (same).

[12] *See, e.g.*, Sony Ex. 1 Ex A § 8(a)(ii) ("All costs associated with hosting, streaming, billing, accounting, and reporting in respect of distribution of the Authorized Materials . . . ."); Sony Ex. 2 Ex. A § 8(a)(ii); Sony Ex. 3 Ex. A § 8(a)(ii); Sony Ex. 4 Ex. A § 8(a)(ii).

[13] *See, e.g.*, Sony Ex. 10 § 7.02 ("[Microsoft] shall maintain accurate and complete records and books of account solely related to sales and distributions of On-Demand Streams, Conditional Downloads and Permanent Downloads embodying the [Sony] Authorized Recordings . . . .").

[14] *See, e.g.*, Sony Ex. 17 § (I)(F)(x)(a) ("To the extent that any amounts payable hereunder are required to be converted from a currency other than United States Dollars to United States Dollars in connection with a sale or distribution . . . .").

[15] *See, e.g.*, Sony Ex. 18 § VII(A) ("In the event the amount of mandatory taxes, levies, and/or changes owed to a Brazilian taxing authority with respect to the distribution of [Sony] Materials . . . .").

The ambiguity regarding what it means for an agreement to "characterize or describe" "the exploitation" is compounded by the fact that "distribution" is a more general term than "broadcast," "transmission," or "sales," in this context, such that the latter three terms could all be described as forms of distribution. One could thus plausibly argue that "distribution" should be construed, consistent with the canon of construction *noscitur a sociis*—which "dictates that words grouped in a list should be given related meaning," *Wojchowski v. Daines*, 498 F.3d 99, 108 n.8 (2d Cir. 2007) (internal citation omitted)—as having a specialized meaning more akin to "sales," and distinct from "transmission" and "broadcast." To interpret it otherwise, this argument goes, would collapse the distinction that paragraph 7.16 seems to draw. On the other hand, one could also plausibly argue that "transmission," "broadcast," "sales," and "distribution" are so-called magic words, such that when they appear in Sony's contracts with streaming services in conjunction with "the exploitation," they trigger the associated royalty rate. A proponent of this interpretation may argue that it does not matter that this understanding could collapse a distinction between "transmission"/"broadcast" and "distribution"/"sales," because paragraph 7.16 does not intend to create such a binary. Such an argument could also be supported by the fact that this paragraph accounts for occasions where an agreement characterizes "the exploitation" as both a "broadcast" (or "transmission") *and* "distribution" (or "sales"). Again, paragraph 7.16 provides no guidance as to which of these constructions is consistent with the drafters' intent. Accordingly, because the language of paragraph 7.16 is "capable of more than one meaning," *JA Apparel Corp*, 568 F.3d at 396, it is ambiguous as a matter of law.

The Court thus holds that paragraph 7.16, as applied to the following contracts is ambiguous:

- July 1, 2013 Digital Audio Distribution Agreement with Spotify Global (Sony Ex. 1)

- September 26, 2008 Digital Audio/Video Distribution Agreement with Spotify International (Sony Ex. 2)

- November 1, 2010 Digital Audio/Video Distribution Agreement with Spotify International (Sony Ex. 3)

- January 18, 2011 Digital Audio/Video Distribution Agreement with Spotify USA (Sony Ex. 4)

- September 1, 2012 Content Integration Agreement with Microsoft (Sony Ex. 10)

- December 21, 2000 Amended and Restated Content Integration and Distribution Agreement with Napster (Sony Ex. 11)

- October 1, 2002 Content and Integration Agreement with Napster (Sony Ex. 12)

- April 1, 2005 Content Integration Agreement with Rhapsody (Sony Ex. 13)

- April 1, 2010 Content Integration Agreement with Rhapsody (Sony Ex. 16)

- April 1, 2014 Content Integration Agreement with Rhapsody (Sony Ex. 19)

- November 11, 2013 Master Digital Distribution Agreement with Beats Music (19 Ex. 8)[16]

- May 1, 2013 Subscription Amendment to the November 15, 2011 Restated Short Form Agreement with Google (19 Ex. 12)

- May 25, 2007 Content Integration Agreement with Last.FM (19 Ex. 17)

- May 8, 2003 Webcasting Performance and Ephemeral License Agreement with MusicMatch (19 Ex. 20)

- May 28, 2010 Content Distribution Agreement with Rdio (19 Ex. 22)

There are a few agreements, however, for which paragraph 7.16 is not ambiguous as applied because they describe or characterize "the exploitation" in only one way. Sony's October 31, 2005 Memorandum of Understanding with AOL does not characterize the delivery of recordings via its subscription service as a "broadcast" or "transmission," a fact that 19 does not dispute. *See generally* Sony Ex. 5. Sony is therefore entitled to judgment in its favor on 19's claim as it applies to this agreement. 19, in turn, is entitled to judgment on its breach of contract

---

[16] "19 Ex." refer to the exhibits attached to the Declaration of Richard S. Busch.

claim as applied to Sony's agreements with 7 Digital Sarl, Apple Inc., and Dada Entertainment, 19 Ex. 3 Ex. A at 16; 19 Ex. 7 § 1(cc); 19 Ex. 9 at 14, a fact that Sony does not dispute.

### *Other Streaming Services*

19's motion for judgment on the pleadings with respect to those contracts attached to its motion as Exhibits 4–6, 10–11, 13–16, 18–19, 21, 23–41 is denied for a separate reason. 19 moves for judgment on these contracts in the footnotes of its motion, and generally asserts that these agreements all characterize the delivery of Audio Material as a transmission. 19 does not, however, point to any language or provision of these agreements that does so. *See* Pl.'s Mem. 12 n.17, 13 n.20, 13 n.21, 13 n.22, 14 n.23–25. "Under Rule 12(c), the movant bears the burden of establishing 'that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law.'" *Bernato v. Arthur J. Gallagher & Co.*, No. 15-CV-1544 (KBF), 2015 WL 4643165, at \*3 (S.D.N.Y. Aug. 5, 2015) (quoting *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir.1990)). 19 has not carried that burden with respect to these agreements.

14

## CONCLUSION

For the foregoing reasons, the parties' cross-motions for judgment on the pleadings are granted in part and denied in part.  For the reasons discussed at the March 22 conference, the Court reserves judgment on Sony's October 10, 2007 Content Integration Agreement with Microsoft (Sony. Ex. 7).   The Clerk of Court is respectfully directed to close the motions pending at Dkts. 66 and 88.

SO ORDERED.

Dated:    September 28, 2016
          New York, New York

_____
Ronnie Abrams
United States District Judge